UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN



*Main Office*

18050 Mack Ave.
Grosse Pointe, MI,
48236

(313) 458-8276
(313) 469-7085 (Fax)

*Village Office*

722 Notre Dame
Grosse Pointe, MI
48230

(313) 886-5769
(313) 886-5851 (Fax)

Dfwnlaw.com
_____

*Attorneys*

Nathan A. Dodson, Esq.
Aimee M. Fowler, Esq.
Daniel J. Williams, Esq.
Christopher J. Nesi, Esq.

CARLOS KIJUAN JENNINGS,

           Plaintiff,

vs.

CITY OF DETROIT, a municipal corporation,
DETROIT POLICE CHIEF TODD A. BETTISON,
in his official capacity,
LIEUTENANT PAUL BROWN, in his official
capacity, and
DETECTIVE JEFFREY COOPER, in his official
capacity.

           Defendants.
_____/

Case No. 26-cv-12295

Hon.

**COMPLAINT**

**JURY TRIAL DEMANDED**

DFWN, PLC
Daniel J. Williams, P72085
Aimee M. Fowler, P72736
Attorneys for Plaintiff
18050 Mack Ave.
Grosse Pointe, MI 48230
(313) 458-8276 / (313) 469-7085
danielnfw@gmail.com
aimeenfw@gmail.com
amanda@dfwnlaw.com (Legal Asst.)

_____/

## <u>COMPLAINT</u>

Now comes Plaintiff, CARLOS KIJUAN JENNINGS, by and through his attorneys,

DFWN, PLC, Daniel J. Williams, Esq. and Aimee M. Fowler, Esq., and for his Complaint

against the above listed Defendants, states as follows:



**JURISDICTION & VENUE**

1. Because this civil rights action arises under the United States Constitution, this Court has jurisdiction under Article III of the Constitution and under 28 U.S.C. §§1331 and 1343(3) and (4). The relief sought is authorized by the United States Constitution and by 42 U.S.C. §1983.

2. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. §1367.

3. Declaratory relief is authorized under 28 U.S.C. §§2201 and 2202.

4. Venue is proper in this Court according to 28 U.S.C. §1391(b) because most incidents, events, and occurrences giving rise to this action occurred in the Eastern District of Michigan and because all Parties are domiciled in the Eastern District of Michigan.

**PARTIES**

<u>Plaintiff</u>

5. Plaintiff Carlos Kijuan Jennings is a thirty-eight (38) year old father of two daughters, one son and husband of nine years who lives in Macomb County, Michigan.

<u>Defendants</u>

6. Defendant City of Detroit is a municipal corporation in the State of Michigan, County of Wayne, located in the Eastern District of Michigan.

7. Defendant Todd Bettison is the Police Chief of the City of Detroit. He is sued in his official capacity. Todd Bettison was the Police Chief of the City of Detroit at the time of the Detroit Police Department's investigation into the homicide of Steven Smith on October 26, 2025, and was also the Police Chief at the time of the Sentinel Event Review. James White was the Police Chief of the City of Detroit at the time the Settlement Agreement in *Williams v . City of Detroit, et al*, 2:21-cv-10827 (E.D. Mich) was entered into and at the time when



the current DPD Policy and Procedures regarding live lineups was implemented in accord with the aforementioned Settlement Agreement and Court Order[1].

8. At all relevant times to this Complaint, Defendant Paul Brown was employed as a Lieutenant with the Detroit Police Department. Defendant Paul Brown is sued in his official capacity.

9. At all relevant times to this Complaint, Defendant Jeffrey Cooper was employed as a Detective with the Detroit Police Department. Defendant Jeffrey Cooper is sued in his official capacity.

### INTRODUCTORY STATEMENT

10. This wrongful arrest and imprisonment case exemplifies the complete and total disregard the City of Detroit and its Police Department have for not only the rights of its citizens generally, and Mr. Jennings specifically, but the City of Detroit and its Police Department's utter disregard and dismissal of their own agreements and the validly entered orders of this Court, the adherence to which would have prevented Mr. Jenning's wrongful arrest and incarceration for 209 days.

11. Plaintiff Jennings was falsely arrested, detained and accused of homicide and other associated felony offenses because, as Detroit Police admitted under oath at a motion hearing in criminal case that followed, they knowingly failed to abide by the Detroit Police Department's policy and procedures for the conduction of a live eyewitness lineup, not just in one way, but in at least ten (10) different ways.

12. The two people primarily responsible for investigating the matter that gave rise to the false allegations against Mr. Jennings were Defendants Brown and Cooper, with Defendant

---

[1] Exhibit 1 – Order of Dismissal and Settlement Agreement w/ Attachments – *Williams v. City of Detroit, et al.* 2:21-cv-10827 (E.D. Mich.)



Cooper being the designated "officer-in-charge" and Defendant Brown being the supervisor and overseer of Defendant Cooper's activities and work.

13. Plaintiff Jennings, who had reported to Detroit Police Headquarters to turn himself in at the request of the Detroit Police Department on October 29, 2025, never imagined the events that followed.

### FACTUAL ALLEGATIONS

14. Plaintiff Jennings was arrested upon arrival at the Detroit Police Department on October 29, 2025, and was processed and transported to the Detroit Detention Center, where Mr. Jennings was told he would be housed unless and until further notice.

15. On October 29, 2025, Lieutenant Brown and Detective Cooper were notified that Mr. Jennings had retained counsel, had been provided the information for his attorney, and had been told to contact Mr. Jennings' attorney about anything that was going to happen with regard to the investigation. Notes regarding this can be found in the Recommendation for Warrant: Investigator's Report[2].

16. On October 30, 2025, Plaintiff Jennings was taken downstairs at the Detroit Detention Center and was placed in a room with other individuals as part of a live lineup, a procedure that is widely recognized as fraught with danger for an accused, and which the Supreme Court has recognized for over sixty years is the single greatest cause of wrongful convictions in the criminal justice system[3].

---

[2] Exhibit 3 – Recommendation for Warrant

[3] *United States v. Wade*, 388 U.S. 218, 228-229; 87 S.Ct. 1926; 18 L.Ed.2d 1149 (1967). "But the confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial. The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification. Mr. Justice Frankfurter once said: 'What is the worth of identification testimony even when uncontradicted? The identification of strangers I proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. These instances are recent-not due to the brutalities of ancient criminal procedure.' *The Case of Sacco and Vanzetti*, 30 (1927). A major



17. During the course of the investigation, Detective Cooper and other members of the Detroit Police Department had gathered descriptions of the alleged perpetrator of the homicide that was the center of the investigation. Though many of the witnesses could not provide much detail, some provided Detective Cooper with a fairly clear description. The perpetrator was described as a six foot one or six foot two, bald, dark-complected African-American male[4].

18. At the hearing on the motion to suppress the live lineup, Detective Cooper testified that he believed he had spoken on the telephone with Cedric Evans, one of the lineup witnesses, prior to the date and time of the lineup, and that the description Mr. Evans had provided to Detective Cooper was substantially similar to that provided by Ms. Griffin.[5].

19. Also of import, Det. Cooper indicated that his conversation with Mr. Evans, while not in any of the police reports, or his own investigator's reports, would likely have appeared in his case notes[6]. However, upon obtaining the case notes during the course of the motion hearing, Det. Cooper's case notes ***do not*** contain any reference to a telephonic conversation with Mr. Evans prior to the date of the Live Lineup on October 30, 2025, a fact which Plaintiff Jennings asserts was because Det. Cooper knew the description provided by Mr. Evans did not match Plaintiff Jennings, whom Det. Cooper had determined in his mind was the only viable suspect, and so he determined to leave reference to the conversation out of his case notes and the case file entirely, despite the fact that such information was clearly

---

factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the anner in which the prosecution presents the suspect to witnesses for pretrial identification. A commentator has observed that 'the influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor-perhaps it is responsible for more such errors than all other factors combined.' *Wall*, *Eye-Witness Identification in Criminal Cases, 26*. Suggestion can be created intentionally or unintentionally in many subtle ways. And the dangers for the suspect are particularly grave when the witness' opportunity for observation was insubstantial and thus his susceptibility to suggestion the greatest."

[4] Exhibit 4 – Police Report of Ofc. Saad w/ Interview of Witness Griffin
[5] Exhibit 11 – Transcript Testimony of Det. Jeffrey Cooper
[6] Exhibit 5 – Case Notes of Detective Jeffrey Cooper


DFWN PLC

exculpatory[7].

20. Plaintiff Jennings is a five foot six inch, medium complected African-American male with a full head of hair, which was also true on October 30, 2025, as evidenced by his booking photo at the Detroit Detention Center[8] and the testimony of both Lieutenant Brown and Detective Cooper at the motion hearing[9]. Clearly, the physical description of the perpetrator provided by at least two of the witnesses at the scene did not match Plaintiff Jennings, and yet, he was under arrest and in police custody for the alleged homicide.

21. The constitutional situation worsened when Plaintiff Jennings was brought down to participate in the live lineup. Unbeknownst to Plaintiff Jennings at the time, Detroit Police did not contact Plaintiff Jennings' retained attorney, and so the court-appointed lineup attorney who was not familiar at all with the facts of the case or the situation, was utilized. The officer-in-charge, Detective Cooper, was the administering officer, rather than the required double-blind administrator that was required not only by the Detroit Police Department's effective policy and procedures, but also widely accepted industry practice.

22. Two witnesses were called in for the live lineup one was Mr. Cedric Evans and the other was Mrs. Wanda Evans. Both witnesses were permitted in the witness room to observe the lineup participants at the same time, rather than having the lineup shown to the witnesses separately and individually[10].

23. There was no video recording inside the participant room of the live lineup. Detective Cooper brought a body camera into the witness room to record the events therein, but the

---

[7] Exhibit 5 Case Notes of Detective Jeffrey Cooper
[8] Exhibit 6 – Booking Photo -Carlos Jennings
[9] Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown; Exhibit 11 – Transcript Testimony of Detective Cooper
[10] Exhibit 7 – Lineup Identification Sheet – Cedric Evans and Exhibit 8 – Lineup Identification Sheet – Wanda Evans


DFWN PLC

body camera fails to capture all six of the lineup participants. Only four of the lineup participants are ever visible at one time, and despite the height difference between the alleged perpetrator and Plaintiff Jennings, none of the participants were standing up, instead all of the participants that are visible on the body cam are seated.

24. During the conduction of the lineup, both Mr. Evans and Mrs. Evans initially indicated that they did not see the perpetrator in the participant room, a fact that Detective Cooper agreed with during his testimony at the motion hearing[11].

25. Despite both of the witnesses stating clearly that it wasn't any of the persons in the lineup, Detective Cooper urged them to "take your time." The witnesses both continued to indicate that it was not any of the persons in the room. However, both Mr. Evans and Mrs. Evans stated that if they had to pick someone out of the lineup, they would each choose person number six. Mr. Jennings was not the participant in position number six.

26. Rather than stopping the live lineup at that time, after a non-identification and the identification of number six, an individual who was not Plaintiff Jennings, Detective Cooper did not stop the live lineup procedure at that time, and instead, instructed Mrs. Evans to leave the room and that he would allow Mr. Evans to continue viewing the lineup.

27. When Mrs. Evans left the room, Detective Cooper instructed Mr. Evans that "this is your selection, just take your time." Mr. Evans then, again, identified number six, which prompted yet another "take your time" from Detective Cooper.

28. Thereafter, once Mr. Evans had stated it was none of the individuals in the lineup, and selecting number six on two separate occasions, Mr. Evans then changed his mind a third time, and selected number four, which person was Plaintiff Jennings.

---

[11] Exhibit 11 - Transcript Testimony of Detective Cooper


DFWN PLC

29. Detective Cooper then immediately ceased the lineup procedure and had Mrs. Evans re-enter the witness room. Detective Cooper did not ask that the participants be rearranged, nor did he ask that any of the participants be changed before Mrs. Evans was permitted to review the lineup for a second time. Upon doing so, Mrs. Evans emphatically reiterated her selection of the person in position number six.

30. Detective Cooper then shuffled Mrs. Evans out of the witness room and the lineup was stopped. After the lineup procedure was complete, Detective Cooper began taking statements from Mr. Evans with regard to what he claimed to have witnessed of the incident that took place on October 26, 2025[12]. None of the police reports, nor Detective Cooper's case notes show that Detective Cooper ever took a prior formal statement from Mr. Evans about the events that occurred during the subject incident or formally setting out a description of the person that Mr. Evans may have seen on that date.[13]. The only formal, written statement was taken after the completion of the lineup procedure and written on the lineup identification sheet[14].

31. Mrs. Evans never identified the Defendant, and instead indicated that the perpetrator was either not any of the live lineup participants, or was the person in seat number six, which was not Plaintiff Jennings.[15]

32. No officer took a photograph of the lineup participants as they were shown during the lineup, and there is no video or photograph that depicted the entirety of the live lineup in the police file, despite the fact that DPD's policy and procedures required a photograph of

---

[12] Exhibit 7 – Lineup Identification Sheet – Cedric Evans
[13] Exhibit 5 – Case Notes of Jeffrey Cooper
[14] Exhibit 7 - Lineup Identification Sheet of Mr. Cedric Evans
[15] Exhibit 8 – Lineup Identification Sheet of Mrs. Wanda Evans


DFWN PLC

the lineup participants be taken and attached to the lineup identification sheet[16].

33. No other witness ever identified Plaintiff Jennings as the perpetrator of the alleged crimes that occurred on October 26, 2025[17].

34. There was no physical evidence tying Plaintiff Jennings to the crime[18].

35. There was no DNA evidence tying Plaintiff Jennings to the crime[19].

36. There was no evidence of motive regarding why Plaintiff Jennings might have committed such an offense against the victim[20].

37. At the time Plaintiff Jennings was arrested and charged with the alleged offenses, no person had provided the police with information pointing to Plaintiff Jennings as the perpetrator of the alleged homicide, other than the fact that he had ridden, as the passenger, in a vehicle that purportedly when to the location with the victim prior to the incident.

38. The identification of Plaintiff Jennings by Mr. Evans on October 30, 2025, in the eyewitness live lineup was the only evidence suggesting Plaintiff Jennings might be the perpetrator of the alleged offenses on October 26, 2025[21].

39. A pre-indictment or pre-information live lineup is required by the Fifth Amendment's Due Process Clause to be conducted in a manner that is not unduly suggestive and which does not steer a witness to choose one of the lineup participants over another. The reason for

---

[16] Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown; Exhibit 11 – Transcript Testimony of Detective Cooper
[17] Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown; Exhibit 11 – Transcript Testimony of Detective Cooper
[18] Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown; Exhibit 11 – Transcript Testimony of Detective Cooper
[19] Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown; Exhibit 11 – Transcript Testimony of Detective Cooper
[20] Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown; Exhibit 11 – Transcript Testimony of Detective Cooper
[21] Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown; Exhibit 11 – Transcript Testimony of Detective Cooper


DFWN PLC

this is because of the highly suggestive nature of the lineup procedure, and the highly susceptible nature of an eyewitness to cues, prompting, or unduly suggestive lineup participant features and characteristics[22].

40. Numerous articles, studies and other publications have recognized the dangers of eyewitness identifications, and the high frequency of misidentifications that occur as a result of live lineups involving eyewitnesses[23].

41. Specifically, in the City of Detroit and Wayne County Michigan, the wrongful conviction of an individual named Eric Anderson resulted in the University of Pennsylvania conducting a Sentinel Event Review, working with the Detroit Police Department, the Wayne County Prosecutor's Office and the Third Judicial Circuit Court[24].

42. In 2024, the City of Detroit entered into a binding settlement agreement with a Plaintiff named Robert Williams, in this Court, on Case No. 2:21-cv-10827-LJM-DRG, before the Honorable Laurie Michelson, to resolve a lawsuit involving the Detroit Police Department's wrongful arrest and incarceration of the Plaintiff in that matter[25].

43. The settlement agreement entered into by the City of Detroit required that the Detroit Police Department put into place new procedures regarding how Live Eyewitness Lineups were to be conducted during the course of an investigation and required that the agreed upon procedures could not be modified for at least four years from the date of implementation, which was May 30, 2024[26].

---

[22] *Wade, supra*.

[23] *C.f.* Wall, Patrick M., *Eye-Witness Identification in Criminal Cases*, Charles C. Thomas Publisher, 1965; Garrett, Brandon, L., *Convicting the Innocent: Where Criminal Prosecutions Go Wrong*, Harvard University Press, 2011; Gambell, Suzannah B, *The Need to Revisit the Neil v. Biggers Factors: Suppressing Unreliable Eyewitness Identification*, 6 Wyo L. Rev. 189 (2006).

[24] Exhibit 9 – Sentinel Event Review

[25] Exhibit 1 – Order of Dismissal and Settlement Agreement from *Williams v. City of Detroit, et al.*, Case No. 2:21-cv-10827 (E.D. Mich.)

[26] Exhibit 2 – May 30, 2024, DPD Live Lineup Procedures.



44. The Detroit Board of Police Commissioners approved the final version of the Live Lineup Procedures, which are currently in effect, and which were in effect on October 30, 2025, on May 30, 2024, and was attached as part of the final settlement agreement and order of dismissal in Case No. 2:21-cv-10827 (E.D. Mich.)[27], which agreement was entered into as a prospective agreement, to ensure that no other persons who were investigated or arrested for alleged criminal wrongdoing by the City of Detroit would ever again be subjected to unconstitutional practices as it regards live lineups[28].

45. The City of Detroit also agreed that all officers would receive mandatory training regarding the live lineup procedure and how to ensure its proper implementation as part of the settlement agreement in Case No. 2:21-cv-10827[29]; yet, the two primary investigators involved in Plaintiff Jennings' case both testified that they could not recall ever receiving such training specifically regarding conduction of live lineups or the implementation of the policy or procedures[30].

46. A motion to suppress the live line up was filed in the Circuit Court by Plaintiff Jenning's defense counsel, alleging that the lineup procedure conducted and used by Detective Cooper not only violated Plaintiff Jenning's Due Process rights, but that the case should also be dismissed on the grounds that Detective Cooper's actions were in violation of a Federal Court Order which required implementation of the May 30, 2024, Detroit Police Department Policy regarding conduction of Eyewitness Live Lineups[31].

---

[27] Exhibit 1 – Order of Dismissal and Settlement Agreement in *Williams v. City of Detroit et al*, Case No. 2:21-cv-10827 (E.D. Mich.).

[28] Exhibit 1 – Order of Dismissal and Settlement Agreement in *Williams v. City of Detroit et al*, Case No. 2:21-cv-10827 (E.D. Mich.)

[29] Exhibit 1 – Order of Dismissal and Settlement Agreement in *Williams v. City of Detroit et al*, Case No. 2:21-cv-10827 (E.D. Mich.)

[30] Exhibit 10 – Transcript Testimony of Lt. Paul Brown; Exhibit 11 – Transcript Testimony of Det. Jeffrey Cooper

[31] Exhibit 10 – Transcript Testimony of Lt. Paul Brown; Exhibit 11 – Transcript Testimony of Det. Jeffrey Cooper



DFWN PLC

47. The Circuit Court suppressed the lineup as violative of Plaintiff Jenning's Due Process Rights[32], and further ordered that the statements taken from Mr. Evans immediately subsequent to the unconstitutional lineup procedure, which were violative of the Detroit Police Department's Policy on Eyewitness Live Lineups[33] and a Federal Court Order and Settlement Agreement[34], were also suppressed and excluded and that the matter was being dismissed without prejudice[35].

48. The policy and procedure changes which were ordered into effect by *Williams v. City of Detroit, et al*, 2:21-cv-10827[36] were made effective by the Detroit Police Department's Board of Commissioners on May 30, 2024[37].

49. The settlement agreement entered into by the City of Detroit in *Williams et al. v. City of Detroit, et al.*, 2:21-cv-10827 required that said policy and procedure changes, once implemented, could not be changed or altered in any way for four (4) years[38].

50. In effectuating the constitutionally defective live lineup in this matter, Detective Cooper, his supervisors, and the Detroit Police Department, violated the following express provisions of the Court Ordered policy and procedures[39]:

    a. 203.11 – 4.2 (1) ***A live lineup or photo array MAY ONLY BE administered to a witness and or victim as defined in this policy***.

    b. 203.11 – 4.2 (2) ***Prior to conducting a live lineup*** or photo array, ***members SHALL***

---

[32] Exhibit 12 – Order Granting Defendant's Motion to Suppress
[33] Exhibit 2 – May 30, 2024, DPD Policy Regarding Eyewitness Live Lineups)
[34] Exhibit 1 – Order of Dismissal and Settlement Agreement in *Williams v. City of Detroit et al*, Case No. 2:21-cv-10827 (E.D. Mich.)
[35] Exhibit 13 – Order of Dismissal
[36] Exhibit 1 – Order of Dismissal and Settlement Agreement in *Williams v. City of Detroit et al*, Case No. 2:21-cv-10827 (E.D. Mich.)
[37] Exhibit 2 – May30, 2024 DPD Policy Regarding Eyewitness Live Lineups
[38] Exhibit 1 – Order of Dismissal and Settlement Agreement in *Williams v. City of Detroit et al*, Case No. 2:21-cv-10827 (E.D. Mich)
[39] Exhibit 2 – May 30, 2024 DPD Policy Regarding Eyewitness Live Lineups



*have the witness or victim provide a recap of the incident to provide clarity that the witness and or victim has actual recollection of the incident and the suspect*.

c.   203.11 – 4.2 (3) *Prior to conducting the photographic line-up, a supervisor shall ensure that there is an independent basis supported by reliable evidence that the suspect, who will be presented in the line-up, committed the crime*.

d.   203.11 – 4.2 (7) Fillers should be reasonably similar in age, height, weight, and general appearance and be of the same sex and race, *in accordance with the witness's and or victim's description of the offender*.

e.   203.11 4.2 (11) *During a double blind presentation*, *no one who is aware of the suspect's identity should be present during the administration of the photo array. However, during a live lineup, the witnessing attorney should be present*.

f.   203.11 – 4.2 (14)  *The live lineup or photo array should be shown to only one witness and or victim at a time*; in order to prevent participating witnesses and or victims from being aware of the responses of other witnesses and or victims, members should separate witnesses and or victims and warn them not to communicate with each other about the lineup or images involved in the lineup until all witnesses and or victims have completed the live lineup or photo array.

g.   203.11 – 4.2 (16) *Members SHALL NOT use statements, cues, casual comments, or provide unnecessary or irrelevant information that in any manner may influence the witnesses' and or victim's decision-making process or perception*. In investigations where facial recognition technology was used prior to the lineup, members shall not inform the witness or victim that facial recognition technology was used or that it generated information contributing to the inclusion of an



DFWN PLC

individual in the lineup.

h. 203.11 – 4.2 (17) The proceeding must be conducted in a fair manner, ***so an not to be unduly suggestive of the suspect.  This is important because any remarks could later be interpreted as an attempt to influence the identification***

i. 203.11 – 4.2 (18) The administrator shall ask the witness and or victim to complete and sign a live lineup or photo array form at the time of the lineup. ***As part of the form, the witness and or victim SHALL record their degree of confidence in their identification***.

j. 203.11 – 4.2 (19) ***Live lineup and photo array procedures shall be video and audio recorded, unless doing so is not possible***. If a procedure is not recorded, a written record shall be created and the reason for not recording shall be documented. ***In the case of live lineups that cannot be recorded, members SHALL take and preserve a still photograph of each individual in the lineup***.

k. 203.11 – 4.2 (20) The administrator shall document all parties present during the live lineup.

l. 203.11 – 4.4 (1) When conducting the live lineup, members shall follow the below guidelines: (a) ***The administrator of a live lineup MUST be a blind administrator who DOES NOT KNOW the identity of the suspect***; (b) ensure that all persons in the live lineup are numbered consecutively and are referred to only by number; and (c) ***document all parties present at the live lineup***.

m. 203.11 – 4.4 (2) The officer-in-charge of the case is responsible for the following: (a) scheduling the live lineup on a date and at a time that is convenient for all concerned parties, ***to include the witnessing attorney*** and any witnesses and or



victims … .

n. 203.11 – 4.4 (3) A written record, the Lineup and Photo Identification Record (DPD355), should include: (a) ***Names, age and addresses of all persons whose photographs are to be used in the live lineup or photo array***; (b) ***Physical description of all persons whose photographs are to be used in the live lineup or photo array***; (c) ***Names and addresses of all persons present at the live lineup or photo array***; (d) ***Statements of identifying witnesses and or victims while making the identification***; and (e) ***The witness's and or victim's degree of confidence in their identification, as specified above in 203.11 – 4.2(18)***.

o. 203.11 – 4.4 (5) ***ALL live lineups shall be photographed. (a) The name, rank, and assignment of the member taking the photograph SHALL be entered on the Lineup and Photo Identification Record (DPD355), in the box designated "OTHERS PRESENT." The photograph shall then be attached to the Lineup and Photo Identification Record and become a permanent part of the court file***.

51. Plaintiff Jennings' lineup procedure violated all of these provisions.

52. Defendant Cooper testified in a fashion that admitted all of these violations at the *Wade* hearing conducted on April 14, 2026[40].

53. Further, both Detective Cooper and Lieutenant Brown both testified that they could not recall that the Department had provided them any specific training with regard to the policy regarding eyewitness identification procedures, either at their yearly in-service training or as a separate training held by the Department[41].

---

[40] (Exhibit 10 – Transcript Testimony of Lieutenant Brown and Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper)

[41] (Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown and Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper)


DFWN PLC

54. Detective Cooper testified that outside of the identification of Mr. Evans, there was little to no other evidence that would have constituted probable cause to arrest Mr. Jennings.

55. There was no DNA evidence recovered[42].

56. There was no clothing that belonged to Mr. Jennings that was recovered from the scene or in the abandoned vehicle[43].

57. There was no weapon recovered[44].

58. There were no fingerprints that were recovered[45].

59. There were no witnesses that saw Mr. Jennings with a weapon on the date and time of the alleged incident[46].

60. The descriptions of the offender provided by Mr. Evans, as set out in Detective Cooper's *Wade* hearing testimony, and that provided by another witness, Ms. Griffin, as set out in the police report of Officer Saad on the scene and in Detective Cooper's testimony, gave descriptions of the perpetrator that varied greatly from those present in Mr. Jennings[47].

61. A NICS check revealed that Mr. Jennings had not purchased a firearm within the last five years prior to the incident, as explained by Detective Cooper in his *Wade* hearing testimony[48].

62. Detective Cooper indicated that there was some hearsay testimony from another witness

---

[42] (Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown and Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper)
[43] (Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown and Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper)
[44] (Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown and Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper)
[45] (Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown and Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper)
[46] (Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown and Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper)
[47] Exhibit 4 – Police Report – Officer Saad with Interview of Witness Griffin; Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper.
[48] Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper.


DFWN PLC

that Mr. Jennings may have "kept a rifle" in the garage of the location where the incident occurred, but the police found no evidence of a rifle having been kept in the garage, no weapon was ever recovered, and Detective Cooper testified that he conducted a NICS check which showed that Mr. Jennings had not purchased any firearm in the last five years, let alone a rifle of the type[49].

63. The evidence, excluding the eyewitness identification, did not constitute probable cause to arrest Mr. Jennings, let alone charge him with criminal offenses and hold him in custody for two-hundred and nine (209) days.

64. Despite having no evidence of guilt other than Mr. Evans' constitutionally defective and exceedingly suspect identification, which was obtained in violation of the Department's lineup procedures, Lieutenant Brown testified that he authorized the warrant for submission to the Prosecutor's office[50].

65. Lieutenant Brown also testified he did not review the body camera footage inside of the witness room at the live lineup, and that he was never made aware of the goings on, or that Mr. Evans' selection at the lineup was not definitive or clear[51].

66. Detective Cooper conveniently failed to make any notation about Mr. Evans' hesitancy in selecting Mr. Jennings in the Recommendation for Warrant[52].

67. Detective Cooper failed to note any of the witnesses' line-up hesitancy regarding Mr. Evans' selection of Mr. Jennings as the perpetrator to Lieutenant Brown or any of his other

---

[49] Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper.
[50] Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown.
[51] Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown.
[52] Exhibit 7 – Lineup Identification Sheet of Mr. Cedric Evans; Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper.



supervisors[53].

68. Detective Cooper continued to press for charges against Mr. Jennings, willfully, knowingly and intentionally despite knowing that the facts and circumstances as presented failed to establish probable cause.

69. Detective Cooper and the members of his team, including his supervisors, failed to act in accordance with the policy and procedures of the Detroit Police Department[54].

70. Detective Cooper and the members of his team, including his supervisors, held, charged, and caused to be detained, Plaintiff Jennings, for a period of time that totaled 209 days, solely on the basis of unconstitutionally obtained evidence, the procurement of which also violated a Federal Court Order and Settlement Agreement, which came about from materially similar conduct[55].

71. The lack of implementation, care, knowledge, or practice on the part of Detective Cooper, Lieutenant Brown, and the Detroit Police Department as a whole, of the policy and procedures regarding live lineups, especially when they were implemented by requirement of a Federal Court Order, which also required mandatory training to ensure proper implementation, resulting the unlawful arrest, detention, and confinement of Plaintiff Jennings for 209 days is legally, morally and ethically reprehensible.

72. Especially given the fact that not only the City of Detroit and the Detroit Police Department, but also the Wayne County Prosecutor's Office, Wayne County, the Wayne County Sheriff's Office and the Third Judicial Circuit Court of Michigan participated in a

---

[53] Exhibit 1 – Order of Dismissal and Settlement Agreement in *Williams v. City of Detroit et al*, 2:21-cv-10827 (E.D. Mich.); Exhibit 7 – Lineup Identification Sheet of Mr. Cedric Evans; Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown; Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper.

[54] Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown; Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper.

[55] Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown; Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper.


DFWN PLC

Sentinel Event Review[56], to study, understand, and, purportedly, to prevent and ensure that false identifications and bad lineup procedures, did not result in the unnecessary incarceration or confinement of any other members of the community.

73. Much publicity has been had by members of the Detroit Police Department, the City of Detroit, Wayne County, and the Wayne County Prosecutor's Office, about their seriousness in ensuring that no person is subjected to incarceration or confinement based upon bad eyewitness identifications and identification procedures again[57].

74. And yet, in the immediate aftermath of such statements, Plaintiff Jennings was subjected to the very treatment that DPD, Detroit, Wayne County and the WCPO had vowed to prevent and ensure would never happen again, demonstrating that despite the statements, promises, and even Court Orders, such promises continue to be lip service, and residents of the City of Detroit and Wayne County continue to be subjected to unlawful arrests, confinement and incarceration stemming from the same improper, unconstitutional police conduct.

75. As a result of his wrongful arrest, wrongful incarceration and malicious prosecution, at the hands of the Detroit Police Department, Plaintiff Jennings was deprived of his freedom for two-hundred and nine (209) days, while he was incarcerated at the Detroit Detention Center, and then subsequently, after charges were issued, at the Wayne Count Adult Detention Facility.

76. While in the facility, Mr. Jennings spent his days in a ten foot by twenty-foot cell with seven (7) other men, all of whom were charged with homicide.

77. Mr. Jennings was regularly subjected to threats of violence and was frequently in the cell

---

[56] Exhibit 9 – Sentinel Event Review
[57] Exhibit 9 – Sentinel Event Review



when other cell mates were engaged in physical altercations with one another.

78. Mr. Jennings was not provided with his blood pressure medications during his time at the WCADF, despite multiple requests for it to be provided.

79. Upon information and belief, Mr. Jennings used the KITE program to make requests for his blood pressure medications which were either denied or ignored by the facility.

80. The KITE program is an internal communication system that allows inmates at the WCADF to submit requests or complaints to administration regarding medical needs or incidents that occur with staff or others.

81. The environment in which Mr. Jennings was forced to live, due to the wrongful arrest and wrongful incarceration, created a highly stressful and fear-filled environment, where Mr. Jennings was constantly concerned about his physical and mental well-being.

82. Mr. Jennings now suffers from diagnosed post-traumatic stress disorder as a result of his wrongful arrest and wrongful detention, as determined by neuropsychological testing subsequent to his incarceration.

83. Mr. Jennings previously diagnosed anxiety disorder has been significantly exacerbated, as determined by neuropsychological testing subsequent to his incarceration.

84. Mr. Jenning suffered a massive myocardial infarction, a heart attack, less than two weeks after his release from incarceration.

85. Mr. Jennings was told by his doctors and medical staff that the heart attack's most likely medical cause was a combination of significant, long-term stress, coupled with his lack of being provided his blood pressure medications as prescribed by his doctors.

86. Upon information and belief, Mr. Jennings had to be resuscitated by emergency hospital staff on more than one occasion after his arrival at the hospital following his heart attack.



87. Mr. Jennings' heart attack was a direct and proximate result of his incarceration at the WCADF, which was the result of the constitutionally flawed investigation conducted by Detective Cooper and his supervisors, and their violations of this Court's judgments, orders and the Department's court-imposed guidelines[58].

DUTIES OWED

88. At all relevant times, Defendant Chief Bettison, Defendant Cooper and Defendant Brown were acting within the course and scope of their employment with the City of Detroit and/or Detroit Police Department, and were acting under color of law with authority granted to them as officers, detectives, sergeants, lieutenants or other title conferred by DPD.

89. Pursuant to 42 U.S.C. §1983, as well as the Fourth and Fourteenth Amendments to the United States Constitution, the individually named Defendants owed Mr. Jennings duties to act prudently and with reasonable care.

90. All Defendants owed duties to the residents of the City of Detroit, Wayne County and to Mr. Jennings in particular, to act prudently and with reasonable care in the implementation, supervision, compliance and enforcement of DPD's policies and procedures related to conduction of eyewitness live lineups, determination of probable cause, provision and discovery of any and all exculpatory evidence and proper documentation of same, as well as to train, test, evaluate, review and update its officers, detectives, sergeants, lieutenants and other supervisory staff and their ability to function in a reasonable manner and in conformance with the laws of the United States and the State of Michigan related to ensuring individuals are not subject to false and wrongful arrest and/or imprisonment.

---

[58] Exhibit 1 – Order of Dismissal and Settlement Agreement with Attachments in *Williams v. City of Detroit et al.*, Case No. 2:21-cv-10827 (E.D. Mich.); Exhibit 2 – May 30, 2024 DPD Policy Regarding Live Lineups.


DFWN PLC

91. The conduct of Defendants deprived Mr. Jennings of his clearly established rights, privileges and immunities in violation of the Fourth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. §1983 as well as the Constitution of the State of Michigan and laws of this State.

92. The City of Detroit, the Detroit Police Department, and the individual officers acted in complete and total disregard to Mr. Jennings' constitutional rights under the Fourth, Fifth, Eighth and Fourteenth Amendments.

93. The City of Detroit, the Detroit Police Department, and the individual officers acted in direct contradiction to the terms of the settlement agreement and orders of this Court when they wrongfully arrested, wrongfully incarcerated and maliciously prosecuted Mr. Jennings.

94. Chief of Police Todd Bettison has failed to ensure all officers and investigators were properly trained and supervised regarding implementation of the Detroit Police Department's approved policy regarding Eyewitness Live Lineups as required by the settlement agreement resolving *Robert Williams v. City of Detroit, et al*, case number 2:21-cv-10827[59].

95. The actions of Detective Cooper violated Mr. Jennings' constitutional rights under the United States Constitution and the Michigan Constitution, including his Fourth, Fifth, Eighth and Fourteenth Amendment rights.

96. The actions of Lieutenant Brown violated Mr. Jennings' constitutional rights under the United States Constitution and the Michigan Constitution, including his Fourth, Fifth, Eighth and Fourteenth Amendment rights.

---

[59] Exhibit 1 – Order of Dismissal and Settlement Agreement in *Williams v. City of Detroit et al*, 2:21-cv-10827 (E.D.Mich.)



97. The actions of Detective Cooper violated the policy and procedure of the Detroit Police Department relative to the conduction of eyewitness live lineups during the October 30, 2025, lineup procedure that resulted in the false identification of Mr. Jennings.

98. The actions of Lieutenant Brown violated the policy and procedure of the Detroit Police Department relative to the conduction of eyewitness live lineups during the October 30, 2025, lineup procedure that resulted in the false identification of Mr. Jennings.

99. The Detroit Police Department and Chief Todd Bettison violated the terms of the settlement agreement entered into resolving the *Robert Williams v. City of Detroit et al* case before this Court on case number 2:21-cv-10827[60].

100. The actions of Detective Cooper, Lieutenant Brown, Chief Todd Bettison and the City of Detroit violated the terms of the settlement agreement that the City of Detroit entered into resolving the *Robert Williams v. City of Detroit, et al.*, before this Court on case number 2:21-cv-10827[61].

101. The actions of Detective Cooper, Lieutenant Brown, and the City of Detroit violated the Court's order of dismissal adopting the settlement agreement in 2:21-cv-10827[62].

102. The actions of Detective Cooper, Lieutenant Brown and the City of Detroit willfully, knowingly or maliciously initiated a prosecution against Mr. Jennings without probable cause.

103. The actions of Detective Cooper, Lieutenant Brown, Chief of Police Todd Bettison and the City of Detroit, violated Mr. Jennings' civil rights under both the United States and the

---

[60] Exhibit 1 – Order of Dismissal and Settlement Agreement with Attachments in *Williams v. City of Detroit et al.*, Case No. 2:21-cv-10827 (E.D. Mich.); Exhibit 2 – May 30, 2024 DPD Policy Regarding Live Lineups
[61] Exhibit 1 – Order of Dismissal and Settlement Agreement in *Williams v. City of Detroit et al*, 2:21-cv-10827 (E.D.Mich.)
[62] Exhibit 2 – May 30, 2024, DPD Policy Regarding Eyewitness Live Lineups.


DFWN PLC

Michigan Constitutions.

104. Detective Cooper's actions and failures to comply with mandatory department policy constitute grossly negligent conduct regarding Mr. Jennings' constitutional and statutory rights.

105. Mr. Jennings' injuries and damages, physical, emotional and mental, are significant and continue to plague Mr. Jennings even now.

106. Mr. Jennings' injuries and damages, physical, emotional and mental, are the direct and proximate result of the actions and/or inactions of Detective Cooper, Lieutenant Brown, Chief Bettison and the City of Detroit.

## CAUSES OF ACTION

107. Plaintiff reincorporates the allegations made in paragraphs one (1) through one-hundred and six (106) as if fully set forth herein.

### COUNT 1 – FALSE ARREST AND IMPRISONMENT IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS AND 42 U.S.C. §1983 (DEFENDANT JEFFREY COOPER AND/OR DEFENDANT BROWN)

108. The Fourth Amendment to the United States Constitution guarantees the right of the People "to be secure in their persons … against unreasonable … seizures" and demands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."

109. In providing that warrants may issue only upon probable cause, the Fourth Amendment requires that the investigating officer will present their evidence in good faith.

110. Consequently, the law clearly recognizes that an officer who obtains a warrant under false pretenses violates the constitutional rights of the individual against whom that warrant issues.

111. Applying clearly established law, a reasonable officer in Defendant Cooper's position



would have known that they did not have probable cause to seek an arrest warrant for arrest Mr. Jennings.

112. Indeed, Defendant Cooper obtained an arrest warrant only because he knowingly or recklessly misrepresented the nature of Cedric Evans' identification of Mr. Jennings at the eyewitness live lineup, and the multiplicity of violations of the Detroit Police Department's policy and procedures relative to the conduction of a live corporeal lineup with an eyewitness.

113. Defendant Cooper also failed to document, as required by the Department's policy and procedures, the multiple non-identifications made by Cedric Evans prior to the eventual "identification" which evidence was exculpatory and relevant.

114. The Wayne County Circuit Court determined that Defendant Cooper's actions violated Mr. Jennings' constitutional rights and suppressed the live lineup in the criminal matter, prior to dismissing all charges against Mr. Jennings.

115. By failing to disclose obviously exculpatory information that was known to him at the time of the warrant request to procure an arrest warrant where no probable cause existed, Defendant Cooper invaded the liberty guaranteed to Mr. Jennings by the Fourth Amendment.

116. Defendant Brown furthered these violations by failing to provide review and supervision of the investigation, which he was required to do as the supervising officer.

117. Defendant Brown admitted during testimony at the *Wade* hearing that he failed to review the body camera footage of the eyewitness identification procedure.

118. Defendant Brown admitted during testimony at the *Wade* hearing that he failed to discuss the identification made by Cedric Evans of Mr. Jennings with Defendant Cooper.



119. Defendant Brown admitted during testimony at the *Wade* hearing that Defendant Cooper never told him about the multiple non-identifications of Cedric Evans prior to the "identification" of Mr. Jennings.

120. Defendant Brown admitted during testimony at the *Wade* hearing that despite not reviewing all of the referenced evidence, he signed his name to the warrant as the reviewing supervisor.

121. Defendant Brown's failure to review the warrant and the evidence that it purported to contain led to probable cause to charge Mr. Jennings with homicide, was a direct and proximate cause of Mr. Jennings wrongful arrest and wrongful incarceration for two-hundred and nine (209) days.

122. Defendant Brown testified at the *Wade* hearing that, had he reviewed the live lineup and saw it being conducted in the manner that Defendant Cooper had conducted it, he would have had serious questions about the lineup's veracity and the identification of Mr. Jennings.

123. Without the identification, no other evidence to supported the conclusion that Mr. Jennings was in any way involved in the alleged homicide for which he was ultimately wrongfully arrested and wrongfully incarcerated.

124. Probable cause did not exist at the time Mr. Jennings' had a warrant submitted against him and when the charges were issued.

**COUNT 2 – *MONELL* LIABILITY FOR FALSE ARREST AND IMPRISONMENT IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENT AND 42 U.S.C. §1983 (Defendants City of Detroit and Chief Bettison in His Official Capacity)**

125. Plaintiff incorporates all preceding averments contained in paragraphs one (1) through one-hundred twenty-four (124) as if fully set forth herein.



126. Under 42 U.S.C. §1983, municipal defendants are "persons" liable for their unconstitutional policies, customs and practices and/or failing to abide by and/or failing to supervise and/or failing to properly train on otherwise constitutional policies, customs and practices resulting in their unconstitutional application.

127. Mr. Jennings was injured and had his Fourth Amendment Right to be free of unreasonable seizures violated because the City of Detroit Police Department failed to follow and/or apply established policy and procedures regarding conduction of live eyewitness lineups, because the City of Detroit Police Department failed to abide by the terms of a settlement agreement entered into with this Court that was designed to prevent the injury and constitutional violations inflicted upon Mr. Jennings. Due to the failure of the City of Detroit Police Department to train and/or supervise officers, detectives and other supervisory command staff, and it's accepted custom of acquiescence regarding the deficient investigatory techniques of its detectives and other investigating officers, Chief Bettison consented to these failures and is liable for them in his official capacity.

128. Specifically, Defendant Cooper testified at the April 14, 2026, *Wade* hearing that he did not receive any training at Detective school (on any of the THREE occasions that he attended) regarding eyewitness live lineups[63].

129. Defendant Cooper also testified at the *Wade* hearing that he did not recall receiving any training or preparation while he was in Major Crimes regarding the conduction of live lineups[64].

130. Upon information and belief, Defendant Cooper was told by his supervisors and peers that most training and learning would happen on the job, primarily through conversations about

---

[63] Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper.
[64] Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper.



ongoing cases with fellow detectives. Yet, Defendant Cooper was thrown into his work with Homicide almost immediately upon becoming a detective and was given the file relevant to this matter within a year and a half of beginning to investigate homicide cases.

131. Defendant Cooper might have learned something from veteran detectives, but, upon information and belief, DPD still has an inextricably deep-rooted custom of letting the "officer-in-charge" handle every aspect of a case using their own preferred tactics and without significant or effectual guidance or input from more experienced detectives or supervisors unless specifically asked for.

132. Upon information and belief, the custom remains so deeply-rooted that officers and supervisors would not correct Defendant Cooper even when they saw him conduct an investigation in ways they thought and/or knew were not appropriate or which violated the policies and procedures of the Department, such as conducting a live line up with multiple witnesses in the room, without having the lineup properly video and photographically recorded, and where the witnesses are repeatedly spoken to in the witness room telling them to "take your time" after they have made repeated statements which identified persons other than the suspect.

133. Upon information and belief, DPD personnel are still not held accountable for failing to read the DPD policies and are not provided testing or review of policies after they are disseminated.

134. In the abstract, personnel are required to read new policies but need only check a box on their computer to confirm they have "read" a new policy. There were no systems or processes in place to ensure actual compliance when Mr. Jennings was wrongfully arrested and incarcerated.



### FAILURE TO TRAIN AND/OR SUPERVISE EYEWITNESS
### LIVE LINEUP PROCEDURES

135. A policy and procedures regarding conduction of live eyewitness lineups was in place when Detective Cooper subjected Mr. Jennings to the live corporeal lineup[65].

136. Despite agreeing to do so as part of the settlement agreement in *Williams v. City of Detroit*, 2:21-cv-10827, upon information and belief, DPD still has not instituted required training for detectives on how to conduct an eyewitness live lineup, on the reliability or unreliability of witnesses, on the definition of eyewitness, on racial bias in witness identifications, or on the importance of avoiding conditions that might, consciously or unconsciously lead a witness toward a specific suspect[66].

137. DPD had no way of ensuring that its detectives and officers read the May 30, 2024, policy on conducting eyewitness live lineups and the procedures associated with that policy, or remembered their limited police academy or DPAC training on lineups[67].

138. Because, in part, of the lack of training and lack of a system to ensure that detectives read policy directives, and because of the lack of supervision and training on those policies, detectives like Defendant Cooper were allowed to conduct eyewitness live lineups in improperly suggestive ways that violated procedure and protocol, that were more likely to produce false identifications[68].

139. Detective Cooper failed to comply with the policy that was set forth by violating at least ***eleven*** of the procedures for conducting a proper live corporeal lineup.

---

[65] Exhibit 2 – May 30, 2024, DPD Policy Regarding Eyewitness Live Lineups
[66] Exhibit 1 – Order of Dismissal and Settlement Agreement in *Williams v. City of Detroit et al*, 2:21-cv-10827 (E.D.Mich.); Exhibit 2 – May 30, 2024, DPD Policy Regarding Eyewitness Live Lineups
[67] Exhibit 2 – May 30, 2024, DPD Policy Regarding Eyewitness Live Lineups; Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown; Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper.
[68] Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown; Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper.


DFWN PLC

140. Detective Cooper and Lieutenant Brown testified at the *Wade* hearing conducted in the criminal case in Wayne County Circuit Court, that neither of them could recall specifically receiving training on the conduction of live corporeal eyewitness lineups, nor did they recall receiving any training on live corporeal eyewitness lineups at their yearly in-service training, as agreed upon in the settlement agreement in case number 2:21-cv-10827[69].

141. The City of Detroit and Chief Bettison failed in properly implementing, training and/or supervising their employees to ensure that the established guardrails for protecting the constitutional rights of individuals subjected to participation in a live corporeal eyewitness lineups are effective[70].

142. Given the long-standing and well-known problem of wrongful convictions based upon false eyewitness identifications in the criminal judicial system generally, but as specifically noted and documented in Wayne County, Michigan[71], enforcement of the policy and procedures in this regard, finally established on May 30, 2024, should have been a top priority of the City of Detroit.

143. While the policy and procedures were a significant improvement on paper, and satisfied the parties in the *Williams v. City of Detroit* matter, the failure of the City of Detroit and Chief Bettison to properly implement, train, and/or supervise the policy and procedures meant that those significant improvements were simply a paper tiger.

144. Further, DPD did not adequately train or supervise its personnel, including Defendant Cooper and Defendant Brown, in key investigatory skills, such as eyewitness

---

[69] Exhibit 1 – Order of Dismissal and Settlement Agreement in *Williams v. City of Detroit et al*, 2:21-cv-10827 (E.D.Mich.); Exhibit 2 – May 30, 2024, DPD Policy Regarding Eyewitness Live Lineups; Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown; Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper.
[70] Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown; Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper.
[71] Exhibit 9 – Sentinel Event Review.



identifications, probable cause, submission of warrant requests, drafting of Recommendations for Warrants, proper use of the case notes system for officers in charge of investigations, and acceptable practices and procedures for conducting eyewitness live lineups.

145. Instead, DPD has continued to take a laissez-faire attitude in allowing detectives to conduct live eyewitness lineups in any fashion they choose, whether or not the live lineup violates policies and procedures, and continues to allow detectives and investigators to conduct investigations as they see fit, with little oversight and few, if any, guardrails, checks or other supervision.

146. The City of Detroit Police Department knew and was in possession of information notifying them of the importance of conducting proper eyewitness live eyewitness lineups, and knew of the serious dangers of a misidentification in the event that the policy and procedures for conducting such lineups, as they had previously agreed as part of the settlement in 2:21-cv-10827 before this Court.

147. Then-Chief White possessed information that eyewitness live lineup misidentifications were the single greatest cause of wrongful convictions in the justice system generally, but more specifically in Detroit and Wayne County.

148. Then-Chief White also participated in the Sentinel Event Review and was a party to the *Williams v. City of Detroit* case that was before this Court and which resulted in the settlement agreement that mandated the changes to the Eyewitness Live Lineup policy and procedures[72].

149. The City of Detroit Police Department approved a new policy and procedures that were, at

---

[72] Exhibit 1 – Order of Dismissal and Settlement Agreement in *Williams v. City of Detroit et al*, 2:21-cv-10827 (E.D.Mich.)



least on paper, mandatory, and which would result in significant new protections for participants in live eyewitness lineups and, in theory, reduce the likelihood of a false identification[73].

150. However, upon information and belief the City of Detroit and DPD did not adequately train officers, detectives, or supervisory staff to ensure that this new policy and the associated procedures were implemented, trained, followed and enforced, as was required by the settlement agreement entered into in *Williams v. City of Detroit, et al*. 2:21-cv-10827 (E.D. Mich.)[74].

151. The City of Detroit and DPD's failure to implement, train, follow and/or enforce the new policy and procedures all but guaranteed that the sins of DPD's past would most assuredly be repeated; and they were.

152. The live eyewitness lineup procedure that was used by Defendant Cooper was inarguably constitutionally deficient and in direct violation of the City of Detroit and DPD's policy and procedures regarding how such a live eyewitness lineup was to be conducted.

153. Because the City of Detroit and DPD knowingly and/or recklessly permitted the conduction of eyewitness live lineups without proper or adequate training and/or supervision of those persons who would use and rely upon eyewitness live lineup identifications, despite a settlement agreement enshrined in a Federal Court Order and the requirements of the Constitution, Mr. Jennings was falsely accused, falsely arrested, and falsely imprisoned for two-hundred and nine (209) days.

154. Upon information and belief, The City of Detroit and DPD have created and/or allowed to

---

[73] Exhibit 2 – May 30, 2024, DPD Policy Regarding Eyewitness Live Lineups
[74] Exhibit 1 – Order of Dismissal and Settlement Agreement in *Williams v. City of Detroit et al*, 2:21-cv-10827 (E.D.Mich.); Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown; Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper.


DFWN PLC

continue and fester, an atmosphere of lax requirements with regard to reading and adhering to the directives, policies and procedures regarding eyewitness live lineups, failed to implement, train on, or ensure compliance with policies and procedures developed to ensure such lineups were conducted in a fair, constitutional, and unbiased manner, designed to protect individuals from the grave dangers of false identifications.

155. Upon information and belief, The City of Detroit and DPD's failure to properly implement, train, and/or supervise allowed officers, detectives and supervisors, like Defendant Cooper and Defendant Brown, significant, and improper, latitude and leeway in handling cases, including using live lineup procedures that were wholly violative of the United States and Michigan Constitutions, as well as DPD's court-mandated policy and procedures agreed upon and designed to avoid the very outcome that arose here, as well as improperly submitted requests for warrants rubber stamped by supervisory staff and failure to use proper investigative techniques or establishing probable cause, failures which resulted in the wrongful arrest and wrongful imprisonment of Mr. Jennings.

156. Upon information and belief, The City of Detroit and DPD's failure to implement the court-mandated policy and procedures on eyewitness live lineups allowed personnel to misuse and abuse that tool to obtain a false identification specifically in this case, but continued to allow a culture of reliance on faulty and constitutionally violative methods to solve crimes. For example, the failure to have a double-blind administrator for the lineup, having two witnesses in the room talking at the same time, and allowing the administrator to make comments or statements to the witnesses together, and then separately, all led to the false identification of Mr. Jennings.

157. Defendant Cooper was well aware that the description of the perpetrator did not match the



physical description of Mr. Jennings in any way. Defendant Cooper was well aware that he was not a double-blind administrator. Defendant Cooper knew that both Cedric Evans and Wanda Evans clearly stated none of the persons in the lineup looked like the perpetrator, and then both identified a different individual as a possible suspect, before Mr. Evans came around to picking Mr. Jennings. Defendant Cooper made no mention of the lack of certainty in Cedric Evans identification and never told supervisors of the problematic identification procedure he applied. Nor did he make any mention of the multiple statements of non-identification or identification of another individual in the Recommendation for Warrant or in the case notes. The obvious and ultimate result of this was the wrongful arrest and wrongful incarceration of Mr. Jennings for two-hundred and nine (209) days[75].

158. The City of Detroit and DPD's lack of implementing and enforcing adequate policies and procedures clearly led to a practice of detectives conducting live lineups based on little or no information, and without understanding that the May 30, 2024, policy and procedures implemented to ensure live lineups are fair and do not result in false identifications had to actually be followed, and were not optional, which was concomitant with and highly likely to generate a false eyewitness lineup identification.

159. Given the importance of lineup identifications to criminal prosecutions, the weight juries tend to place on such identifications, and the known high rate of false identifications as a result of improperly conducted and unsafeguarded eyewitness identifications, the failure to regulate the use of live eyewitness lineups or properly train its employees about the policy

---

[75] Exhibit 1 – Order of Dismissal and Settlement Agreement in *Williams v. City of Detroit et al*, 2:21-cv-10827 (E.D.Mich.); Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown; Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper.



and procedures necessary to ensure fair conduct of such a lineup yields deliberate indifference to the plight of those would be erroneously "identified" and included in a live eyewitness lineup, where there would be significant chance that they would be identified as the perpetrator, particularly given the longstanding problems with eyewitness identifications, particularly given that their inclusion in such a lineup is likely to result in a false identification of the suspect when the policy and procedures designed to avoid such an outcome are not implemented, trained on, supervised or followed by officers, detectives, investigators and supervisors.

160. On April 22, 2026, the Wayne County Circuit Court suppressed the eyewitness live lineup identification made by Mr. Cedric Evans, as having violated Mr. Jennings' constitutional rights and that the lineup was impermissibly suggestive and procedurally improper[76].

161. On May 26, 2026, the Circuit Court dismissed all charges against Mr. Jennings, putting DPD on notice of the violations and failures in the implementation and compliance with the policy and procedures it had agreed to abide by as part of a settlement agreement in a matter presided over by this Court[77].

162. The lack of implementation, training, supervision and/or review of the May 30, 2024, policy regarding eyewitness live lineups led directly and proximately to Mr. Jennings' false and wrongful arrest and incarceration.

<u>FAILURE TO TRAIN AND SUPERVISE ON PROBABLE CAUSE</u>

163. Upon information and belief, DPD has instituted no specific training regimen for detectives on what "probable cause" is or what evidence is sufficient to establish probable cause,

---

[76] Exhibit 12 – April 22, 2026, Order Suppressing Live Lineup – *People v. Carlos Kijuan Jennings*, Wayne County Circuit Court Case No. 26-000925-01-FC.
[77] Exhibit 13 – May 26, 2026, Order of Dismissal – *People v. Carlos Kijuan Jennings*, Wayne County Circuit Court Case No. 26-000925-01-FC



outside of some brief training provided at the Detroit Promotional Assessment Center, also known as "Detective School."[78].

164. DPD has no way of ensuring that its detectives and officers read policies on probable cause or remember their limited police academy or DPAC training on probable cause from years prior[79].

165. Upon information and belief, supervising officers rarely offered guidance on what was necessary to include in a warrant request, including whether to include all exculpatory evidence, whether enough evidence was contained in a warrant packet, or whether certain facts or omissions may mislead a magistrate[80].

166. Because, in part, of the lack of training and lack of a system to ensure that detectives have read policy directives, Defendant Cooper did not adhere to the probable cause policies of the City of Detroit Police Department.

167. DPD's failure to supervise and train on probable cause was one of the central factors leading to the false and wrongful arrest and incarceration of Mr. Jennings.

FAILURE TO TRAIN AND SUPERVISE ON PROPER WARRANT REQUEST PROCEDURES

168. Furthermore, DPD seems to have failed in instituting required training for detectives on how to prepare and submit a valid request for warrant.

169. DPD had no way of ensuring that its detective and officers ***actually*** read policies on submitting warrant requests or remembered their limited police academy training on

---

[78] Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown; Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper.
[79] Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown; Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper.
[80] Exhibit 10 – Transcript Testimony of Lieutenant Paul Brown; Exhibit 11 – Transcript Testimony of Detective Jeffrey Cooper.


DFWN PLC

warrant procedures.

170. DPD failed to train and supervise detectives and officers, thereby allowing its employees to submit improper warrant requests lacking probable cause.

171. DPD failed to train its detectives on their legal obligation to disclose known exculpatory information to prosecutors and magistrates when requesting a warrant.

172. DPD's detective and officers, including Defendant Cooper and/or Defendant Brown, have shown a clear and persistent lack of understanding of proper warrant request procedures, including the need for a reviewing supervisor to actually review the request for warrant and supporting evidence, rather than act as a proverbial "rubber stamp."

173. Because, in part, of the lack of training and lack of a system to ensure that detectives read policy directives, Defendant Cooper and/or Defendant Brown did not adhere to the warrant request policies of the City of Detroit Police Department.

174. While DPD still requires a supervising officer to sign off on a request for warrant, as it did at the of the *Williams v. City of Detroit*, 2:21-cv-10827 matter was filed, but just as was the case when that matter was file and resolved, DPD still does not have a policy in place, or is not enforcing such a policy, to prevent supervising officers with little or no information about a case from "rubber-stamping" and approval of a request for warrant to be submitted to the Prosecutor's Office.

175. The City of Detroit Police Department's failure to supervise, train, and create proper policies on warrant request submission procedures was one of the central factors leading to the false and wrongful arrest and incarceration of Mr. Jennings.

**COUNT 3 – VIOLATION OF M.C.L. §37.2302: THE ELLIOT-LARSEN CIVIL RIGHTS ACT – (Defendant Chief Bettison in His Official Capacity, Defendant Cooper and Defendant Brown)**


DFWN PLC

176. Plaintiff incorporates all preceding averments contained in paragraphs one (1) through one-hundred seventy-five (175) as if fully set forth herein.

177. The Elliott-Larsen Civil Rights Act, M.C.L. §37.2302, states that, "except where permitted by law, a person shall not (a) [d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status."

178. The City of Detroit Police Department is a public service within the meaning of the statute. M.C.L. §37.2301 defines "public service" to be "a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state, a political subdivision or an agency thereof."

179. By employing techniques that are widely known to cause misidentifications of individuals and especially African-Americans at rates higher than other groups of people, and failing to abide by the Department's policies and procedures implemented to, at least ostensibly prohibit in writing, but not in practice, the exact behavior in which Defendant Cooper engaged in, DPD denied Mr. Jennings the full and equal enjoyment of the Detroit Police Department's services, privileges, and advantages because of his race or color.

**COUNT 4 – FALSE ARREST AND IMPRISONMENT IN VIOLATION OF THE MICHIGAN CONSTITUTION AND MICHIGAN COMMON LAW**
**(Defendant Cooper and Defendant Brown)**

180. Plaintiff incorporates all preceding averments contained in paragraphs one (1) through one-hundred seventy-nine (179) as if fully set forth herein.

181. The Michigan Constitution, like the United States Constitution, demands there be probable cause to arrest individuals.



DFWN PLC

182. There was no probable cause that Mr. Jennings committed a crime.

183. As detailed previously in Count 1 of this Complaint, Defendant Cooper knowingly and/or recklessly and/or willfully misrepresented and omitted information in the request for warrant that was material to the prosecutor's and the magistrate's decision to issue an arrest warrant.

184. As detailed in Count 1, Defendant Cooper also knowingly and/or recklessly and/or willfully failed to abide by DPD's policies and procedures for the conduction of an eyewitness live lineup, leading to the false identification of Mr. Jennings, and providing the critical "identification" of the alleged perpetrator that led to the wrongful arrest and incarceration of Mr. Jennings as a result.

185. As detailed in Count 1, Defendant Brown knowingly and/or recklessly and/or willfully failed to properly, fully and fairly review the evidence contained in the request for warrant, prior to signing off as the "reviewing supervisor" that all information contained therein was true and accurate.

186. Defendant Cooper's false statements and omissions led to Mr. Jennings' wrongful arrest and incarceration, and so Defendant Cooper committed the Michigan State law tort of false arrest and false imprisonment.

187. Additionally, as detailed in Count 1, but for Defendant Brown's imprimatur on the request for warrant, it could not have been submitted to the prosecutor or magistrate for review.

188. Defendant Brown's signing off on the request for warrant as being accurate and complete when it was not, constitutes a false statement or omission of its own, as well as an endorsement of Defendant Cooper's own false statements and omissions, which, in part, led to Mr. Jennings' wrongful arrest and incarceration, and so Defendant Brown committed



the Michigan State law tort of false arrest and false imprisonment.

### COUNT 5 – MICHIGAN CAUSE OF ACTION – MALICIOUS PROSECUTION
#### (Defendant Cooper)

189. Plaintiff incorporates all preceding averments contained in paragraphs one (1) through one-hundred eighty-eight (188) as if fully set forth herein.

190. Defendant Cooper submitted a request for warrant for the arrest of Mr. Jennings which knowingly and/or recklessly and/or willfully presented false statements and/or omissions, which caused charges to be levied against Mr. Jennings.

191. Defendant Cooper knowingly and/or recklessly and/or willfully violated DPD policies and procedures relative to eyewitness live lineups, probable cause, investigations, inclusion of exculpatory evidence, and submission of a proper request for warrant, resulting in criminal legal proceedings being instituted against Mr. Jennings.

192. The underlying criminal proceedings were terminated in Mr. Jennings' favor on May 26, 2026, by order of dismissal of all counts by the Wayne County Circuit Court.

193. The favorable termination of proceedings was based, in part, upon the constitutionally improper conduct of Defendant Cooper and the failure of Defendant Cooper to abide by the policies and procedures related to eyewitness live lineups that were agreed upon and ordered as part of the settlement agreement in *Williams v. City of Detroit*, Case No. 2:21-cv-10827.

194. As noted in Counts 1, 2, 3 and 4 above, Defendant Cooper lacked probable cause to pursue legal action against Mr. Jennings but did so anyway without reasonable grounds or credible evidence.

195. Defendant Cooper's conduct, and the resulting violations of Mr. Jennings' rights, were done intentionally, and/or knowingly, and/or maliciously, and/or willfully in a manner that


DFWN PLC

was not conducive to the ends of justice, and which resulted in Mr. Jennings' wrongful arrest and wrongful incarceration.

196. As a result, Defendant Cooper committed the Michigan State law tort of malicious prosecution as set forth by M.C.L. §600.2907.

## RELIEF REQUESTED

WHEREFORE, Plaintiff, CARLOS KIJUAN JENNINGS, respectfully requests that this Honorable Court enter judgment in his favor, with relief granted to the following effect:

a. Damages as may be proven at trial to compensate Plaintiff for all pain, suffering, humiliation, shame, embarrassment, and emotional distress caused by being falsely arrested and falsely imprisoned;

b. Damages as may be proven at trial to compensate Plaintiff for lost wages caused by the unlawful arrest and unlawful imprisonment;

c. All punitive and exemplary damages as may be proven at trial;

d. Interest on all sums awarded to Plaintiff from the date of the events and/or losses;

e. An award of Plaintiff's reasonable attorney's fees and costs of this action, pursuant to 42 U.S.C. §1988, M.C.L. §37.2802, and any other applicable law;

f. An award of treble damages for having maliciously prosecuted Plaintiff without cause pursuant to M.C.L. §600.2907;

g. A judgment declaring that Defendants:

    i. violated Plaintiff's rights under the Fourth Amendment to the United States Constitution;

    ii. violated Plaintiff's rights under the Fourteenth Amendment to the United States Constitution;



       iii.  violated Plaintiff's rights under the Michigan Constitution and Michigan common law;

       iv.  maliciously prosecuted Plaintiff.

  h.  Any further or other relief the Court deems just and proper under the circumstances.

Respectfully Submitted,

DFWN, PLC

/s/ Daniel J. Williams, Esq.
Aimee M. Fowler, P72736
Daniel J. Williams, P72085
Attorneys for Plaintiff
18050 Mack Ave.
Grosse Pointe, MI 48230
(313) 458-8276 / (313) 469-7085 (FAX)
aimeenfw@gmail.com
danielnfw@gmail.com
amanda@dfwnlaw.com (Legal Asst.)

July 7, 2026





**DFWN PLC**
DODSON FOWLER WILLIAMS & NESI

*Main Office*

18050 Mack Ave.
Grosse Pointe, MI,
48236

(313) 458-8276
(313) 469-7085 (Fax)

*Village Office*

722 Notre Dame
Grosse Pointe, MI
48230

(313) 886-5769
(313) 886-5851 (Fax)

Dfwnlaw.com
_____

*Attorneys*

Nathan A. Dodson, Esq.
Aimee M. Fowler, Esq.
Daniel J. Williams, Esq.
Christopher J. Nesi, Esq.

# INDEX OF EXHIBITS

| EXHIBIT NUMBER | EXHIBIT TITLE |
| --- | --- |
| 1 | Order of Dismissal and Settlement Agreement – *Williams v. City of Detroit et al.* Case No. 2:21-cv-10827 (E.D. Mich.) |
| 2 | May 30, 2024, DPD Policy and Procedures Regarding Eyewitness Live Lineups |
| 3 | Recommendation for Warrant – *People v. Carlos Kijuan Jennings*, Wayne County Circuit Court Case No. 26-000925-01-FC |
| 4 | Police Report – Officer Saad with Interview of Witness Griffin – *People v. Carlos Kijuan Jennings*, Wayne County Circuit Court Case No. 26-000925-01-FC |
| 5 | DPD Case Notes – Detective Jeffrey Cooper |
| 6 | Booking Photo of Carlos Kijuan Jennings at Detroit Detention Center – *People v. Carlos Kijuan Jennings*, Wayne County Circuit Court Case No. 26-000925-01-FC |
| 7 | Eyewitness Lineup Identification Sheet – Cedric Evans – *People v. Carlos Kijuan Jennings*, Wayne County Circuit Court Case No. 26-000925-01-FC |
| 8 | Eyewitness Lineup Identification Sheet – Wanda Evans – *People v. Carlos Kijuan Jennings*, Wayne County Circuit Court Case No. 26-000925-01-FC |
| 9 | UPENN Carey Law School – Sentinel Event Review On Vacation of All Charges Against Eric Anderson – Wayne County Sentinel Event Review Team – November 2025 |
| 10 | Transcript Testimony of Lieutenant Paul Brown – April 14, 2026 – Motion Hearing – *People v. Carlos Kijuan Jennings*, Wayne County Circuit Court Case No. 26-000925-01-FC |



| 11 | **Transcript Testimony of Detective Jeffrey Cooper – April 14, 2026 – Motion Hearing – *People v. Carlos Kijuan Jennings*, Wayne County Circuit Court Case No. 26-000925-01-FC** |
|----|----|
| 12 | **Order Granting Motion to Suppress Live Lineup – April 22, 2026 – *People v. Carlos Kijuan Jennings*, Wayne County Circuit Court Case No. 26-000925-01-FC** |
| 13 | **Order of Dismissal – May 26, 2026 – *People v. Carlos Kijuan Jennings*, Wayne County Circuit Court Case No. 26-000925-01-FC** |





**DODSON
FOWLER
WILLIAMS
& NESI, PLC**

*Main Office*

18050 Mack Ave.
Grosse Pointe Farms,
MI, 48230

(313) 458-8276
(313) 469-7085 (Fax)

*Village Office*

722 Notre Dame
Grosse Pointe, MI
48230

(313) 886-5769
(313) 886-5851 (Fax)

dfwnplc.com

**Attorneys**

Nathan A. Dodson, Esq.
Aimee M. Fowler, Esq.
Daniel J. Williams, Esq.
Christopher J. Nesi, Esq.

# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ROBERT JULIAN-BORCHAK WILLIAMS,

     Plaintiff,                              Case No. 21-10827

                v.                      Hon. Laurie J. Michelson
                                          Mag. Judge David R. Grand

CITY OF DETROIT, a municipal corporation,
DETROIT POLICE CHIEF JAMES WHITE,
in his official capacity, and DETECTIVE
DONALD BUSSA, in his individual capacity,

     Defendants.

_____/

### STIPULATED ORDER OF
### VOLUNTARY DISMISSAL WITH PREJUDICE

The parties, through their respective counsel, hereby stipulate and agree as follows:

1. Plaintiff and Defendants have reached a negotiated resolution in this matter. To that end, the parties have entered into a Settlement Agreement. *See* Exhibit 1 and the attachments thereto.

2. Pursuant to the stipulation of the parties and Fed. R. Civ. P. 41(a), and consistent with the above, all of Plaintiff's claims in this lawsuit against all Defendants are dismissed with prejudice and without costs.

3.  The Court hereby retains jurisdiction to enforce the Settlement Agreement

for four years from the date of the entry of this order.

**IT IS SO ORDERED**.

Dated: June 28, 2024

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

2

The parties stipulate to the entry of the above order:

*/s/Michael J. Steinberg*
Michael J. Steinberg (P43085)
Julia Kahn*
Nethra Raman*
Collin Christner*
Ewurama Appiagyei-Dankah*
Civil Rights Litigation Initiative
University of Michigan Law School
701 S. State St., Suite 2020
Ann Arbor, MI 48109
(734) 763-1983
mjsteinb@umich.edu
jekahn@umich.edu
nethra@umich.edu
collindc@umich.edu
eadankah@umich.edu

Philip Mayor (P81691)
Daniel S. Korobkin (P72842)
Ramis J. Wadood (P85791)
American Civil Liberties Union Fund
of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6803
pmayor@aclumich.org
dkorobkin@aclumich.org
rwadood@aclumich.org

Nathan Freed Wessler
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
nwessler@aclu.org

*Counsel for Plaintiff*

3

*Student Attorney practicing pursuant to Local Rule 83.21

_/s/ Patrick M. Cunningham_
Patrick M. Cunningham (P67643)
City of Detroit Law Department
2 Woodward Avenue, Suite 500
Detroit, MI 48226
(313) 237-5032
cunninghamp@detroitmi.gov

_Counsel for Defendants_

Dated: 6/25/24

# EXHIBIT 1

Settlement Agreement with Attachments A-E

**SETTLEMENT AGREEMENT**
*WILLIAMS v. CITY OF DETROIT, et al.,*
**EASTERN DISTRICT OF MICHIGAN CASE NUMBER: 21-cv-10827**

1.      <u>Preamble</u>.    The City of Detroit and Chief James White ("Defendants") recognize the need to safeguard the Fourth Amendment rights of individuals involved in a criminal investigation and to ensure that policy advances to keep pace with evolving technology used to fight crime in the City of Detroit, and therefore hereby enter into this settlement agreement with Plaintiff Robert Julian-Borchak Williams ("Plaintiff").

2.      <u>Purpose</u>.      Defendants and Plaintiff (collectively the "Parties") intend for this Agreement to settle and resolve the dispute referenced above, *Williams v. City of Detroit, et al.*, case number 21-cv-10827, filed in the United States District Court for the Eastern District of Michigan ("the Court"). This Agreement represents the compromise of a disputed claim and is not to be construed as an admission of liability on the part of Defendants.

3.      <u>Facial Recognition Manual Directive</u>. Defendants agree to implement and enforce the attached Detroit Police Department ("DPD") Manual Directive 307.5 ("Facial Recognition"), which was approved by the Detroit Board of Police Commissioners (the "BOPC") on May 30, 2024.  *See Attachment A*.

4.      <u>Facial Recognition Forms</u>. Defendants agree to implement and instruct DPD personnel to use the attached investigative lead report and vetting

1

report forms. *See Attachment B*. DPD policy shall require that the relevant portions of these forms be completed by DPD Crime Intelligence Unit examiners and DPD investigators in connection with any facial recognition search.

5. <u>Eyewitness Identification and Lineup Manual Directive</u>. Defendants agree to implement and enforce the provisions of the attached DPD Manual Directive 203.11 ("Eyewitness Identification and Lineups") that have been added or changed between the date this lawsuit was filed on April 13, 2021, and the effective date of this Agreement, which was approved by the BOPC on May 30, 2024. *See Attachment C.*

6. <u>Audit of Prior Cases.</u> Within 180 days of the execution of this agreement, the DPD's Civil Rights Division will conduct an audit of all cases in which facial recognition technology was utilized to generate an investigative lead that was followed by an arrest or the issuance of an arrest warrant. The audit will be based upon a log of facial recognition requests maintained by DPD's Crime Intelligence Unit beginning on February 22, 2017. The audit will examine qualifying arrests made and arrest warrants issued through August 10, 2023. Auditors will identify all cases in which an arrest was made or a warrant was issued after an investigative lead was generated, and then determine: whether a live or photo lineup was utilized; whether there was an independent basis for the arrest such as an outstanding warrant or probable cause that the individual committed a

separate arrestable offense at another time or place; whether there was independent evidence supporting the arrest or issuance of the arrest warrant, and identify such independent supporting evidence in a written audit log.  In the event that the audit reveals arrests made or arrest warrants issued following an investigative lead alone or an investigative lead and lineup identification that are unsupported by independent evidence, the DPD will notify the appropriate prosecutor.  Active investigations subject to this audit shall comply with Manual Directives 203.11 and 307.5 prior to an arrest or the issuance of an arrest warrant.

7.    Training Program. Defendants agree that DPD shall implement and abide by the attached Training Program for DPD for four years from the effective date of this agreement. *See Attachment D*.

8.    Future Modifications to Manual Directives. Defendants may seek approval of future modifications of DPD Manual Directives 307.5 or 203.11 from the BOPC.  However, Defendants agree that for four years following the effective date of this agreement, they shall not propose or make any substantive modifications that reduce, decrease, or remove protections in either policy that were added or changed between the filing of this lawsuit on April 13, 2021, and the effective date of this Agreement.  This limitation on substantive modifications includes, but is not limited to any potential modification that would, (1) authorize investigators to conduct a lineup based on a facial recognition investigative lead

3

without first developing an independent and reliable basis for conducting the lineup, or to request an arrest warrant based only upon such a lineup combined with a facial recognition-derived investigative lead; (2) eliminate or reduce the number of supervisory officers who must approve investigative actions or arrest warrant requests made pursuant to either policy; (3) authorize photographic lineups to be conducted, (a) with a non-eyewitness, (b) in a non-blind fashion, (c) in a non-consecutive manner, or (d) containing a photograph derived from a facial recognition technology search; or (4) authorize DPD members to inform a witness to be administered a photographic lineup that facial recognition has been used to generate an investigative lead. When proposing any modifications of either policy to the BOPC, Defendants shall provide the proposed modifications to the ACLU Fund of Michigan.

9. <u>Release of Claims for Damages, Attorneys' Fees, and Costs</u>. The Parties agree that Plaintiff's claims for damages, attorney fees, and costs have been resolved as described in the attached General Release. See *Attachment E*. The Parties agree that Attachment E will be redacted in its entirety when this Agreement is filed with the court.

10. <u>Breach of Terms.</u> A breach of any term of this Agreement may be enforced by any party by filing a motion before the Court for enforcement of the Agreement. The party establishing a breach of this Agreement may be entitled to

equitable relief, costs, or attorney fees authorized by law, as determined by the Court.

11.  Entry of Stipulated Order of Dismissal.  Contemporaneous with the Parties' execution of this Agreement, the Parties through their counsel stipulate to the entry of an order of dismissal with prejudice ("Stipulated Order"), attached to which as an exhibit shall be an executed copy of this Agreement. The Stipulated Order shall expressly retain the Court's jurisdiction to enforce this Agreement for four years following the date of the Stipulated Order.  In the event that the Court refuses to enter the Stipulated Order or retain jurisdiction to enforce this Agreement, this Agreement shall be null and void unless the Parties are able to agree to alternative terms.

12.  Effective Date.  This Agreement shall become effective immediately upon the Court entering the Stipulated Order.

13.   Execution.  This Agreement may be executed in counterparts, and is fully executed on the date by which both Parties have executed this agreement. Facsimiles and PDF versions of signatures will constitute acceptable, binding signatures for purposes of this Agreement.

14.  Severability.  If any provision of this Agreement, or part thereof, is held invalid, void, or voidable as against public policy or otherwise, the invalidity shall not affect other provisions, or parts thereof, which may be given effect

5

without the invalid provision or part. To this extent, the provisions, and parts thereof, of this Agreement are declared to be severable.

15. Entire Agreement. This Agreement and the attachments thereto contain all the terms and conditions agreed upon by and between the Parties. Other than the attachments to this Agreement, no oral agreement between Plaintiff and Defendants entered into at any time, nor any written agreement between Plaintiff and Defendants entered into prior to the execution of this Agreement regarding the subject matter of the instant proceeding, shall be deemed to have any force or effect, or to bind the Parties hereto, or to vary the terms and conditions contained herein.

Conrad L. Mallett, Jr. (P30806)
Corporation Counsel
City of Detroit Law Department

Date: June 21, 2024

Patrick M. Cunningham (P67643)
Attorney for Defendants
City of Detroit Law Department

Date: June 24, 2024

Michael J. Steinberg (P43085)
Julia Kahn*
Nethra Raman*
Collin Christner*
Ewurama Appiagyei-Dankah*
Civil Rights Litigation Initiative

Date: June 25, 2024

6

University of Michigan Law School
701 S. State St., Suite 2020
Ann Arbor, MI 48109
(734) 763-1983
mjsteinb@umich.edu
jekahn@umich.edu
nethra@umich.edu
collindc@umich.edu
eadankah@umich.edu


Philip Mayor (P81691)
Daniel S. Korobkin (P72842)
Ramis J. Wadood (P85791)
ACLU Fund of Michigan
Attorneys for Plaintiff
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6803
pmayor@aclumich.org
dkorobkin@aclumich.org
rwadood@aclumich.org

Nathan Freed Wessler
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
nwessler@aclu.org


*Student Attorney practicing pursuant to Local Rule 83.21

7

# Attachment A

Revised Manual Directive 307.5

Regarding Facial Recognition



# DETROIT POLICE DEPARTMENT MANUAL

| Series<br>300 Support<br>Services | Effective Date | Review Date<br>Annually | Directive Number<br><br>307.5 |
|---|---|---|---|
| Chapter<br>307 – Information System | | | |
| Reviewing Office<br>Crime Intelligence | | | ☐ New Directive |
| References: | | | ☐ Revised |

## FACIAL RECOGNITION

## 307.5 - 1  PURPOSE

The purpose of this policy is to establish acceptable use *of Facial Recognition technology by* the Detroit Police Department (DPD). Facial Recognition shall only be used when there is reasonable suspicion that such use will provide information relevant to an active or ongoing *investigation of a* Part 1 Violent Crime or a first-degree Home Invasion. If *an investigative lead* is *developed* through DPD's *Facial Recognition program*, it shall be considered *only* an investigative lead *that shall not be the sole ground for arrest or to apply for an arrest warrant.*

## 307.5 - 2  Definitions

### 307.5 - 2.1  Biometric Data

Data derived from one or more intrinsic physical or behavioral traits of humans, to include fingerprints, palm prints, iris scans, and *Facial Recognition* data.

### 307.5 - 2.2  Examiner

An individual who has received advanced training in the *Facial Recognition program* and its features. Examiners have at least a working knowledge of the limitations of *Facial Recognition. Examiners are* qualified to assess image quality and appropriateness for *Facial Recognition* searches and to perform one-to-many and one-to-one facial image comparisons.

### 307.5 - 2.3  Facial Recognition (FR)

The automated searching of a facial image in a biometric database (one-to-many), typically resulting in a group of facial images ranked by computer-evaluated similarity. All Facial Recognition searches must be corroborated by at least two examiners and one supervisor.

# DETROIT POLICE DEPARTMENT
### MANUAL

**307.5 Facial Recognition**

**307.5 - 2.4    *First-degree Home Invasion***
*A person who breaks and enters a dwelling with intent to commit a felony, larceny, or assault in the dwelling, a person who enters a dwelling without permission with intent to commit a felony, larceny, or assault in the dwelling, or a person who breaks and enters a dwelling or enters a dwelling without permission and, at any time while he or she is entering, present in, or exiting the dwelling, commits a felony, larceny, or assault is guilty of home invasion in the first degree if at any time while the person is entering, present in, or exiting the dwelling either of the following circumstances exists:*
*(a) The person is armed with a dangerous weapon.*
*(b) Another person is lawfully present in the dwelling. (MCL 750.110a(2)).*

**307.5 - 2.5    Part 1 Violent Crimes**
For the purposes of this directive, Part 1 Violent Crimes are defined as robbery, sexual assault, aggravated assault, or homicide.

**307.5 - 2.6    *Predictive Analysis***
*The process of using data to forecast future outcomes.*

**307.5 - 2.7   Reasonable Suspicion**
The specific facts and reasonable inferences drawn from those facts to convince an ordinarily prudent person that criminality is at hand.

**307.5 - 2.8   Statewide Network of Agency Photos (SNAP)**
A computer application managed by the SNAP Unit, deployed through the MiCJIN portal, which serves as an investigative tool and a central repository of images from local, state, and federal agencies.

## 307.5 - 3    Prohibited Uses

**307.5 - 3.1 Surveillance**
Members shall not use *Facial Recognition* to surveil the public through any camera or video device.

**307.5 - 3.2    Live Streaming or Recorded Videos**
Members shall not use *Facial Recognition* on live stream or on recorded videos. This prohibition applies to all videos, whether they originate from DPD itself, from private citizens, or from any other source.

**307.5 - 3.3    Mobile Facial Recognition**
Members shall not use mobile *Facial Recognition*.

**307.5 - 3.4    Predictive Analysis**
Members shall not use *Facial Recognition* for predictive analysis.

# DETROIT POLICE DEPARTMENT
### MANUAL

**307.5 Facial Recognition**

### 307.5 - 3.5    First Amendment Events
The Detroit Police Department will not violate First, Fourth, and Fourteenth Amendments and will not perform or request *Facial Recognition* searches about individuals or organizations based solely on the following:

    a.  Their religious, political, or social views or activities;
    b.  Their participation in a particular noncriminal organization or lawful event; or
    c.  Their races, ethnicities, citizenship, places of origin, ages, disabilities, genders, gender identities, sexual orientations, or other classification protected by law.

### 307.5 - 3.6    Facial Recognition Use for Immigration Enforcement
DPD members are strictly prohibited from using *Facial Recognition* to assess immigration status.

## 307.5 - 4    Discipline

1. Any violations to this policy shall be deemed major misconduct. Any misuse of the *Facial Recognition program* will be investigated and reviewed for criminality. The remedy for this misconduct is dismissal from DPD.

2. If *Facial Recognition* is used contrary to section 307.5 -3.5 First Amendment Events, DPD shall notify the Board of Policy Commissioners, the Mayor of Detroit, City Council President, and City Council President Pro Tem within 24 hours of the violation.

## 307.5 - 5    Use of Facial Recognition Technology
### 307.5 - 5.1    Use Limited to Still Images
Facial Recognition *technology* may only be used on a still image of an individual, *including still images captured from video.*

### 307.5 - 5.2    Criminal Investigation Required
Members shall not use *Facial Recognition* technology unless *there is reasonable suspicion that use of Facial Recognition technology will provide information relevant to* an active or ongoing *investigation of a* Part 1 Violent Crime or a *first-degree* Home Invasion.

### 307.5 - 5.3    *An Arrest or Arrest Warrant Request Following Use of Facial Recognition Technology Must Be Supported by Additional Independent Reliable Evidence*
*Probable cause must be established for an arrest or for an arrest warrant request must be established using legally authorized methods other than Facial Recognition. Examples of other investigative methods may include, but are not limited to cellular data analysis; eyewitness testimony, establishment of a timeline, DNA, etc. A request for an arrest warrant, or an arrest, shall not be made solely on the basis of an investigative lead developed through Facial Recognition technology in combination with a lineup identification. A request for an arrest warrant, or an arrest, must be supported by additional independent reliable evidence.*

# DETROIT POLICE DEPARTMENT
**MANUAL**

## 307.5 - 5.4 Process for Requesting Facial Recognition

1. Requests for *Facial Recognition* services shall be submitted to the Crime Intelligence Unit (CIU), with photograph(s) to be reviewed, the incident number, the crime type, and other pertinent information.

    a. *Members requesting Facial Recognition services shall affirm that they have completed investigative Facial Recognition training;*

    b. *Members performing Facial Recognition services shall confirm that the requesting member has made the affirmation above.*

## 307.5 - 5.5 *Process for Performing Facial Recognition*

1. *Prior to the use of Facial Recognition, a CIU examiner shall complete the Real Time Crime Center – Facial Recognition Vetting form, which shall contain:*
a. *The requestor's name, rank, and command;*
b. *Confirmation that the requestor has affirmed that they have completed investigative Facial Recognition training;*
c. *The crime being investigated (Part 1 Violent Crime or first-degree Home Invasion);*
d. *The role the individual in the probe image is reasonably suspected to have played in the incident; and*
e. *A description of the probe image quality.*

2. *CIU shall reject a request for Facial Recognition when:*
    a. *The request fails to identify the requestor's name, rank or command;*
    b. *The requestor fails to affirm that they have completed investigative Facial Recognition training;*
    c. *The crime being investigated is not a Part 1 Violent Crime or first-degree Home Invasion;*
    d. *There is not a reasonable suspicion that the individual in the probe image had a role in the commission of the crime; or*
    e. *The quality of the probe image is unsuitable for Facial Recognition.*

3. CIU shall perform *Facial Recognition* searches utilizing SNAP, which includes criminal mug shot images. In the event additional analysis is needed for confirmation of an investigative lead, a formal request may be made to MSP to search the state's database. Any such request must be approved by a CIU supervisor.

4. If the examiner *develops* an investigative lead, the examiner must corroborate this lead with at least one other examiner and a CIU supervisor. *Both examiners and the CIU supervisor shall sign off on the investigative lead.*

5. Upon final approval, CIU shall complete *an investigative lead* report for the requestor. *This investigative lead report must be attached to any request for a warrant for any person named in the investigative lead report.* The investigative lead report shall include the following language:

# DETROIT POLICE DEPARTMENT

**MANUAL**

## 307.5 Facial Recognition

- "The result of a facial recognition search is provided by the Detroit Police Department only as an investigative lead and IS NOT TO BE CONSIDERED A POSITIVE IDENTIFICATION OF ANY SUBJECT. Any *possible* connection or involvement of any subject to the investigation must be determined through further *independent* investigation and investigative resources."

- *"Facial Recognition technology's accuracy depends in part on the ability to discern facial details. Thus, the accuracy of a facial recognition result depends on the probe image's quality, lighting, face angle, and face obstructions, among other factors."*

- *"Facial Recognition error rates increase as the quality of the probe image decreases; however, even when using a high-quality probe image, facial recognition technology can still fail to provide an accurate result. Any result provided by the technology will always be false when the suspect does not have a photo in the comparison database (for example, no prior arrest photos in an arrest-photo database).*

*In addition, the investigative lead or vetting report shall also:*

- *Disclose the probe image used to run the Facial Recognition search (in both its original form and with any enhancements), and identify all features of the probe image that may reduce the reliability of the Facial Recognition result (such as low light, low pixel density, angle of face, partial occlusion of face, etc.), and any enhancements or modifications made to the probe image during the course of the search process;*

- *Disclose each of the following: the date the investigative lead image was taken, how many other images of the same individual in the investigative lead image exist in the database that was searched, and, if other images of the same individual exist in the database, the dates when each was taken.*

6. *In any case in which charges are filed and in which Facial Recognition technology was used at any stage of the investigation, the member responsible for that investigation shall provide the following to the Wayne County Prosecutor's Office (WCPO):*

- *Any investigative lead report and vetting report;*

7. In the event that *an investigative lead* cannot be developed, the requestor will be notified that no *investigative lead was developed*.

# DETROIT POLICE DEPARTMENT
### MANUAL

### 307.5 Facial Recognition

### 307.5- 5.6  Outside Agency Using Facial Recognition
An outside agency, or investigators from an outside agency, may request *Facial Recognition* searches *by DPD* to assist with investigations only if the following requirements are met:

    a.   Prior to making the request, the outside agency has a formalized agreement (e.g. a memorandum of understanding or an interagency agreement) between *DPD* and the outside agency;

    b.   The outside agency is a law enforcement agency that is making the request based on a valid law enforcement purpose that falls within the authorized uses listed in this directive and the requestor provides a case number and contact information (requestor's name, requestor's agency, address, and phone number) and acknowledges an agreement with the following statement:

        •  "The result of a facial recognition search is provided by the Detroit Police Department only as an investigative lead and IS  NOT TO BE CONSIDERED A POSITIVE IDENTIFICATION OF ANY SUBJECT. Any *possible* connection or involvement of any subject to the investigation must be determined through further *independent* investigation and investigative resources."

    c.   If any agency is found not in compliance with this Directive, *DPD* shall immediately suspend all Facial Recognition requests until the requesting agency becomes in compliance with this Directive.

## 307.5 - 6   Governance and Oversight
### 307.5 - 6.1   LASO & *CIU* Responsibilities
1.  The primary responsibility for the operation of *DPD*'s criminal justice information systems, *Facial Recognition* program and system, operations, and the coordination of personnel, the receiving, seeking, retention, evaluation, data quality, use, purging, sharing, disclosure, or dissemination of information; and the enforcement of this policy is assigned to the Local Agency Security Officer (LASO) who is assigned to Technical Services.

2.  The LASO will be responsible for the following:

    a.   Overseeing and administering the *Facial Recognition* program to ensure compliance with applicable laws, regulations, standards, and policy;

    b.   Acting as the  authorizing official for individual access to *Facial Recognition* information;

    c.   Ensuring that user accounts and authorities granted to personnel are maintained in a current and secure "need-to-know" status; and

    d.   Ensuring that random evaluations of user compliance with system requirements along with this policy and applicable laws are conducted and documented;

# DETROIT POLICE DEPARTMENT

**MANUAL**

### 307.5 Facial Recognition

3. The commanding officer of *CIU* will be responsible for the following:

   a. Reviewing *Facial Recognition* search requests, reviewing the results of *Facial Recognition* searches, and returning the most likely candidates – or candidate images – if any, to the requestor.
   b. Ensuring and documenting that personnel (including investigators from external agencies who request *Facial Recognition* searches) meet all prerequisites stated in this policy prior to being authorized to use the *Facial Recognition* system.

4. *Members of investigative entities shall be responsible for the following:*

   a. *In the event that the Facial Recognition program develops an investigative lead, prior to making any probable cause arrest, or requesting a warrant from the (WCPO), the member must obtain written approval from their commanding officer and the commanding officer of Investigative Operations.*

5. *DPD* is guided by applicable laws, regulations, and standards to ensure that privacy, civil rights, and civil liberties are not violated by this Facial Recognition policy or by the *DPD*'s *Facial Recognition* information collection, receipt, access, use, dissemination, retention, and procedure.

## 307.5 - 6.2   Weekly Report to the Board of Police Commissioners
*DPD* shall provide a weekly report to the Board of Police Commissioners with information pertaining to the number of *Facial Recognition* requests that were fulfilled, the crimes that the *Facial Recognition* requests were attempting to solve, the number of leads developed from the *Facial Recognition* *program, and the number of searches that did not produce investigative leads.* During this report, if there are any upgrades to the Facial Recognition software, any planned changes to the contract, and/or any confirmed policy violations, *DPD* shall notify the Board of Police Commissioners.

## 307.5 – 6.3   Annual Report to the Board of Police Commissioners
*DPD* shall provide an annual report to the Board of Police Commissioners. This annual report shall include a summary of the weekly reports and an evaluation of the efficacy of the *DPD*'s *Facial Recognition* technology. The evaluation shall include any relevant lawsuits or settlements involving *Facial Recognition*, the number of cases *in which* use of the technology assisted in investigations, and any other relevant factors. This shall be disseminated at the Board of Police Commissioners' meeting, and electronic copy shall be provided to the Board for dissemination to the public.

# DETROIT POLICE DEPARTMENT
### MANUAL

**307.5 Facial Recognition**

**307.5 - 6.4    All Policy Changes to the Board of Police Commissioners**
*DPD* shall seek the Board of Police Commissioners' approval regarding any and all changes to *this manual directive*.

## 307.5 - 7    Security and Maintenance

1.  *DPD* will comply with generally accepted industry or other applicable standards for security to protect data at rest, in motion, or in use. Security safeguards will cover any type of medium (printed or electronic) or technology (e.g. physical servers, virtual machines, and mobile devices) used in a work-related *DPD* activity. *DPD*'s *Facial Recognition* system will operate in a secure facility protected with multiple layers of physical security from external intrusion and will utilize secure internal and external security and privacy safeguards against network intrusions, such as strong multifactor authentication; encrypted communications; firewalls; and other reasonable physical technological, administrative, procedural, and personnel security measures to minimize the risks of unauthorized access to the system.

    Access to the *DPD*'s *Facial Recognition* information from outside the facility will be allowed only over secure networks. All results produced by *DPD* as a result of a *Facial Recognition* search are disseminated by secured electronic means (such as an official government e-mail address). Non-electronic disseminations will be conducted personally or by phone with the requestor or designee. When such non-electronic dissemination is made, the member shall memorialize the dissemination as follows:

    a.  To whom it was released;
    b.  Date and time it was released; and
    c.  Manner in which it was released (i.e. if by phone, include the number; if in person, include name of witness who saw it released).

2.  All members with access to *DPD*'s information or information systems will report a suspected or confirmed breach to their immediate supervisor who will ensure that the LASO) is notified as soon as possible without unreasonable delay, consistent with applicable laws, regulations, policies, and procedures. This includes a breach in any medium or form, including paper, oral, *or* electric. Following assessment of the suspected or confirmed breach and as soon as practicable, *DPD* will notify the originating agency from which the entity received *Facial Recognition* information of the nature and scope of a suspected or confirmed breach of such information. *DPD* will determine whether a data breach requires notification to an affected individual, in accordance with applicable laws, regulations, policies, and procedures.

3.  All *Facial Recognition* equipment and *Facial Recognition* software and components will be properly maintained in accordance with the manufacturer's recommendations, including routine updates as appropriate.

# DETROIT POLICE DEPARTMENT
**MANUAL**

### 307.5 Facial Recognition

4. *DPD* will store *Facial Recognition* information in a manner that ensures that it cannot be modified, accessed, or purged except by members authorized to take such actions.

5. Authorized access to the *DPD*'s *Facial Recognition* system will be granted only to members whose positions and job duties require such access and who have successfully completed a background check and required training.

6. Usernames and passwords to the *Facial Recognition* system are not transferrable, must not be shared by *DPD* members, and must be kept confidential.

7. The system administrator (LASO) will ensure that all manufacturer- generated default passwords are replaced with secure passwords before web-based interfacial of the system become operational. User passwords must meet the standards outlined in Manual Directive 307.4, Criminal Justice Information Systems (CJIS).

8. Queries made to *DPD*'s *Facial Recognition* system will be logged into the system identifying the user initiating the query. All user access, including participating agency access, and queries are subject to review and audit.

9. *DPD* will maintain an audit trail of requested, accessed, searched, or disseminated *Facial Recognition* information. An audit trail will be kept for a minimum of one (1) year of requests, access, and searches of *Facial Recognition* information for specific purposes and of what *Facial Recognition* information is disseminated to each individual in response to the request. Audit logs will include:

   a. The name and unit of the law enforcement user;
   b. The date of access;
   c. Case number; and
   d. The authorized law enforcement or public safety justification for access including a relevant case number.

# Attachment B

Investigative Lead Report and Vetting Report Forms

The result of a facial recognition search is provided by the Detroit Police Department only as an investigative lead and **IS NOT TO BE CONSIDERED A POSITIVE IDENTIFICATION OF ANY SUBJECT.** Any possible connection or involvement of any subject to the investigation must be determined through further independent investigation and investigative resources.

Facial recognition technology's accuracy depends in part on the ability to discern facial details. Thus, the accuracy of a facial recognition result depends on the input image's quality, lighting, face angle, and face obstructions, among other factors.

Facial recognition error rates increase as the quality of the probe image decreases; however, even when using a high-quality probe image, facial recognition technology can still fail to provide an accurate result. Any result provided by the technology will always be false when the suspect does not have a photo in the comparison database (for example, no prior arrest photos in an arrest-photo database).

Revised: 12/6/2023

## REAL TIME CRIME CENTER — FACIAL RECOGNITION INVESTIGATIVE LEAD    Page 2 of 3

The result of a facial recognition search is provided by the Detroit Police Department only as an investigative lead and **IS NOT TO BE CONSIDERED A POSITIVE IDENTIFICATION OF ANY SUBJECT**. Any possible connection or involvement of any subject to the investigation must be determined through further independent investigation and investigative resources. Facial recognition technology's accuracy depends in part on the ability to discern facial details. Thus, the accuracy of a facial recognition result depends on the input image's quality, lighting, face angle, and face obstructions, among other factors. Facial recognition error rates increase as the quality of the probe image decreases; however, even when using a high-quality probe image, facial recognition technology can still fail to provide an accurate result. Any result provided by the technology will always be false when the suspect does not have a photo in the comparison database (for example, no prior arrest photos in an arrest-photo database).

| REQUEST #: | 23-00 | | | | |
|---|---|---|---|---|---|
| REQUEST DATE/TIME: | | | | | |
| REPORT NUMBER: | | | | | |
| CRIME: | ☐Homicide  ☒Robbery/Carjacking  ☐Aggravated Assault/NFS  ☐CSC 1/CSC 3  ☐Home Invasion 1 | | | | |
| REQUESTER NAME: | | RANK: | Choose an item | COMMAND: | |
| REASON: | ☒ Reasonable Suspicion of a Part I Violent Crime or First-Degree Home Invasion <br> ☐ Physical Incapacity/Mental Incapacity/At-Risk Person/Deceased Person (Homicide Only) | | | | |

| IMAGES: | ORIGINAL IMAGE | | INQUIRY IMAGE | | INVESTIGATIVE LEAD | |
|---|---|---|---|---|---|---|
| IMAGE SOURCE: | Choose an item | | Choose an item | | SNAP | Date |
| IMAGE ENHANCEMENTS: | Choose an item | | Choose an item | | None | |
| # OF IMAGES PRODUCED IN GALLERY: | | # OF LEAD IMAGES IN DATABASE: | | DATES OF LEAD IMAGES: | | |

| NAME: | | | | |
|---|---|---|---|---|
| ALIAS: | | | | |
| DOB: | | | | |
| DL/PID #: | | | | |
| SID #: | | FBI #: | | |
| ADDRESS: | | | | |
| SOCIAL MEDIA: | | | | |
| INCARCERATION STATUS: | Choose an item | SOURCE: | Choose an item | DATE: |
| INVESTIGATIVE LEAD PROCESS: | ☒ Statewide Network of Agency Photos (SNAP) <br> ☒ DataWorks Plus <br> ☐ Forwarded to Michigan State Police (MSP) for additional assistance | | | |

| DATE/TIME FINALIZED: | |
|---|---|
| CIU PERSONNEL: | |
| CIU PEER REVIEWER: | |
| SUPERVISOR: | |

Revised: 12/6/2023

## REAL TIME CRIME CENTER — FACIAL RECOGNITION INVESTIGATIVE LEAD

Page **3** of **3**

The result of a facial recognition search is provided by the Detroit Police Department only as an investigative lead and **IS NOT TO BE CONSIDERED A POSITIVE IDENTIFICATION OF ANY SUBJECT.** Any possible connection or involvement of any subject to the investigation must be determined through further independent investigation and investigative resources. Facial recognition technology's accuracy depends in part on the ability to discern facial details. Thus, the accuracy of a facial recognition result depends on the input image's quality, lighting, face angle, and face obstructions, among other factors. Facial recognition error rates increase as the quality of the probe image decreases; however, even when using a high-quality probe image, facial recognition technology can still fail to provide an accurate result. Any result provided by the technology will always be false when the suspect does not have a photo in the comparison database (for example, no prior arrest photos in an arrest-photo database).

**FURTHER INVESTIGATION WAS COMPLETED TO DETERMINE THE NECESSARY PROBABLE CAUSE TO PROCEED**

**WITH AN ARREST OF THE INDIVIDUAL AND/OR SUBMISSION OF A WARRANT:**

☐ CODIS Match

☐ AFIS hit

☐ CDR warrant results

☐ PEN warrant results

☐ Social Media warrant results

☐ Witness Statements

☐ Other: _____

☐ Other: _____

☐ Other: _____

**INVESTIGATIVE OPERATIONS:**

**Prior to an arrest of an individual and/or submission of a warrant, the information was reviewed and:**

☐ APPROVED

☐ DENIED

**Investigate Operations Captain (print):** _____

**Signature:** _____   **Date:** _____

**COMMANDING OFFICER:**

**Prior to an arrest of an individual and/or submission of a warrant, the information was reviewed and:**

☐ APPROVED

☐ DENIED

**Commanding Officer (print):** _____

**Signature:** _____   **Date:** _____

Revised: 12/6/2023

## REAL TIME CRIME CENTER — FACIAL RECOGNITION VETTING      Page 1 of 1

The result of a facial recognition search is provided by the Detroit Police Department only as an investigative lead and **IS NOT TO BE CONSIDERED A POSITIVE IDENTIFICATION OF ANY SUBJECT**. Any possible connection or involvement of any subject to the investigation must be determined through further independent investigation and investigative resources. Facial recognition technology's accuracy depends in part on the ability to discern facial details. Thus, the accuracy of a facial recognition result depends on the input image's quality, lighting, face angle, and face obstructions, among other factors. Facial recognition error rates increase as the quality of the probe image decreases; however, even when using a high-quality probe image, facial recognition technology can still fail to provide an accurate result. Any result provided by the technology will always be false when the suspect does not have a photo in the comparison database (for example, no prior arrest photos in an arrest-photo database).

| | |
|---|---|
| **REQUEST DATE/TIME:** | |
| **REPORT NUMBER:** | |
| **CRIME:** | ☐Homicide ☐Robbery/Carjacking ☐Aggravated Assault/NFS ☒CSC 1/CSC 3 ☐Home Invasion 1 |

| **REQUESTER NAME:** | | **RANK:** | Choose an item. | **COMMAND:** | |
|---|---|---|---|---|---|
| **IMAGE SOURCE:** | | | | **NUMBER OF IMAGES:** | |

| **REASON:** | ☒ Reasonable Suspicion of a Part I Violent Crime or First-Degree Home Invasion |
|---|---|
| | ☐ Physical Incapacity/Mental Incapacity/At-Risk Person/Deceased Person (Homicide Only) |

### PER POLICE REPORT, SUPPLEMENTS, AND DETECTIVE NOTES:

| **PROBE ROLE IN CRIME:** | Choose an item. |
|---|---|
| **SUSPECT KNOWN:** | Choose an item. |

### PHOTO QUALITY:

| **FILE SIZE:** | | **DIMENSIONS:** | |
|---|---|---|---|
| **RACE:** | | **SEX:** | |
| **FACIAL OBSTRUCTIONS:** | | | |
| **FACE ORIENTATION** | | | |
| **IMAGE BRIGHTNESS** | | | |
| **TATTOOS/FACIAL PIERCINGS/BIRTH MARKS:** | | | |
| **NUMBER OF USABLE IMAGES:** | | | |

| **STATUS OF REQUEST:** | Choose an item |
|---|---|
| **IF REJECTED, WHY?** | |

| **ANALYST:** | | **DATE/TIME:** | |
|---|---|---|---|
| **REVIEWER:** | | **DATE/TIME:** | |
| **SUPERVISOR:** | | **DATE/TIME:** | |

## Intel Number:      23-

Revised: 12/6/2023

# Attachment C

Revised Manual Directive 203.11

Regarding Eyewitness Identification and Lineups

# DETROIT POLICE DEPARTMENT

**MANUAL**

| FSeries<br>200 Operations | Effective Date | Review Date<br>*Two Years* | Directive Number |
|---|---|---|---|
| **Chapter**<br>203 – Criminal Investigations | | | **203.11** |
| **Reviewing Office**<br>*Investigative Operations* | | | ☐ **New**<br>☐ **Directive**<br>☒ **Revised**<br>Revisions in *italics* |
| **References** | | | |

## EYEWITNESS IDENTIFICATION AND LINEUPS

## 203.11 - 1 PURPOSE

The purpose of this directive is to establish the guidelines for eyewitness identification *procedures involving showups, photo arrays, and live lineups. Erroneous eyewitness identifications have been cited as the factor most frequently associated with wrongful convictions. Therefore, in addition to eyewitness identification, all appropriate investigative steps and methods should be employed to uncover evidence that either supports or eliminates the suspect identification.*

## 203.11 - 2 POLICY

Members shall strictly adhere to this directive in order to maximize the reliability of identifications, minimize *erroneous identifications, and gather evidence that conforms to established legal procedures.*

## 203.11 - 3 Definitions

### 203.11 - 3.1 *Administrator*
*The law enforcement official conducting the identification procedure.*

### 203.11 - 3.2 *Double-Blind Presentation*
*The administrator conducting the identification procedure does not know the suspect's identity.*

### 203.11 - 3.3 *Filler*
*A live person, or a photograph of a person, included in an identification procedure who is not considered a suspect.*

### 203.11 - 3.4 *Live Lineup*
*The process of presenting live individuals to an eyewitness for the purpose of identifying or eliminating suspects.*

---

# DETROIT POLICE DEPARTMENT

### 203.11 Eyewitness Identification and Lineups

#### 203.11 - 3.5  *Photo Array*
*A means of presenting photographs to an eyewitness for the purpose of identifying or eliminating suspects.*

#### 203.11 - 3.6  *Sequential*
*Presentation of a series of photographs or individuals to a witness and or a victim one at a time.*

#### 203.11 - 3.7 *Showup*
*The presentation of a suspect to an eyewitness within a short time frame following the commission of a crime to eliminate them as a possible perpetrator.  Showups, sometimes referred to as field identifications, are conducted in a contemporaneous time frame and proximity to the crime.*

#### 203.11 - 3.8 *Simultaneous*
*Presentation of a series of photographs or individuals to a witness and or a victim all at once.*

#### 203.11 – 3.9 *Victim*
*For purposes of this directive, an individual who is allegedly the victim of a crime and who also meets the definition of Witness under this policy.*

#### 203.11 – 3.10 *Witness*
*For purposes of this directive, an eyewitness, meaning an individual who saw the suspect in person.*

## 203.11 - 4 Procedures

#### 203.11 - 4.1 *Showups*
*The use of showups should be avoided whenever possible in preference to the use of a live lineup or photo array procedure.  However, when circumstances require the prompt presentation of a suspect to a witness and or a victim, the following guidelines shall be followed to minimize potential suggestiveness and increase reliability:*

a. *Document the witness's and or a victim's description of the perpetrator prior to conducting the showup. This description should be clearly noted as the witness and or victims' description and separate from the description noted by the member;*
b. *Conduct a showup only when the suspect is detained within a reasonable time frame after the commission of the offense and within a close physical proximity to the location of the crime;*
c. *Members shall obtain supervisory approval before conducting a showup;*

# DETROIT POLICE DEPARTMENT

### 203.11 Eyewitness Identification and Lineups

d. Do not use a showup procedure if probable cause to arrest the suspect has already been established;

e. Transport the witness and or the victim to the location of the suspect whenever possible. Members shall not transport the suspect to the witness and or victim;

f. If possible, avoid conducting a showup when the suspect is in a patrol vehicle, handcuffed, or physically restrained by Department members, unless safety concerns make this impractical;

g. Do not take a suspect to the witness's and or victim's residence unless it is the scene of the crime and without the consent of both the suspect and the witness or victim;

h. Caution the witness and or victim that the person they are about to see may or may not be the perpetrator – and it is equally important to clear an innocent person. The witness and or victim should also be advised that the investigation will continue regardless of the outcome of the showup;

i. Do not conduct the showup with more than one witness and or victim present at a time;

j. Separate witnesses and or victims and do not allow communication between them before or after conducting a showup;

k. If one witness and or victim identifies the suspect, use a live lineup or photo array for remaining witnesses;

l. Do not present the same suspect to the same witness and or victim more than once;

m. Do not require showup suspects to put on clothing worn by, speak words uttered by, or perform other actions of the perpetrator;

n. Members should avoid words or conduct of any type that may suggest to the witness and or victim that the individual is or may be the perpetrator;

o. Remind the witness and or victim not to talk about the showup to other witnesses and or victims until police or prosecutors deem it permissible;

p. Videotape the identification process using an in-car or body-worn camera;

q. Members shall not use a cellular phone or other mobile communication device for a showup; and

r. Members shall document the time and location of the showup, the members present, the result of the procedure, and any other relevant information on their officer's daily report.

# DETROIT POLICE DEPARTMENT

## 203.11 Eyewitness Identification and Lineups

### 203.11 - 4.2 *Basic Procedures for Conducting a Live Lineup or Photo Array*

1. *A live lineup or photo array may only be administered to a witness and or victim as defined in this policy.*
2. *Prior to conducting a live lineup or photo array, members shall have the witness and or victim provide a recap of the incident to provide clarity that the witness and or victim has actual recollection of the incident and the suspect.*
3. *Prior to conducting a photographic line-up, a supervisor shall ensure that there is an independent basis supported by reliable evidence that the suspect, who will be presented in the line-up, committed the crime. An investigative lead generated by a search using facial recognition technology does not alone constitute an independent basis that the person selected as the lead committed the crime.*
4. *The photographic lineup shall not contain an image derived from facial recognition.*
5. *All photo lineups will be conducted using the sequential, double-blind presentation technique to ensure effective eye-witness identification. This means that an investigator, other than the lead investigator, who does not know who the suspect is, will present the line-up to the witness and or victim. It also means that photographs will be presented one-by-one to the witness and or victim.*
6. *The live lineup or photo array should consist of a minimum of six (6) individuals or photographs. Use a minimum of five (5) fillers and only one suspect.*
7. *Fillers should be reasonably similar in age, height, weight, and general appearance and be of the same sex and race, in accordance with the witness's and or victim's description of the offender.*
8. *Avoid the use of fillers who so closely resemble the suspect that a person familiar with the suspect might find it difficult to distinguish the suspect from the fillers (i.e., twins, look-alikes, facial recognition derived images, etc.).*
9. *Create a consistent appearance between the suspect and the fillers with respect to any unique or unusual features (e.g. scars, tattoos, facial hair) used to describe the perpetrator by artificially adding or concealing that feature on the fillers.*
10. *If there is more than one suspect, include only one in each live lineup or photo array.*
11. *During a double-blind presentation, no one who is aware of the suspect's identity should be present during the administration of the photo array. However, during a live lineup, the witnessing attorney should be present.*
12. *Place suspects in different positions in each live lineup or photo array.*
13. *Neither witnesses nor victims should be permitted to see or be shown any photos or images of the suspect prior to or during the live lineup or photo array other than the photo of the suspect included in the photo array at the time it is administered.*
14. *The live lineup or photo array should be shown to only one witness and or victim at a time; in order to prevent participating witnesses and or victims from being aware of the responses of other witnesses and or victims, members should separate witnesses and or victims and warn them not to communicate with each other about the lineup or images involved in the lineup until all witnesses and or victims have completed the live lineup or photo array.*

# DETROIT POLICE DEPARTMENT

**MANUAL**

15. Multiple identification procedures should not be conducted in which the same witness and or victim views the same suspect more than once.
16. Members shall not use statements, cues, casual comments, or provide unnecessary or irrelevant information that in any manner may influence the witnesses' and or victim's decision-making process or perception. In investigations where facial recognition technology was used prior to the lineup, members shall not inform the witness or victim that facial recognition technology was used or that it generated information contributing to the inclusion of an individual in the lineup.
17. The proceeding must be conducted in a fair manner, so as not to be unduly suggestive of the suspect. This is important because any remarks could later be interpreted as an attempt to influence the identification.
18. The administrator shall ask the witness and or victim to complete and sign a live lineup or photo array form at the time of the lineup. As part of the form, the witness and or victim shall record their degree of confidence in their identification.
19. Live lineup and photo array procedures shall be video and audio recorded, unless doing so is not possible. If a procedure is not recorded, a written record shall be created and the reason for not recording shall be documented. In the case of live lineups that cannot be recorded, members shall take and preserve a still photograph of each individual in the lineup.
20. The administrator shall document all parties present during the live lineup.

## 203.11 - 4.3 *Photographic Arrays*

*Prior to conducting a photographic lineup, a supervisor shall ensure that there is an independent basis supported by reliable evidence that the suspect, whose picture is to be presented in the course of the photo lineup, committed the crime. An investigative lead generated by a search using facial recognition technology does not alone constitute an independent basis.*

1. When creating a photo array, members shall follow the below guidelines:
   a. Do not use a facial recognition derived image;
   b. Use photos contemporary to when the crime occurred;
   c. Use black and white photos only if there are no color photos available;
   d. Do not mix color and black and white photos;
   e. Use photos of the same size and basic composition;
   f. Never mix mug shots with other photos;
   g. Do not include more than one photo of the same suspect; and
   h. Cover any portions of mug shots or other photos that provide identifying information on the subject – and similarly cover other photos used in the array.
   i. Do not use images of people who so closely resemble the suspect that a person familiar with the suspect might find it difficult to distinguish the suspect from the fillers (i.e., twins, look-alikes, facial recognition derived images, etc.).

# DETROIT POLICE DEPARTMENT

### 203.11 Eyewitness Identification and Lineups

2. *The sequential procedure process should be preserved as part of the case file.*
3. A *witnessing* attorney *must* be present if a witness and or victim views photographs when the suspect is in custody. *Members shall obtain the attorney's information including their name, phone number, address, and state bar number.*
4. The attorney shall initial photocopies of all photographs used in the *photo array*. The officer in charge of the case shall ensure that attorneys witnessing the photo *array* are provided with a document outlining the attorney's role at the photo show up.
5. Where a witness and or victim identifies the suspect through the use of photographs, the "totality of the circumstances" test is used to determine whether the photographs utilized are not unnecessarily suggestive of any particular suspect.

### 203.11 - 4.4 *Live Lineups*

1. *When conducting the live lineup, members shall follow the below guidelines:*

   a. *The administrator of a live lineup must be a blind administrator who does not know the identity of the suspect;*
   b. *Ensure that all persons in the live lineup are numbered consecutively and are referred to only by number; and*
   c. *Document all parties present at the live lineup.*

2. *The officer in charge of the case is responsible for the following:*

   a. *Scheduling the live lineup on a date and at a time that is convenient for all concerned parties, to include the witnessing attorney and any witnesses and or victims;*
   b. *Ensuring compliance with any legal requirements for transfer of the subject to the live lineup location if they are incarcerated at a detention center; and*
   c. *Making arrangements to have persons act as fillers.*

3. A written record, the *Lineup* and Photo Identification Record (DPD355), should include:
   a. Names, *age,* and addresses of all persons whose photographs are to be used in the *live lineup or photo array;*
   b. Physical description of all persons whose photographs are to be used in the *live lineup or photo array;*
   c. Names and addresses of all persons present at the *live lineup or photo array;*
   d. Statements of identifying witnesses and or victims while making the identification; and
   e. *The witness's and or victim's degree of confidence in their identification, as specified above in 203.11 – 4.2(18).*

# DETROIT POLICE DEPARTMENT

### 203.11 Eyewitness Identification and Lineups

4. A *live* lineup cannot be avoided by having a witness and or victim view photographs when a formal *live* lineup is *reasonably* possible. *A photo array shall* not *be* conduct*ed* if the suspect is in custody, unless:
    a. It is not possible to arrange a proper lineup;
    b. There are an insufficient number of persons available with the defendant's physical characteristics;
    c. The nature of the case requires immediate identification;
    d. The witnesses and or victims are *physically unable to attend a lineup*; or
    e. The subject refuses to participate in a lineup and by this action would seek to destroy the value of the identification.

5. All live lineups shall be photographed.
    a. The name, rank, and assignment of the *member* taking the photograph shall be entered on the *Lineup* and Photo Identification Record (DPD355), in the box designated "OTHERS PRESENT." The photograph shall then be attached to the *Lineup* and Photo Identification Record and become a permanent part of the court file.
    b. The officer in charge of the case shall be responsible for the photographing of lineups conducted at all other locations.

## 203.11 - 4.5 Refusal of Detainee to Stand in a Lineup

1. If a detainee refuses to stand in a lineup, the following procedures shall be followed:
    a. A determination shall be made as to the availability of a photograph of the detainee suitable for use in photograph identification; and
    b. Photograph identification can be used in lieu of a lineup if the subject refuses to participate in a lineup and, by the subject's action, would seek to destroy the value of the identification.

2. Regardless *of* whether a photograph is available or not, between the hours of 8:30 a.m. to 4:30 p.m. on weekdays and from 8:30 a.m. to 1:00 p.m., on Saturdays, Sundays, and holidays, the Wayne County Prosecutor's Office shall be contacted. *At any other time*, the Control Desk shall be contacted for the number of the on-duty assistant prosecuting attorney.

3. The prosecuting attorney contacted shall be informed if a photograph of the detainee is available or not and shall be informed that the detainee refuses to participate in a lineup. Department members and detention personnel shall be guided by the advice of the prosecuting attorney. Although the Michigan Supreme Court has ruled that forced participation in a lineup does not constitute unreasonable search and seizure, no force shall be exerted to force participation of a detainee in a lineup unless the prosecuting attorney contacted gives direction for such action.

# DETROIT POLICE DEPARTMENT

**203.11 Eyewitness Identification and Lineups**

### 203.11 - 4.6 *Limited Use of Video for Identification Purposes*
*Members shall only utilize video to confirm the identity of a subject should the witness and or victim be a close associate or family member of the subject (e.g. mother / father or close friend).*

## 203.11 - 5 Witnessing Attorney

1. *A witnessing attorney shall be present for all live lineups and photo arrays when the suspect is in custody.*
2. *Should the suspect be criminally charged and have obtained a lawyer, then the suspect's defense attorney shall act as a witnessing attorney. In all other cases, the officer in charge of the case shall call Notification and Control who shall identify the witnessing attorney.*
3. The purpose *of the witnessing attorney*'s presence is not to interfere with the conduct of the *live* lineup or *photo array* but to observe the procedures used by the law enforcement officers, so that in any subsequent court proceeding the accused will have a lawyer as a witness to any unfair suggestive procedures that may have been employed during the lineup or *photo array*.
4. Under no circumstances may a lawyer interfere with the conduct of the *live* lineup. While counsel may advise a client not to make incriminating statements, counsel may not advise a client to refuse to participate in the *live* lineup or any requested physical demonstrations *including a voice test, a handwriting sample, to wear certain clothing to assume a stance, to walk or to gesture.* If any lawyer should so advise a client, the Prosecuting Attorney's Office should be notified so that appropriate action may be considered.
5. *The OIC's responsibility is to document any objections, procedural violations, or other concerns voiced by the witnessing attorney during the live lineup or photo array.*

# Attachment D

Training Provisions

Training Provisions for Settlement in *Williams v. City of Detroit*

1. The Detroit Police Department (DPD) will continue its current practice of requiring all newly promoted or newly hired detectives to complete a detective training school (currently known as the Detective Promotional Assessment Course (DPAC)). In addition to its current components, the detective training school shall include:
   a. A unit on the basics of how facial recognition technology functions, what features of a probe image can affect the reliability of the result of a facial recognition search, and why facial recognition technology alone should not be relied on for a positive identification;
   b. A unit on all of the requirements of DPD's manual directive on facial recognition;
   c. A unit on all of the requirements of DPD's manual directive on eyewitness identification and lineups.
2. DPD shall provide its sworn officers with training on the manual directives for facial recognition and for eyewitness identification and lineups as part of their annual in-service training. Training on both policies will also be incorporated into the training programs for new sergeants and lieutenants (SPAC and LPAC programs).
3. DPD shall train detectives, investigators, or supervisors of detectives and investigators stationed in each precinct detective unit (PDU) that utilize facial recognition technology on how facial recognition technology functions.
   a. The facial recognition training shall include training on the following subjects:
      i. That a facial recognition investigative lead is not a positive identification;
      ii. The basic steps that occur in a one-to-many facial recognition search, the image databases that are searched by each algorithm and what type of photos are contained in each database, the standards by which the system identifies possible matches, and the human process of morphological comparison that follows;
      iii. The fact that the accuracy of a facial recognition result depends on the probe image's quality, lighting, face angle, and face obstructions, among other factors;
      iv. The requirements of Manual Directive 307. 5-3, 307.5-4, 307.5-5.3, 307.5-5.4;
      v. Understanding the Investigative Lead Report and the Vetting Report.
      vi. The fact that studies have shown that facial recognition technology is not as accurate at identifying people with darker skin tones as it is at identifying white people.
   b. The facial recognition training shall be conducted by one or more trained facial recognition examiner(s) trained in the technical and operational details of the facial recognition system utilized by the Detroit Police Department and Michigan State Police.

    c.   DPD shall complete training under this section within one year of the date of this Agreement for all currently active detectives, investigators, or supervisors of detectives and investigators stationed in each precinct detective unit (PDU) that utilize facial recognition technology.  This one-year timeline shall not include training of any sworn members who are unavailable for training due to an approved long-term leave of absence, including but not limited to members unavailable due to military service, disability, suspension, or family-emergency-medical-leave. Those members shall be trained as soon as practicable upon their return to active service with DPD.

# Attachment E

General Release

# GENERAL RELEASE

███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████

████████████████████████████████████████

██████████████████████████████████████████████

███████████████████

 

██    ████████████████████

     ████████████████████████████  ██████  ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

     ███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

██    ██████████████████████████████

     ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

██    ██████████████████████████████████████████

     ██████████████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

V 7-1-2021



V 7-1-2021



**DODSON
FOWLER
WILLIAMS
& NESI, PLC**

*Main Office*

18050 Mack Ave.
Grosse Pointe Farms,
MI, 48230

(313) 458-8276
(313) 469-7085 (Fax)

*Village Office*

722 Notre Dame
Grosse Pointe, MI
48230

(313) 886-5769
(313) 886-5851 (Fax)

dfwnplc.com

***Attorneys***

Nathan A. Dodson, Esq.
Aimee M. Fowler, Esq.
Daniel J. Williams, Esq.
Christopher J. Nesi, Esq.

# EXHIBIT 2



**POLICE DEPARTMENT**

Detroit Public Safety Headquarters
1301 Third Street, Suite 7S-751
Detroit, Michigan 48226

Phone: 313-596-1800
Fax:    313-596-6813

April 3, 2024

Mr. QuanTez Pressley, Chairperson
Board of Police Commissioners
Detroit Public Safety Headquarters
1301 Third Street, Suite 7S-767
Detroit, Michigan 48226



APPROVED

MAY 3 0 2024

BOARD OF POLICE COMMISSIONERS

Re:  **POLICIES FOR REVIEW**

Dear Chairperson Pressley:

I am pleased to present to you the attached Facial Recognition Policy, new templates for Facial Recognition, and Eyewitness Identification and Lineups Policy that was collaboratively worked on and agreed upon with Philip Mayor, Ramis Wadood, Dan Korobkin, and Nate Wessler of the American Civil Liberties Union (ACLU), Michael Steinberg of the University of Michigan Law School, and the assistance of the United States District Court – Eastern Michigan District.

Should you have any questions, please feel free to contact 2nd Deputy Chief Grant Ha, Legal Advisor to the Chief of Police, Monday through Friday, 8:00 a.m. until 4:00 pm at 313-596-1803.

Sincerely,

**JAMES E. WHITE**
Chief of Police

JEW/gh

Attachment:
1. Facial Recognition Policy
2. Facial Recognition Templates
3. Eyewitness Identification and Lineups Policy

# DETROIT POLICE DEPARTMENT

MANUAL

| FSeries 200 Operations | Effective Date | Review Date Two Years | Directive Number |
|---|---|---|---|
| Chapter 203 – Criminal Investigations | | | 203.11 |
| Reviewing Office *Investigative Operations* | | | ☐ New |
| References | | | ☐ Directive ☒ Revised Revisions in *Italics* |

## EYEWITNESS IDENTIFICATION AND LINEUPS

### 203.11 - 1 PURPOSE

The purpose of this directive is to establish the guidelines for eyewitness identification *procedures involving showups, photo arrays, and live lineups. Erroneous eyewitness identifications have been cited as the factor most frequently associated with wrongful convictions. Therefore, in addition to eyewitness identification, all appropriate investigative steps and methods should be employed to uncover evidence that either supports or eliminates the suspect identification.*

### 203.11 - 2 POLICY

Members shall strictly adhere to this directive in order to maximize the reliability of identifications, minimize *erroneous identifications, and gather evidence that conforms to established legal procedures.*

### 203.11 - 3 Definitions

#### 203.11 - 3.1 *Administrator*
*The law enforcement official conducting the identification procedure.*

#### 203.11 - 3.2 *Double-Blind Presentation*
*The administrator conducting the identification procedure does not know the suspect's identity.*

#### 203.11 - 3.3 *Filler*
*A live person, or a photograph of a person, included in an identification procedure who is not considered a suspect.*

#### 203.11 - 3.4 *Live Lineup*
*The process of presenting live individuals to an eyewitness for the purpose of identifying or eliminating suspects.*

# DETROIT POLICE DEPARTMENT

MANUAL

## 203.11 Eyewitness Identification and Lineups

### 203.11 - 3.5  Photo Array
A means of presenting photographs to an eyewitness for the purpose of identifying or eliminating suspects.

### 203.11 - 3.6  Sequential
Presentation of a series of photographs or individuals to a witness and or a victim one at a time.

### 203.11 - 3.7  Showup
The presentation of a suspect to an eyewitness within a short time frame following the commission of a crime to eliminate them as a possible perpetrator.  Showups, sometimes referred to as field identifications, are conducted in a contemporaneous time frame and proximity to the crime.

### 203.11 - 3.8  Simultaneous
Presentation of a series of photographs or individuals to a witness and or a victim all at once.

### 203.11 – 3.9  Victim
For purposes of this directive, an individual who is allegedly the victim of a crime and who also meets the definition of Witness under this policy.

### 203.11 – 3.10  Witness
For purposes of this directive, an eyewitness, meaning an individual who saw the suspect in person.

## 203.11 - 4 Procedures
### 203.11 - 4.1  Showups
The use of showups should be avoided whenever possible in preference to the use of a live lineup or photo array procedure.  However, when circumstances require the prompt presentation of a suspect to a witness and or a victim, the following guidelines shall be followed to minimize potential suggestiveness and increase reliability:

a. Document the witness's and or a victim's description of the perpetrator prior to conducting the showup. This description should be clearly noted as the witness and or victims' description and separate from the description noted by the member;

b. Conduct a showup only when the suspect is detained within a reasonable time frame after the commission of the offense and within a close physical proximity to the location of the crime;

c. Members shall obtain supervisory approval before conducting a showup;

# DETROIT POLICE DEPARTMENT

MANUAL

## 203.11 Eyewitness Identification and Lineups

d. Do not use a showup procedure if probable cause to arrest the suspect has already been established;

e. Transport the witness and or the victim to the location of the suspect whenever possible. Members shall not transport the suspect to the witness and or victim;

f. If possible, avoid conducting a showup when the suspect is in a patrol vehicle, handcuffed, or physically restrained by Department members, unless safety concerns make this impractical;

g. Do not take a suspect to the witness's and or victim's residence unless it is the scene of the crime and without the consent of both the suspect and the witness or victim;

h. Caution the witness and or victim that the person they are about to see may or may not be the perpetrator – and it is equally important to clear an innocent person. The witness and or victim should also be advised that the investigation will continue regardless of the outcome of the showup;

i. Do not conduct the showup with more than one witness and or victim present at a time;

j. Separate witnesses and or victims and do not allow communication between them before or after conducting a showup;

k. If one witness and or victim identifies the suspect, use a live lineup or photo array for remaining witnesses;

l. Do not present the same suspect to the same witness and or victim more than once;

m. Do not require showup suspects to put on clothing worn by, speak words uttered by, or perform other actions of the perpetrator;

n. Members should avoid words or conduct of any type that may suggest to the witness and or victim that the individual is or may be the perpetrator;

o. Remind the witness and or victim not to talk about the showup to other witnesses and or victims until police or prosecutors deem it permissible;

p. Videotape the identification process using an in-car or body-worn camera;

q. Members shall not use a cellular phone or other mobile communication device for a showup; and

r. Members shall document the time and location of the showup, the members present, the result of the procedure, and any other relevant information on their officer's daily report.

# DETROIT POLICE DEPARTMENT

### 203.11 Eyewitness Identification and Lineups

### 203.11 - 4.2 Basic Procedures for Conducting a Live Lineup or Photo Array

1. A live lineup or photo array may only be administered to a witness and or victim as defined in this policy.
2. Prior to conducting a live lineup or photo array, members shall have the witness and or victim provide a recap of the incident to provide clarity that the witness and or victim has actual recollection of the incident and the suspect.
3. Prior to conducting a photographic line-up, a supervisor shall ensure that there is an independent basis supported by reliable evidence that the suspect, who will be presented in the line-up, committed the crime. An investigative lead generated by a search using facial recognition technology does not alone constitute an independent basis that the person selected as the lead committed the crime.
4. The photographic lineup shall not contain an image derived from facial recognition.
5. All photo lineups will be conducted using the sequential, double-blind presentation technique to ensure effective eye-witness identification. This means that an investigator, other than the lead investigator, who does not know who the suspect is, will present the line-up to the witness and or victim. It also means that photographs will be presented one-by-one to the witness and or victim.
6. The live lineup or photo array should consist of a minimum of six (6) individuals or photographs. Use a minimum of five (5) fillers and only one suspect.
7. Fillers should be reasonably similar in age, height, weight, and general appearance and be of the same sex and race, in accordance with the witness's and or victim's description of the offender.
8. Avoid the use of fillers who so closely resemble the suspect that a person familiar with the suspect might find it difficult to distinguish the suspect from the fillers (i.e., twins, look-alikes, facial recognition derived images, etc.).
9. Create a consistent appearance between the suspect and the fillers with respect to any unique or unusual features (e.g. scars, tattoos, facial hair) used to describe the perpetrator by artificially adding or concealing that feature on the fillers.
10. If there is more than one suspect, include only one in each live lineup or photo array.
11. During a double-blind presentation, no one who is aware of the suspect's identity should be present during the administration of the photo array. However, during a live lineup, the witnessing attorney should be present.
12. Place suspects in different positions in each live lineup or photo array.
13. Neither witnesses nor victims should be permitted to see or be shown any photos or images of the suspect prior to or during the live lineup or photo array other than the photo of the suspect included in the photo array at the time it is administered.
14. The live lineup or photo array should be shown to only one witness and or victim at a time; in order to prevent participating witnesses and or victims from being aware of the responses of other witnesses and or victims, members should separate witnesses and or victims and warn them not to communicate with each other about the lineup or images involved in the lineup until all witnesses and or victims have completed the live lineup or photo array.

## DETROIT POLICE DEPARTMENT

### 203.11 Eyewitness Identification and Lineups

15. Multiple identification procedures should not be conducted in which the same witness and or victim views the same suspect more than once.

16. Members shall not use statements, cues, casual comments, or provide unnecessary or irrelevant information that in any manner may influence the witnesses' and or victim's decision-making process or perception. In investigations where facial recognition technology was used prior to the lineup, members shall not inform the witness or victim that facial recognition technology was used or that it generated information contributing to the inclusion of an individual in the lineup.

17. The proceeding must be conducted in a fair manner, so as not to be unduly suggestive of the suspect. This is important because any remarks could later be interpreted as an attempt to influence the identification.

18. The administrator shall ask the witness and or victim to complete and sign a live lineup or photo array form at the time of the lineup. As part of the form, the witness and or victim shall record their degree of confidence in their identification.

19. Live lineup and photo array procedures shall be video and audio recorded, unless doing so is not possible. If a procedure is not recorded, a written record shall be created and the reason for not recording shall be documented. In the case of live lineups that cannot be recorded, members shall take and preserve a still photograph of each individual in the lineup.

20. The administrator shall document all parties present during the live lineup.

### 203.11 - 4.3 Photographic Arrays

Prior to conducting a photographic lineup, a supervisor shall ensure that there is an independent basis supported by reliable evidence that the suspect, whose picture is to be presented in the course of the photo lineup, committed the crime. An investigative lead generated by a search using facial recognition technology does not alone constitute an independent basis.

1. When creating a photo array, members shall follow the below guidelines:
   a. Do not use a facial recognition derived image;
   b. Use photos contemporary to when the crime occurred;
   c. Use black and white photos only if there are no color photos available;
   d. Do not mix color and black and white photos;
   e. Use photos of the same size and basic composition;
   f. Never mix mug shots with other photos;
   g. Do not include more than one photo of the same suspect; and
   h. Cover any portions of mug shots or other photos that provide identifying information on the subject – and similarly cover other photos used in the array.
   i. Do not use images of people who so closely resemble the suspect that a person familiar with the suspect might find it difficult to distinguish the suspect from the fillers (i.e., twins, look-alikes, facial recognition derived images, etc.).

# DETROIT POLICE DEPARTMENT

MANUAL

### 203.11 Eyewitness Identification and Lineups

2. *The sequential procedure process should be preserved as part of the case file.*
3. A *witnessing* attorney *must* be present if a witness and or victim views photographs when the suspect is in custody. *Members shall obtain the attorney's information including their name, phone number, address, and state bar number.*
4. The attorney shall initial photocopies of all photographs used in the *photo array.* The officer in charge of the case shall ensure that attorneys witnessing the photo *array* are provided with a document outlining the attorney's role at the photo show up.
5. Where a witness and or victim identifies the suspect through the use of photographs, the "totality of the circumstances" test is used to determine whether the photographs utilized are not unnecessarily suggestive of any particular suspect.

## 203.11 - 4.4 *Live Lineups*

1. *When conducting the live lineup, members shall follow the below guidelines:*

   a. *The administrator of a live lineup must be a blind administrator who does not know the identity of the suspect;*
   b. *Ensure that all persons in the live lineup are numbered consecutively and are referred to only by number; and*
   c. *Document all parties present at the live lineup.*

2. *The officer in charge of the case is responsible for the following:*

   a. *Scheduling the live lineup on a date and at a time that is convenient for all concerned parties, to include the witnessing attorney and any witnesses and or victims;*
   b. *Ensuring compliance with any legal requirements for transfer of the subject to the live lineup location if they are incarcerated at a detention center; and*
   c. *Making arrangements to have persons act as fillers.*

3. A written record, the *Lineup* and Photo Identification Record (DPD355), should include:
   a. Names, *age,* and addresses of all persons whose photographs are to be used in the *live lineup or photo array;*
   b. Physical description of all persons whose photographs are to be used in the *live lineup or photo array;*
   c. Names and addresses of all persons present at the *live lineup or photo array;*
   d. Statements of identifying witnesses and or victims while making the identification; and
   e. The witness's and or victim's degree of confidence in their identification, as specified above in *203.11 – 4.2(18).*

# DETROIT POLICE DEPARTMENT

MANUAL

### 203.11 Eyewitness Identification and Lineups

4. A *live* lineup cannot be avoided by having a witness and or victim view photographs when a formal *live* lineup is *reasonably* possible. *A photo array shall* not *be conducted* if the suspect is in custody, unless:
   a. It is not possible to arrange a proper lineup;
   b. There are an insufficient number of persons available with the defendant's physical characteristics;
   c. The nature of the case requires immediate identification;
   d. The witnesses and or victims are *physically unable to attend a lineup*; or
   e. The subject refuses to participate in a lineup and by this action would seek to destroy the value of the identification.

5. All live lineups shall be photographed.
   a. The name, rank, and assignment of the *member* taking the photograph shall be entered on the *Lineup* and Photo Identification Record (DPD355), in the box designated "OTHERS PRESENT." The photograph shall then be attached to the *Lineup* and Photo Identification Record and become a permanent part of the court file.
   b. The officer in charge of the case shall be responsible for the photographing of lineups conducted at all other locations.

### 203.11 - 4.5 Refusal of Detainee to Stand in a Lineup

1. If a detainee refuses to stand in a lineup, the following procedures shall be followed:
   a. A determination shall be made as to the availability of a photograph of the detainee suitable for use in photograph identification; and
   b. Photograph identification can be used in lieu of a lineup if the subject refuses to participate in a lineup and, by the subject's action, would seek to destroy the value of the identification.

2. Regardless *of* whether a photograph is available or not, between the hours of 8:30 a.m. to 4:30 p.m. on weekdays and from 8:30 a.m. to 1:00 p.m., on Saturdays, Sundays, and holidays, the Wayne County Prosecutor's Office shall be contacted. *At any other time*, the Control Desk shall be contacted for the number of the on-duty assistant prosecuting attorney.

3. The prosecuting attorney contacted shall be informed if a photograph of the detainee is available or not and shall be informed that the detainee refuses to participate in a lineup. Department members and detention personnel shall be guided by the advice of the prosecuting attorney. Although the Michigan Supreme Court has ruled that forced participation in a lineup does not constitute unreasonable search and seizure, no force shall be exerted to force participation of a detainee in a lineup unless the prosecuting attorney contacted gives direction for such action.

# DETROIT POLICE DEPARTMENT

### 203.11 Eyewitness Identification and Lineups

### 203.11 - 4.6 *Limited Use of Video for Identification Purposes*
*Members shall only utilize video to confirm the identity of a subject should the witness and or victim be a close associate or family member of the subject (e.g. mother / father or close friend).*

## 203.11 - 5 Witnessing Attorney

1. *A witnessing attorney shall be present for all live lineups and photo arrays when the suspect is in custody.*
2. *Should the suspect be criminally charged and have obtained a lawyer, then the suspect's defense attorney shall act as a witnessing attorney. In all other cases, the officer in charge of the case shall call Notification and Control who shall identify the witnessing attorney.*
3. The purpose of the witnessing attorney's presence is not to interfere with the conduct of the *live* lineup or *photo array* but to observe the procedures used by the law enforcement officers, so that in any subsequent court proceeding the accused will have a lawyer as a witness to any unfair suggestive procedures that may have been employed during the lineup or *photo array*.
4. Under no circumstances may a lawyer interfere with the conduct of the *live* lineup. While counsel may advise a client not to make incriminating statements, counsel may not advise a client to refuse to participate in the *live* lineup or any requested physical demonstrations *including a voice test, a handwriting sample, to wear certain clothing to assume a stance, to walk or to gesture.* If any lawyer should so advise a client, the Prosecuting Attorney's Office should be notified so that appropriate action may be considered.
5. *The OIC's responsibility is to document any objections, procedural violations, or other concerns voiced by the witnessing attorney during the live lineup or photo array.*



**DODSON
FOWLER
WILLIAMS
& NESI, PLC**

*Main Office*

18050 Mack Ave.
Grosse Pointe Farms,
MI, 48230

(313) 458-8276
(313) 469-7085 (Fax)

*Village Office*

722 Notre Dame
Grosse Pointe, MI
48230

(313) 886-5769
(313) 886-5851 (Fax)

dfwnplc.com

***Attorneys***

Nathan A. Dodson, Esq.
Aimee M. Fowler, Esq.
Daniel J. Williams, Esq.
Christopher J. Nesi, Esq.

# EXHIBIT 3

UD-94 (2-89)

AUTHORITY: PA 59 of 1935

Compliance Voluntary

## DETROIT POLICE REQUEST FOR WARRANT

| 2510260176 | **INVESTIGATOR'S REPORT** | | |
|---|---|---|---|
| Police Offense Number | Homicide File # | | Prosecutor Case No. |
| ☐ | **25-185** | DATE: 10/31/2025 | |

| CUST | DEFENDANT NAME (Last, First, Middle) | FULL ADDRESS | AGE | SEX | RACE | D.O.B. | ST. & LOCAL I.D. |
|---|---|---|---|---|---|---|---|
| Y | Jennings, Carlos, Kijuan | ▉ | ▉ | M | B | ▉ | 2750440H |
| | | | | | | | |
| | | | | | | | |

Offense (To be filled in by Prosecutor)

| Place of Offense: | | Date: | 10/26/2025 | Date of Complaint: |
|---|---|---|---|---|
| 10719 Beaconsfield S. | | Time | 13:17 AM | 10/31/2025 |

| Complainant's Name (Last, First, Middle) | Full Address: | | Age | Sex | Race | Phone No. |
|---|---|---|---|---|---|---|
| Smith, Steven | See File | | 56 | M | B | See File |

| Person to Sign (Last, First, Middle) | Reviewing Attorney and Bar No. |
|---|---|
| | |

## DETAILS OF INVESTIGATION

GUN
USED  **Y**

#KILLED/INJURED
**YES**

### CIRCUMSTANCES:

On October 26, 2025, at approximately 1:17 p.m., two ShotSpotter activations were recorded in the area of 10927 Beaconsfield Street, Detroit, MI 48205—one indicating twenty-one (21) rounds and another indicating six (6) rounds discharged. Multiple 911 callers also reported that a male was lying face down in a driveway, unresponsive and not breathing. Scout 9-8, manned by Police Officer Darryl Cowart (Badge #807) and Police Officer Lara Saad (Badge #4606), responded to the location and observed the victim, identified as Steven Smith, lying face down in the driveway of 10917 Beaconsfield Street. Medics arrived and pronounced the victim deceased on scene. The victim's remains were transported to the Wayne County Medical Examiner's Office where a post mortem examination was conducted. Dr. Leigh Hlavaty Dr. ruled the cause of death to be from multiple gunshot wounds, and the manner of death homicide.

**Relationship:** Father-in-law and son-in-law

| | Reviewed | | |
|---|---|---|---|
| Officer in Charge      Badge.      Homicde      Precinct/Bureau | Approved By: | Commanding Officer | Precinct/Bureau |

**Det. Jeffery Cooper D-576 HOMICIDE**

UD-94 (2-89)

AUTHORITY: PA 59 of 1935

Compliance Voluntary

## DETROIT POLICE REQUEST FOR WARRANT

### INVESTIGATION:

The investigation revealed that on October 26, 2025, Steven Smith, along with his son-in-law, Carlos Jennings, departed from ████████████████ in Detroit shortly before 1:00 p.m. with the intention of going to a hardware store. At approximately 1:16 p.m., a ShotSpotter notification was received for approximately twenty (20) or more gunshots in the area of 10917 Berkshire Street. Responding officers arrived on scene and discovered the decedent lying face up in the driveway, suffering from multiple gunshot wounds.

The decedent's two daughters, identified as Sharda Smith and Staveena Jennings, arrived on scene shortly thereafter, frantically searching for their father, Steven Smith, and Staveena's husband, Carlos Jennings. Staveena Jennings stated that her father and husband had recently left the Evanston Street address to go to the hardware store. She reported hearing gunshots in the area and, after being unable to reach either of them by phone, went to the scene to look for them. Upon arrival, she observed her father lying in the driveway at 10917 Beaconsfield.

### Sharda Smith statement:

While on scene, Ms. Sharda Smith was interviewed by Officer Kyle Delaney. During the interview, Ms. Smith stated that she had been on the phone with her father, Steven Smith, who was giving her advice at the time of the incident. She reported that her sister, Staveena Jennings, informed her that Carlos Jennings was with their father. Ms. Smith stated that while still on the phone with her father, she suddenly heard multiple gunshots, after which her father stopped responding. She further reported hearing an unknown male voice say, "Now move over, [expletive]," which was the last thing she heard before the call disconnected.

Ms. Smith stated that she immediately went to the area searching for the black 2015 Chrysler 200 that her father and Carlos Jennings had been driving, which is registered to Staveena Jennings. Upon arriving in the area, she located the vehicle parked in the driveway of 9424 Beaconsfield. Ms. Smith observed multiple bullet holes in the windshield, as well as blood on the driver's seat. She promptly notified police of her discovery and provided officers with a video she recorded of the vehicle at that location.

### Staveena Jennings statement:

While on scene, Ms. Staveena Jennings was interviewed by Police Officer Raven Simmons. During the interview, Ms. Jennings stated that earlier that morning, she and her husband, Carlos Jennings, had woken up and she noticed a missed call from her father, Steven Smith. Ms. Jennings stated she returned her father's call, and during their conversation, he mentioned that he was receiving a shot in his foot. Ms. Jennings stated that she and Carlos then got dressed and went to ████████████████, a property they were in the process of renovating to rent out. She stated that while they were at the Evanston address, her father called to inform her that he was on his way. Upon his arrival, Carlos assisted Steven in unloading tools from his vehicle. Ms. Jennings stated that Steven and Carlos each opened a beer and, shortly thereafter, left together to go to the hardware store.

UD-94 (2-89)

AUTHORITY: PA 59 of 1935

Compliance Voluntary

## DETROIT POLICE REQUEST FOR WARRANT

Approximately three to four minutes after their departure, Ms. Jennings received a phone call from her brother, who informed her that their sister, Sharday, had been on the phone with Steven when she heard approximately fifteen gunshots in the background. Ms. Jennings stated she immediately went to a neighbor's house, and together they began driving around the neighborhood searching for Steven and Carlos.

Ms. Jennings further stated that she later met up with her sister, got into her vehicle, and continued looking for the two men. While driving down Beaconsfield near Harper, they observed the black Chrysler 200 that Steven and Carlos had left in. Ms. Jennings stated that the vehicle belonged to her and Carlos. She observed multiple bullet holes in the front of the vehicle and blood inside the cabin. Ms. Jennings stated she was unable to locate Carlos, and repeated attempts to contact him by phone were unsuccessful. Ms. Jennings further mentioned to Detective Jeffery Cooper in a separate interview that Carlos Jennings suffers from Schizophrenia. Ms. Jennings provided these two numbers for Carlos Jennings ███████████ and ███████████

On October 27, 2025, I received a phone call from Ms. Staveena Jennings, who stated she had received an anonymous phone call from an individual claiming to be speaking on behalf of Carlos Jennings. The caller allegedly asked, "What do you want him to do?" Ms. Jennings replied, "I want him to turn himself in." Ms. Jennings further stated that her brother-in-law, Jermaine Jennings, later contacted her, apologized for what had occurred, and stated that he wanted to assist in turning Carlos Jennings in to the authorities. Ms. Jennings further stated that Carlos was wearing a black Nike Tech outfit on the day of the incident, which aligns with witness statements describing the suspect's black hoodie

On October 28, 2025, the affiant, along with members of the Detroit Police Department's Tactical Services Section, executed a search warrant at 10917 Beaconsfield. During the search, the affiant observed live 7.62 Tulammo brand ammunition located in the upstairs bedroom crawl space. This brand and caliber are consistent with the shell casings recovered from the scene.

### Kasaun Watkins statement:

While on scene of the search warrant, I conducted an interview with the homeowner, Mr. Kasaun Watkins, who identified himself as the cousin of Carlos Jennings. Mr. Watkins stated that Jennings frequently visits the residence and keeps a stash of narcotics and an A.K 47 style assault rifle inside of his garage. Mr. Watkins further stated that on the day of the homicide, he was parked down the street smoking marijuana in his van when his wife, Ms. Latonya Watkins, called to inform him that gunshots had been fired outside their home. Mr. Watkins stated that he immediately drove back toward his residence on Beaconsfield and observed a black vehicle with multiple bullet holes traveling past him at a high rate of speed. He added that he had previously seen Carlos Jennings operating that same vehicle. Mr. Watkins further stated that Carlos Jennings has a stash house on the other side of Beaconsfield and pointed out 9424 Beaconsfield, which is the same address the victim's daughter discovered the black Crysler 200 after the murder parked in the driveway.

UD-94 (2-89)

AUTHORITY: PA 59 of 1935
Compliance Voluntary

## DETROIT POLICE REQUEST FOR WARRANT

### Jermaine Jennings Statement:

On October 29, 2025, Jermaine Jennings voluntarily appeared at the Detroit Public Safety Headquarters for an interview. During the interview, Mr. Jennings stated he received a phone call from Sharday Smith informing him that there had been a shooting and that Steven Smith was deceased. Jermaine stated that he went to the location, where he briefly spoke with Staveena and Sharday before locating Carlos Jennings walking in the area. He stated that he told Carlos to get into his vehicle, but Carlos refused to discuss what had happened. Jermaine reported that he then took Carlos to his residence at ███████████████ and allowed him to stay there.

### Eyewitness Cedric Evans statement:

On October 30, 2025, I conducted a live lineup at the Detroit Detention Center. During the lineup, witness Cedric Evans, a Black male born ██████████ of ████████████████ positively identified Carlos Jennings from seat number four.

Mr. Evans stated that he observed Carlos Jennings walking from the area of Gratiot toward Beaconsfield, at which time Jennings retrieved an AK-47 style rifle from his pants and began shooting at the decedent, who was inside a vehicle and on the phone. Mr. Evans further stated that he observed Jennings approach the driver's side of the vehicle and attempt to pull the decedent out; however, he struggled due to the decedent's size. According to Mr. Evans, Jennings eventually placed the AK-47 on the ground, forcibly removed the decedent from the vehicle by his pants, placed the decedent on the ground, secured the rifle in the passenger seat of the vehicle, and then fled the scene in a black sedan.

I received Vivant video from Mr. Evans that shows the suspects black Chrysler 200 fleeing after the shooting. Mr. Evans also provided a photograph he screenshotted from his Vivant camera as the vehicle drove past, the picture is attached below.



On October 31, 2025, I received mapping from Carlos Jennings phone, his telephone number ███████████ s consistent with being at the scene at 1:13 p.m. just three minutes prior to

UD-94 (2-89)

AUTHORITY: PA 59 of 1935

Compliance Voluntary

## DETROIT POLICE REQUEST FOR WARRANT

the fatal shooting.  Mr. Jennings telephone number ▮▮▮▮▮▮▮▮ is consistent with him traveling south after the incident.

### CONFESSIONS / ADMISSIONS:

On October 29, 2025, Carlos Jennings voluntarily arrived at the Detroit Public Safety Headquarters accompanied by his attorney, Dan Williams, to surrender himself to authorities. Mr. Jennings was advised of his constitutional rights, at which time he invoked his right to counsel and declined to provide a statement.

UD-94 (2-89)                                                         AUTHORITY: PA 59 of 1935

                                                                     Compliance Voluntary

### DETROIT POLICE REQUEST FOR WARRANT

**EVIDENCE:**

See tracker evidence sheet.

**LINE UPS:**

On October 30, 2025, I conducted a live lineup at the Detroit Detention Center. During the lineup, witness Cedric Evans, a Black male born █████████ of █████████ positively identified Carlos Jennings from seat number four.

On October 30, 2025, I conducted a live lineup at the Detroit Detention Center. During the lineup, witness Wanda Evans, black female who lives at █████████ she selected seat number six who was not the suspect.

**WITNESS LIST:**

1. Dr. Leigh Hlavaty wil ltestify to performing the post mortem examintation

2. Cedric Evans will testify to his identifying the suspect in a photo lineup.

3. Sharda Smith will testify to her observations and statement

4. Staveena Jennings will testify to her statement

**NINTH PRECINCT PERSONNEL:**

1. Police Officer Lara Saad will testify to her observations and reports.

2. Police Officer Darrell Cowart will testify to his observations and reports.

3. Police Officer Robert Bobcean will testify to his observations and reports.

4. Police Officer Hussein Dakroub will testify to his observations and reports.

5. Police Officer Milik Hill will testify to his observations and reports.

6. Police Officer Alan Urbina will testify to his observations and reports.

7. Police Officer Chris Nieman will testify to his observations and reports.

8. Police Officer Marvin Jennings will testify to his observations and reports.

9. Police Officer Brittni McAlpine will testify to his observations and reports.

10. Police Officer Keith Nightingale will testify to his observations and reports.

11. Police Officer Rebecca Hillman will testify to his observations and reports.



**DODSON
FOWLER
WILLIAMS
& NESI, PLC**

*Main Office*

18050 Mack Ave.
Grosse Pointe Farms,
MI, 48230

(313) 458-8276
(313) 469-7085 (Fax)

*Village Office*

722 Notre Dame
Grosse Pointe, MI
48230

(313) 886-5769
(313) 886-5851 (Fax)

dfwnplc.com

***Attorneys***

Nathan A. Dodson, Esq.
Aimee M. Fowler, Esq.
Daniel J. Williams, Esq.
Christopher J. Nesi, Esq.

# EXHIBIT 4

## REPORTING OFFICER NARRATIVE

| | | OCA |
|---|---|---|
| *Detroit Police Department* | | *251026-0176* |

| Victim | Offense | Date / Time Reported |
|---|---|---|
| *SMITH, STEVEN RAY* | *NEGLIGENT HOMICIDE / MANSLAUGHTER* | *Sun 10/26/2025 13:46* |

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

[10/26/2025 13:49, SAADL352, 34243]

PO LARA SAAD BADGE 4606 BWC 066135
PO DARRELL COWART BADGE 807 BWC 067613
SCOUT 9-8...VEH CODE 205019
NO ARREST MADE/NO FORCE USED

VICTIM - STEVEN RAY SMITH B/M ███████ OF ████████████████████████
SUSPECT(S) - B/M, APPROXIMATELY 6`00"-6`2", THIN BUILD, DARK COMPLEXION, APPROXIMATELY
35-40YO, SHORT/TRIMMED BLACK BEARD, UNKNOWN CLOTHING
WITNESS 1 - POLICE OFFICER DEMETRIUS BROWN BADGE 5121
WITNESS 2 - LATONYA EUGENA NEELEY-WATKINS B/F ████████ OF ████████████████
████████
WITNESS 3 - SHEKEVA DENISE GRIFFIN B/F ██████████████ OF ████████████████
████████
INVOLVED OTHER 1 - KASAUN WATKINS B/M ████████████████ OF ██████████████
████████
INVOLVED OTHER 2 - ANDREA CHRISTINA ROBINSON B/F ████████████████ OF ██
██████████████████████
INVOLVED OTHER 3 - SHARDA MAXINE SMITH B/F ████████████████ OF ████████████
████████
INVOLVED OTHER 4 - CARLOS KIJUAN JENNINGS ████████████████████
████████████████

SHOTSPOTTER ID# 318-646984 - 21 GUNSHOTS DETECTED @ 13:17:21 HOURS
SHOTSPOTTER ID# 318-646985 - 6 GUNSHOTS DETECTED @ 13:17:28 HOURS

On October 26, 2025 at approximately 1322 hours, my partner and I were in a fully marked scout and class B
uniforms. My partner and I were dispatched to 10917 Beaconsfield, the run location for a
"MULTI-SHOTSPOTTER", which upgraded into a "SHOOTING/CUTTING/PENT WOUND".

Upon arrival, I observed witness 1 running up to the victim; the victim was lying prone on the southside of the
driveway of the residence. I did observe what appeared to be several gunshot wounds ranging from the victim`s head
to his torso. I also observed what appeared to be blood on the victim`s clothing.

As I approached the victim, I notified dispatch via radio that I did have a confirmed gunshot wound victim and the
victim appeared to be deceased.

I also observed several spent silver shell casings on scene around the victim, as well as what appeared to be untinted,
broken/shattered glass on the north side of the driveway, across from where the victim was lying.

Witness 1 stated as he was traveling southbound Beaconsfield toward Grayton on board his vehicle, he heard several
gunshots. Witness 1 stated as he continued traveling southbound, he observed what he believed to be a black older
model Chevrolet Impala or black older model Chrysler sedan fleeing the location heading southbound Beaconsfield,
at a high rate of speed. Witness 1 stated that when he observed the victim lying on the ground, witness 1 then stopped
his vehicle and attempted to render aid to the victim. I then advised District 7 via radio of the suspect vehicle
description. Per Crime Intel, a black 2014 Chrysler 200 was captured on Motorola camera(s) heading westbound

| Reporting Officer: *SAAD, LARA* | Printed By: COOPERJ521,     10/31/2025 21:27 | Page 6 |
|---|---|---|
| *R_CS3NC* | | |

# REPORTING OFFICER NARRATIVE

| | | OCA |
|---|---|---|
| *Detroit Police Department* | | *251026-0176* |
| Victim<br>*SMITH, STEVEN RAY* | Offense<br>*NEGLIGENT HOMICIDE / MANSLAUGHTER* | Date / Time Reported<br>*Sun 10/26/2025 13:46* |

**THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY**

Whittier from Roxbury at 13:17:58 hours.

I spoke with the residents of the run location, the involved other 1 and witness 2. The involved other 1 stated he was not home at the time that this incident occurred, but that witness 2 had called him stating he needed to get home as soon as possible. I then spoke with witness 2 who stated she was inside her residence at the time this incident occurred. Witness 2 stated she did not see anything but did hear the gunshots. The involved other 1 and witness 2 stated they did not know the victim. Witness 2 appeared to be visibly emotionally upset at the time I attempted to gather information from her. Witness 2 then stated she had to leave the location because she had to go to the store. While I was attempting to stop witness 2, the involved other 1 began stating that witness 2 was just going to their neighbors residence, ███████████, the residence on the north side of witness 2`s registered address. I also observed a Ring security camera and second security camera on witness 2`s residence, but the involved other 1 stated the security cameras on the residence do not work.

I attempted to make contact with the homeowner of ███████████ the neighbor and residence on the north side of witness 2`s residence; I was met at the front door of the residence by witness 2. I asked witness 2 if the homeowner was inside; witness 2 then walked out of the residence and went back to her registered address. I then made contact with seemingly the homeowner, an unidentified black female at the residence of ███████████, the residence on the north side of witness 2`s registered address, who stated she did not want to get too involved and appeared to be visibly nervous to speak with me. I asked the unidentified black female if anything was captured on her Ring security camera, to which she stated "no".

Engine 58 and Medic 75 arrived on scene. Medic 75 pronounced the victim`s time of death to be at 1326 hours.

Medic 75 advised me that the members of Engine 58 searched the victim`s pockets and recovered a black wallet; Engine 58 then turned over the black wallet to Medic 75. At this time, the victim was still considered to be a "John Doe". I advised Medic 75 to place the recovered black wallet next to the victim.

I then spoke with witness 3 who stated she heard several gunshots while she was inside her residence; witness 3 stated when she heard the gunshots, she walked out to her front porch and observed the suspect(B/M, APPROXIMATELY 6`00"-6`2", THIN BUILD, DARK COMPLEXION, APPROXIMATELY 35-40YO, SHORT/TRIMMED BLACK BEARD, UNKNOWN CLOTHING) running to the driver seat of a dark gray older model Chrysler sedan, get into the drivers seat, reverse out of the driveway, then flee the incident scene. Witness 3 stated she believed the suspect ran out of the run location residence, which is witness 2`s registered address.

I attempted to gather any further information from any neighbors in regard to this incident, with negative results. I was advised that no security camera(s) captured this incident.

As I was walking back to my scout car, the unidentified black female from the neighboring residence on the north side of the run location, ███████████, asked for me to walk back up to her front porch and speak with her. The unidentified black female began asking me if the victim was a black or hispanic male. The unidentified black female again stated that nothing was captured on her Ring security camera(s).

While my partner, assisting units and myself continued our investigation on scene, the involved other 2 began running into the taped off crime scene, in close proximity to the victim. An assisting unit and I detained the involved other 2 and placed her into the rear of the scout without incident. Very shortly after being detained, I released the involved other 2; the involved other 2 advised me that the victim is her father. The involved other 2 confirmed the victim`s identity with his name and birthdate. I then confirmed the victim`s identity with the information provided, via LEIN.

| | | | |
|---|---|---|---|
| Reporting Officer: *SAAD, LARA*<br>*R_CS3NC* | Printed By: COOPERJ521, | 10/31/2025 21:27 | Page 7 |



**DODSON
FOWLER
WILLIAMS
& NESI, PLC**

*Main Office*

18050 Mack Ave.
Grosse Pointe Farms,
MI, 48230

(313) 458-8276
(313) 469-7085 (Fax)

*Village Office*

722 Notre Dame
Grosse Pointe, MI
48230

(313) 886-5769
(313) 886-5851 (Fax)

dfwnplc.com

*Attorneys*

Nathan A. Dodson, Esq.
Aimee M. Fowler, Esq.
Daniel J. Williams, Esq.
Christopher J. Nesi, Esq.

# EXHIBIT 5

| User: COOPERJ521 | Detroit Police Department | 05/07/2026 |
|---|---|---|

## Case Management (DPD 251026-0176) Tracking

| Time | Action | Description | Officer | Time Spent (Mins) |
|---|---|---|---|---|
| 11/03/2025 09:10 | WARRANT | WARRANT OBTAINED<br><br>For MR. Carlos Jennings, sworn in Saturday November 1, 2025. [11/03/2025 09:11, COOPERJ521, 3436, DPD] | COOPER, JEFFERY A | 0.00 |
| 11/01/2025 11:21 | OTHER | OTHER<br><br>I placed the fingernail clippings, the morgue bullets and the victims clothes on evidence.<br><br>Fingernails: 2510260176- 3883893-51<br>Morgue Bullets: 2510260176- 3883894- 52<br>Victims Clothes: 2510260176- 3883895- 53<br>[11/01/2025 11:23, SIMMONSR767, 27657, DPD] | SIMMONS, RAVEN C | 0.00 |
| 10/29/2025 14:24 | INTERVIEW- | INTERVIEW- WITNESS<br>Jermaine Jennings ███████<br>███████<br><br>On October 29, 2025, Mr. Jermaine Jennings responded to the Detroit Police Department's Public Safety Headquarters to be interviewed regarding the homicide investigation. During the interview, Mr. Jennings stated that on the day of the incident, he received a phone call from Mr. Carlos Jennings' wife inquiring about the victim, Steven Smith, and her husband, Carlos Jennings. She informed Mr. Jennings that there had been gunshots fired in the area and that she was unable to locate either individual. Mr. Jennings stated he then went to the location of the crime scene, where he met with Ms. Staveena Jennings. He advised that he searched the surrounding area for Mr. Carlos Jennings and eventually located him a few blocks away. Mr. Jennings reported that he instructed Mr. Jennings to get into his vehicle, and that Carlos did not make any statements regarding the shooting at that time. Mr. Jennings further stated that he transported Carlos Jennings to ███████ ███████ where he provided him with a change of clothing. Mr. Jennings added that Carlos Jennings suffers from schizophrenia and that he has been attempting to get him professional help.<br> [10/29/2025 14:25, COOPERJ521, 3436, DPD] | COOPER, JEFFERY A | 0.00 |
| 10/29/2025 12:11 | OTHER | OTHER<br><br>███████<br>Kasaun Watkins | COOPER, JEFFERY A | 0.00 |

| Time | Action | Description | Officer | Time Spent (Mins) |
|---|---|---|---|---|
| | | 11. On October 28, 2025, the affiant, along with members of the Detroit Police Department`s Tactical Services Section, executed a search warrant at 10917 Beaconsfield. During the search, the affiant observed live 7.62 Tulammo brand ammunition located in the upstairs bedroom crawl space. This brand and caliber are consistent with the shell casings recovered from the scene.<br><br>The affiant conducted an interview with the homeowner, Mr. Kasaun Watkins, who identified himself as the cousin of Carlos Jennings. Mr. Watkins stated that Jennings frequently visits the residence and keeps a stash of narcotics and a rifle inside the garage. Mr. Watkins further stated that on the day of the homicide, he was parked down the street smoking marijuana in his van when his wife, Ms. Latonya Watkins, called to inform him that gunshots had been fired outside their home.<br><br>Mr. Watkins stated that he immediately drove back toward his residence on Beaconsfield and observed a black vehicle with multiple bullet holes traveling past him at a high rate of speed. He added that he had previously seen Carlos Jennings operating that same vehicle.<br><br>Mr. Watkins further stated that Carlos Jennings has a stash house on the other side of Beaconsfield and pointed out 9424 Beaconsfield, which is the same address the victim`s daughter discovered the black Crysler 200 after the murder parked in the driveway.<br><br> [10/29/2025 12:13, COOPERJ521, 3436, DPD] | | |
| 10/27/2025 16:20 | TELEPHONE CALL | TELEPHONE CALL<br>David Williams<br>Carlos Jennings attorney<br><br>███████<br><br>Mr. WIlliams called and stated he would like to turn Carlos in. I Told him we would keep him posted. [10/27/2025 16:22, COOPERJ521, 3436, DPD] | COOPER, JEFFERY A | 0.00 |
| 10/27/2025 16:20 | INTERVIEW- | INTERVIEW- WITNESS<br><br>On October 27, 2025, i conducted a recorded phone interview with Ms. Stavenna Jennings. During the interview, Ms. Jennings stated she received a call earlier that morning from an unidentified individual stating, "Carlos wants to know what you want him to do." Ms. Jennings responded, "Tell him to turn himself in." She further stated that Carlos was wearing a black Nike Tech outfit on the day of the incident, which aligns with witness statements describing the suspect`s black hoodie. | COOPER, JEFFERY A | 0.00 |

| Time | Action | Description | Officer | Time Spent (Mins) |
|---|---|---|---|---|
| | | [10/27/2025 16:20, COOPERJ521, 3436, DPD] | | |
| 10/27/2025 16:10 | OTHER | OTHER<br><br>Vivant WARRANT WAS TYPED AND SERVED FRO THE FOLLOWNIG ADDRESSES.<br><br>███████<br><br>Service location and account information:<br><br>Account holder: UNK<br>Address:<br>████████████<br><br>[10/27/2025 16:17, COOPERJ521, 3436, DPD]  [10/27/2025 16:17, COOPERJ521, 3436, DPD] | COOPER, JEFFERY A | 0.00 |
| 10/27/2025 16:09 | INTERVIEW- | INTERVIEW- WITNESS<br>Desarae Neal (Black female, DOB ████████)<br><br>I interviewed Desarae Neal (Black female, ████████████), who stated she was asleep when her younger sister woke her, yelling, "They`re shooting!" Ms. Neal stated that she looked out the window after hearing multiple gunshots and observed a Black male with a medium complexion, wearing a black hoodie, light-colored shorts or pants, and a low haircut, enter the driver`s seat of an older-model Chrysler 200 with tinted windows. [10/27/2025 16:10, COOPERJ521, 3436, DPD] | COOPER, JEFFERY A | 0.00 |
| 10/27/2025 14:11 | OTHER | `*TO BE COMPLETED, REVIEWED, AND SUBMITTED AS CASE NOTES IN RMS WITHIN 24-HOURS OF SCENE*<br>INITIAL SCENE INVESTIGATION:<br>FILE #: HF 25-185<br>RMS #: 2510260176<br><br>SCENE SUMMARY<br>INCIDENT: FATAL SHOOTING<br>MOTIVE: UNKNOWN<br>WEAPON TYPE: 762 Rifle<br>INCIDENT DATE:  Sunday, October 26, 2025<br>INCIDENT TIME: 13:17 PM<br>SCENE LOCATION: ██████████<br>LOCATION TYPE: RESIDENCE<br>SCENE TYPE: OUTSIDE<br>LIGHTING: Natural Lighting<br>ODOR: None<br>OUTDOOR TEMP: 55°<br>WEATHER CONDITIONS: Clear<br>PRECINCT: 9TH<br>DISTRICT: EASTERN<br>TIME TEAM NOTIFIED: 1:30 PM | SROUR, MALAK | 0.00 |

| Time | Action | Description | Officer | Time Spent (Mins) |
|------|--------|-------------|---------|-------------------|

TIME ARRIVED AT SCENE: 2:10 PM
OFFICER COMPLETING SCENE
INVESTIGATION: P.O. Raven Simmons
ASSISTING HOMICIDE TEAM: P.O. Paul
Sweppy, Det. Jeffery Cooper, LT. Paul Brown,
Det. Caitlyn Patrick- Davidson
CRIME ANALYST COMPLETING
INTELLIGENCE WORKUP: CA. Malak Srour
FIRST OFFICERS ON SCENE: P.O. L. Saad
#4606 and PO D. Cowart #807
UNIT: Scout 9-8
DISPATCHED LOCATION: 10927
Beaconsfield St
DISPATCHED TIME:  1:22 pm
ARRIVAL TIME:  1:22 pm
ORIGINAL RUN OFFENSE: Multi Shots
Spotter/ Shooting Pent wound
EVIDENCE TECHNICIANS ON SCENE: FT
C. ROWE
UNIT: 4712
MEDICAL EXAMINER ON SCENE:
Investigator Webber
ARRIVAL TIME: 4:00 PM
ME #: 25-13483

ADDITIONAL OFFICERS ON THE SCENE
PO M. Jennings #1689 and PO B. Mcalpine
#2711
PO C. Sharpe #2539 and PO P. Padron
#2309
PO K. Nightingale #4338 and PO R. Hillman
#5091
SGT. C. Nieman #S-232
CANVASS:



OBSERVATIONS AT THE SCENE
The incident location, in the driveway of 10917
Beaconsfield, located on the west side of
Beaconsfield between Grayton and Britain.
This is a residential neighborhood.
I approached the incident location, traveling
North up Beaconsfield St from Whittier.
Approaching the scene I observed police cars
with activated lights blocking the road on both
ends of the street of Beaconsfield from
Grayton to Britain. There is yellow police tape
blocking both the sidewalks, and roadway.
I enter the blocked off area and observe the
victim under a white sheet in the driveway of
10917 Beaconsfield. I can see his feet are
west and his head is east and he is lying on
his back in the supine position. I observed
several shell casings on the left side of the
victims body and I can see a patch of grass on
the right side of the victims body under the
sheet.  To the right of the victim a couple feet

| Time | Action | Description | Officer | Time Spent (Mins) |
|------|--------|-------------|---------|-------------------|
| | | was shattered glass on the cement. Upon the arrival of the medical examiner, ME Webber, the sheet was removed from over the victim. I observed the victim to be a black male who appeared to be in his 50`s or so, wearing a black hoodie with a white t-shirt under it, blue jean pants and black socks with apparent gunshot wounds. | | |

After processing the initial scene location of 10917 Beaconsfield. Eastern Homicide Squad canvassed the area of 9419 Beaconsfield, where the homicide vehicle went after the shots were fired. While canvassing the area, the vehicle was located on Nottingham in a vacant field near Wade Street. I observed the vehicle still running with multiple bullet holes through the windshield and blood inside of the vehicle. The vehicle was unoccupied. There were several tools and dry wall next to the vehicle and a white t shirt.

ME investigator Webber made the location and provided ME#25-13483.

SUMMARY

As told by PO Saad,

Upon arrival, she observed a witness (Off duty officer Demetrius Brown #5121) running up to the victim. The victim was lying prone on the Southside of the driveway. She observed multiple apparent gunshot wounds to the victim ranging from his head to his torso. PO Saad spoke with neighbors in the area who stated they heard the gunshots but did not see anything. PO Saad stated she spoke to the resident of █████████████, Shekeva Griffen, who stated she heard gunshots, came outside and seen the suspect running from the inside of █████████████ and get into a dark colored Chrysler then flee. PO Saad stated while her and her partner were still on scene investigating, at approximately 1:29pm, a 911 call came in stating there was a black Chrysler 200 at the location of 9419 Beaconsfield shot up. The caller stated her husband and father were in the vehicle and the shooting happened about 20 minutes prior. Assisting officers responded to the location and did not find the vehicle.

As told by witness Staveena Jennings, Staveena stated her and her husband, Carlos Jennings, woke up and her father, Steven Smith, called her but she missed the call. Staveena stated she called her father back and he said he was getting a shot in his foot. Staveena stated her and Carlos got ready and went to the neighborhood that the shooting happened because they were renovating █████████████ to rent out. Staveena stated her and Carlos were at the Evanston address when her father called and said he was on his way. When Steven arrived Carlos helped him get his tools out of the vehicle. Steven and Carlos cracked open a beer and shortly after left because Steven needed to go to the hardware store. Staveena stated 3-4 minutes after Carlos and Steven left she got a call from

| Time | Action | Description | Officer | Time Spent (Mins) |
|---|---|---|---|---|
| | | her brother saying that their sister Sharde told him she was on the phone with Steven and heard 15 gunshots over the phone. Staveena stated she went to the neighbor`s house and they rode around the neighborhood looking for Steven and Carlos. Staveena stated her sister pulled up and she got in the car with her and they continued looking for Steven and Carlos. Staveena stated while they were driving down Beaconsfield near Harper they observed the Black Chrysler 200 that Steven and Carlos left in. Staveena stated the Chrysler belonged to her and Carlos. Staveena stated the car had bullet holes all in the front of the vehicle and there was blood inside. Staveena stated she was unable to find Carlos and he would not answer the phone. As told by witness Sharda Smith, Sharda stated she was on the phone with the victim Steven Smith (her father) and he was giving her advice. While they were on the phone Sharda stated she heard gunshots and heard someone say "Now move over Nigga". Sharda stated that was the last thing she heard. Sharda stated she knew her father was with Carlos because they were fixing up Sharda and Carlos rental home. Sharda stated the vehicle Carlos and Steven were in was pulled all the way into the driveway of 9242 Beaconsfield left running and shot up. Sharda stated her and her sister left ████ ████████ after they seen the car in the driveway because her sister said she doesn`t trust anyone. They returned to the address five minutes later and the vehicle was gone. Sharda stated her sister tried to talk to the guy who lived there but he locked the door and left stating he didn`t know anything. As told by witness Desarae Neal, Desarae stated she was asleep when her younger sister woke her up yelling "They are shooting". Desarae stated she looked outside and observed a black male with a medium complexion, wearing a black hoodie with light colored shorts or pants, a low haircut get in the driver seat of an older model Chrysler 200 with tinted windows.<br><br>VICTIM #1<br>MDOC STATUS: NONE<br>IDENTITY: Steven Smith<br>DOB: ████████<br>HANDS BAGGED: Yes<br>RACE/SEX/AGE: B/M 56<br>ADDRESS: ████████████████ ██<br>CELL PHONE #: Unknown<br>CELL RECOVERED: Yes<br>CARRIER: Unknown<br>CLOTHING: White T-shirt, Black Hoodie, Blue Jeans, Black socks.<br>VEHICLE: None | | |

| Time | Action | Description | Officer | Time Spent (Mins) |
|------|--------|-------------|---------|-------------------|

LOCATION OF WOUNDS & OTHER MARKS:
Multiple Gunshot wounds
FAMILY CONTACTED: Yes
NAME: Sharda Smith
DATE: October 26, 2025.
TIME: 1:30 PM
ADDRESS: ███████████████████
██████ 4 ██████
POSSIBLE CAUSE OF DEATH: GSW (s)
CONDITION: DECEASED
SUSPECT #1
HOUSED: NO
MDOC STATUS: NONE
IDENTITY: Carlos Jennings
██████
RACE/SEX/AGE: B/M/36
ADDRESS: ███████████
███████
CELL PHONE #: ████████
CELL RECOVERED: NO
CARRIER: Unknown
CLOTHING: Black Jacket
CCH: NO
VEHICLE: 2015 Chrysler 200 Black

WITNESS #1
MDOC STATUS: NONE
IDENTITY: Desarae Neal
DOB: ████████
██████ B/F/22
ADDRESS: █████████
CELL PHONE #: █████████
CELL RECOVERED: No
CARRIER: Unknown
CLOTHING: N/A
CCH: N/A
VEHICLE: N/A

WITNESS #2
MDOC STATUS: NONE
IDENTITY: Sharda Smith
DOB: ████████
RACE/SEX/AGE: B/F/32
ADDRESS: █████████
CELL PHONE #: █████████
CELL RECOVERED: No
CARRIER: Unknown
CLOTHING: N/A
CCH: N/A
VEHICLE: N/A
WITNESS #3
MDOC STATUS: NONE
IDENTITY: Staveena Jennings
DOB: ████████
RACE/SEX/AGE: B/F/36
ADDRESS: ███████████████
██████
CELL PHONE #: █████████
CELL RECOVERED: No

| Time | Action | Description | Officer | Time Spent (Mins) |
|------|--------|-------------|---------|-------------------|
| | | CARRIER: Unknown<br>CLOTHING: N/A<br>CCH: N/A<br>VEHICLE: N/A | | |

EVIDENCE LIST
1.  (1)- Tulammo 7.62 Casing
2.  (1)- Tulammo 7.62 Casing
3.  (1)- Tulammo 7.62 Casing
4.   (1)- Tulammo 7.62 Casing
5.  (1)- Tulammo 7.62 Casing
6.  (1)- Tulammo 7.62 Casing
7.  (1)- Tulammo 7.62 Casing
8.  (1)- Tulammo 7.62 Casing
9.  (1)- Tulammo 7.62 Casing
10. (1)- Tulammo 7.62 Casing
11. (1)- Tulammo 7.62 Casing
12. (1)- Tulammo 7.62 Casing
13. (1)- Tulammo 7.62 Casing
14. (1)- Tulammo 7.62 Casing
15. Glass
16. Suspected Blood
17. (1)- Tulammo 7.62 Casing
18.  (1)- Tulammo 7.62 Casing
19.  (1)- Tulammo 7.62 Casing
20.  (1)- Tulammo 7.62 Casing
21.  (1)- Tulammo 7.62 Casing
22.  (1)- Tulammo 7.62 Casing

Two Fragments were recovered, drill battery and utility knife recovered from victims hoodie pocket, phone charger recovered from right front pocket, wallet found near right side of victims body. Hands were swabbed and bagged.
Vehicle was recovered and towed from Nottingham in a vacant field near Wade. Recovered from near the vehicle was a white t-shirt, swabs from tools near the vehicle and fabric from driver side of vehicle.
 [10/27/2025 14:11, SROURM510, 27304, DPD]

**Total Time Spent in Minutes:** 0.00



**DODSON
FOWLER
WILLIAMS
& NESI, PLC**

*Main Office*

18050 Mack Ave.
Grosse Pointe Farms,
MI, 48230

(313) 458-8276
(313) 469-7085 (Fax)

*Village Office*

722 Notre Dame
Grosse Pointe, MI
48230

(313) 886-5769
(313) 886-5851 (Fax)

dfwnplc.com

**Attorneys**

Nathan A. Dodson, Esq.
Aimee M. Fowler, Esq.
Daniel J. Williams, Esq.
Christopher J. Nesi, Esq.

# EXHIBIT 6

# Detroit Police Department

**Mugshot Report**

1301 3rd Ave
Detroit, MI  48226
Tel:  313-596-1800    Fax:  313-596-1450

CB Number: ████████
Arrest Date: 10-29-2025 :
Report Printed: 02-20-2026 11:22



| | |
|---|---|
| Name: | JENNINGS, CARLOS |
| Address: | ████████████████ |
| S.S.N.: | |
| D.O.B.: | ████████ |
| Age at Photo: | ███ |
| DPD Number: | 666087 |
| CB Number: | 156589\|193564 |
| Booking Date: | 10-29-2025 |
| Release Date: | |
| Hair Color: | Black |
| Eye Color: | Brown |
| Height: | 507 |
| Weight: | 210 |

Complexion: Skin Tone Code
Build:

Race: Black
Gender: Male

TCN: DN25305492M

Produced by the ID Networks ImageNet System

# Detroit Police Department

1301 3rd Ave
Detroit, MI  48226
Tel:  313-596-1800    Fax:  313-596-1450

# Arrest Report

CB Number: 156589|193564
Arrest Date: 10-29-2025 :
Report Printed: 02-20-2026 11:23

## ARRESTEE

| Name | JENNINGS, CARLOS KIJUAN | | | | | S.S.N. | | | |
|---|---|---|---|---|---|---|---|---|---|
| D.O.B. | Sex M | Race B | Height 507 | Weight 210 | Hair Color BLK | Eye Color BRO | Complexion | Build | |

| Street Address | | City | | State | | Zip | | County | |
|---|---|---|---|---|---|---|---|---|---|

| Telephone | | Cell Phone | | Business Phone | | Pager | |
|---|---|---|---|---|---|---|---|

| Alias | | | Alias D.O.B. | | Maiden | |
|---|---|---|---|---|---|---|

| Place of Birth | | Arrest Location (Location Name, Street Address, City, State, Zip) |
|---|---|---|

## I.D.

| DPD Number 666087 | CB Number 156589|193564 | Case # |
|---|---|---|

| SID | FBI # | D.L. State | D.L. Number |
|---|---|---|---|

## PHYSICAL

| Hair Style | Facial Hair | Hair Length | SMTO | |
|---|---|---|---|---|
| | | Handed | **Code** | **Description** |
| | | Glasses No | | |
| | | Contacts No | | |

## BACKGROUND

| Marital Status | Education | Read English No | Write English No | Speak English No | **Caution** |
|---|---|---|---|---|---|
| Gang | Gang Name | | Member Type | | |
| Employer | Occupation | | Employer Telephone | | |
| Employer Address | | City | State | Zip | |
| Emergency Contact | | Relationship | Phone | | |

## VEHICLE

| Year | Make | Model | Color | VIN |
|---|---|---|---|---|
| Owner | | Plate | Insured By | Towed By | Accident No |
| Release Info | | | | | |

## UIO

| P.B.T. | B.A.C. | Blood Test No | Urine Test No | In Car Video No | Squad # | Testing Officer |
|---|---|---|---|---|---|---|

## CHARGES

| Charge 1 | Charge Code & Description | | | Offense Location | |
|---|---|---|---|---|---|
| | 0900 MURDER | | | | |
| Arrest Type Flag F | Count 1 | Incident # 2510260176 | Criminal Tracking # | Charge Type Code 3 | Disposition REW | Date of Offense |

| Charge 2 | Charge Code & Description | | | Offense Location | |
|---|---|---|---|---|---|
| Arrest Type Flag | Count | Incident # | Criminal Tracking # | Charge Type Code | Disposition | Date of Offense |

| Charge 3 | Charge Code & Description | | | Offense Location | |
|---|---|---|---|---|---|
| Arrest Type Flag | Count | Incident # | Criminal Tracking # | Charge Type Code | Disposition | Date of Offense |

| Charge 4 | Charge Code & Description | | | Offense Location | |
|---|---|---|---|---|---|
| Arrest Type Flag | Count | Incident # | Criminal Tracking # | Charge Type Code | Disposition | Date of Offense |

| Charge 5 | Charge Code & Description | | | Offense Location | |
|---|---|---|---|---|---|
| Arrest Type Flag | Count | Incident # | Criminal Tracking # | Charge Type Code | Disposition | Date of Offense |

| CONTACTS | | | | | | |
|---|---|---|---|---|---|---|
| Person Type | Name | | | | | D.O.B. |
| Telephone | | Address | | | | |
| Person Type | Name | | | | | D.O.B. |
| Telephone | | Address | | | | |
| Person Type | Name | | | | | D.O.B. |
| Telephone | | Address | | | | |

| MISC | | | | |
|---|---|---|---|---|
| Mirandized **No** | Force Used **No** | Evidence Collected **No** | **Checks Completed** | **Armed With** |
| T.C.N. **DN25305492M** | Priors **No** | Cell # | | |
| Send LEIN Fingerprint Response to the Attention of | | | | |

| OFFICERS | | | | |
|---|---|---|---|---|
| Arresting Officer | Unit # | Assisting Officer | Unit # |
| Transferring Officer | Unit # | Searched By | Unit # |
| Processing Officer | Unit # | Checks Done By | Unit # |
| Releasing Officer | Unit # | Other Officer | Unit # |

**NARRATIVE**

| BOND/COURT | | | | | | |
|---|---|---|---|---|---|---|
| Condition of Prisoner Release | | | | | | Hold For Bond Court |
| Bond # | Bond Set By | | Bond Date | Bond Amount | Bond Receipt | Cash Deposit |
| Arraignment Officer | | Arraignment Date Time | | Lodge Date Time | | Clear Date Time |
| Submission Date Time | | Custodial Status | | | | |
| Court | | Court Address | | | Court Room # | Court Date Time |

| SIGNATURES | | |
|---|---|---|
| Processing Officer | | Date |
| OIC | | Date |



**DODSON
FOWLER
WILLIAMS
& NESI, PLC**

*Main Office*

18050 Mack Ave.
Grosse Pointe Farms,
MI, 48230

(313) 458-8276
(313) 469-7085 (Fax)

*Village Office*

722 Notre Dame
Grosse Pointe, MI
48230

(313) 886-5769
(313) 886-5851 (Fax)

dfwnplc.com

***Attorneys***

Nathan A. Dodson, Esq.
Aimee M. Fowler, Esq.
Daniel J. Williams, Esq.
Christopher J. Nesi, Esq.

# EXHIBIT 7

 **police**

## LINEUP & PHOTO ARRAY IDENTIFICATION RECORD

| Date: 10-30-25 | Time: 205 PM |
|---|---|
| Complainant/Witness Name: Det. Jeffery Cooper | Administrator Name: Det. Jeffery Cooper |
| Complainant/Witness Address: 1301 3rd St. | Administrator Assignment: Homicide |
| Complainant/Witness Phone Number: ███████ | Location of Lineup/Photo Array: DDC |

| Photo Number | Name and Position of Suspect | Age | Height | Weight | Description and Remarks |
|---|---|---|---|---|---|
| #1 | William Mcray | 31 | | | |
| #2 | Casblanca Mathia | 51 | | | |
| 3 | Deangelo William | 27 | | | |
| 4 | Carlos Jennings | 31 | | | |
| 5 | Terry Jackson | 44 | | | |
| 6 | Cedric K. Dicus | 31 | | | |
| | | | | | |
| | | | | | |

| Shown by: Det. Jeffery Cooper | Attorney Present Name: Andrew D. Maggio |
|---|---|
| | Business Address: 37238 Cambridge |
| Prepared by: Det. Jeffery Cooper | Phone Number: 734-546-2174 |
| | Supervisor Name/Rank: Stephen Heid |
| Others Present: P.O Paul Sweppy | Time (From/To): 1:50 - 2:10pm |

Identification Made: Yes ☑ No ☐

Comments: Picked #4 Carlos Jennings as the shooter

DPD 355 (Revised 01/2020)



# Eyewitness Identification Form

Type of Identification:   Live Lineup ☑   Photo Lineup ☐   Showup ☐

Case Number: 25 10260176

Law Enforcement Official Name: Jeffory Cooper

Date and Time of Presentation: 10-30-25

Witness Name: Cedric Evans ███████████

Attorney Name & P-Number, if present: Andrew D. Maggio 456119

## INSTRUCTIONS (read by law enforcement official to witness)

In a moment I'm going to ask you to view some individuals (or photographs). The person who is involved in the crime may or may not be among them.

You should not feel compelled to make an identification. The police department will continue to investigate the incident whether or not you select someone.

If you select someone, I'm going to ask you to explain why you selected that individual (or photograph) and to describe how confident you are in your selection.

Please do not ask questions about the person you have selected because we cannot share that information with you at this time. Since this is an ongoing investigation, you should not discuss the identification procedures or the results with other people.

Do you understand these instructions?  Yes

## WITNESS STATEMENT (written by law enforcement official)

Witness picked individual (or photograph) number: Picked #4, walked Craiton towards Beauousfield, Started Spsofing, My son looked out and Saw him Shot the man in the Cur.) He sat gun down, and pulled the vic out.

✝ I, Mr. Cedric M. E_____, affirm that I read or was read the instructions above, that I understand the instructions, and that the statement written by the law enforcement official accurately reflects what I said.

Finally, I understand that I should not talk to other people about the individuals (or photos) or tell them which individual (or photo) I picked, if any.

Signature of Witness  Mr. Cedric M. E_____

DPD 749



**DODSON
FOWLER
WILLIAMS
& NESI, PLC**

*Main Office*

18050 Mack Ave.
Grosse Pointe Farms,
MI, 48230

(313) 458-8276
(313) 469-7085 (Fax)

*Village Office*

722 Notre Dame
Grosse Pointe, MI
48230

(313) 886-5769
(313) 886-5851 (Fax)

dfwnplc.com

*Attorneys*

Nathan A. Dodson, Esq.
Aimee M. Fowler, Esq.
Daniel J. Williams, Esq.
Christopher J. Nesi, Esq.

# EXHIBIT 8



# Eyewitness Identification Form

Type of Identification:     Live Lineup ☑     Photo Lineup ☐     Showup ☐

Case Number: 25 10262176

Law Enforcement Official Name: Det. Jeffrey Cooper

Date and Time of Presentation: 10-30-25

Witness Name: Wanda Evans

Attorney Name & P-Number, if present: Andrew D. Masg.o

## INSTRUCTIONS (read by law enforcement official to witness)

In a moment I'm going to ask you to view some individuals (or photographs). The person who is involved in the crime may or may not be among them.

You should not feel compelled to make an identification. The police department will continue to investigate the incident whether or not you select someone.

If you select someone, I'm going to ask you to explain why you selected that individual (or photograph) and to describe how confident you are in your selection.

Please do not ask questions about the person you have selected because we cannot share that information with you at this time. Since this is an ongoing investigation, you should not discuss the identification procedures or the results with other people. *(JC)*

Do you understand these instructions? Wanda Evans

## WITNESS STATEMENT (written by law enforcement official)
Witness picked individual (or photograph) number: picked #6, stated "I saw him pull up"

I, Wanda Evans *(JC)*, affirm that I read or was read the instructions above, that I understand the instructions, and that the statement written by the law enforcement official accurately reflects what I said.

Finally, I understand that I should not talk to other people about the individuals (or photos) or tell them which individual (or photo) I picked, if any. *(JC)*

Signature of Witness Wanda Evans

DPD 749



## LINEUP & PHOTO ARRAY IDENTIFICATION RECORD

| Date: 10-30-25 | Time: 2:15 pm |
|---|---|
| Complainant/Witness Name: Det. Jeffery Cooper | Administrator Name: Det. Jeffery Cooper |
| Complainant/Witness Address: 1301 3rd st | Administrator Assignment: Homicide |
| Complainant/Witness Phone Number: ████████ | Location of Lineup/Photo Array: DDC |

| Photo Number | Name and Position of Suspect | Age | Height | Weight | Description and Remarks |
|---|---|---|---|---|---|
| 1 | William Mcray | 31 | | | |
| 2 | Casblanca Mathia | 51 | | | |
| 3 | Deangelo William | 27 | | | |
| 4 | Carlos Jennings | 31 | | | |
| 5 | Terry Jackson | 44 | | | |
| ✱ 6 | Cedric Dicus | 31 | | | |
| | | | | | |
| | | | | | |

| | |
|---|---|
| Shown by: Det Jeffery Cooper | Attorney Present Name: Andrew Dimaggio |
| | Business Address: 30738 Cambridge |
| Prepared by: Det. Jeffery Cooper | Phone Number: 734-546-2174 |
| | Supervisor Name/Rank: Stephen Heid |
| Others Present: PO Paul Swoppy | Time (From/To): 1:50 pm - 2:15 pm |

Identification Made: Yes ☑ No ☐

Comments: Chose # 6, Stated she saw him pull up.

DPD 355 (Revised 01/2020)



**DODSON
FOWLER
WILLIAMS
& NESI, PLC**

*Main Office*

18050 Mack Ave.
Grosse Pointe Farms,
MI, 48230

(313) 458-8276
(313) 469-7085 (Fax)

*Village Office*

722 Notre Dame
Grosse Pointe, MI
48230

(313) 886-5769
(313) 886-5851 (Fax)

dfwnplc.com

***Attorneys***

Nathan A. Dodson, Esq.
Aimee M. Fowler, Esq.
Daniel J. Williams, Esq.
Christopher J. Nesi, Esq.

# EXHIBIT 9



# SENTINEL EVENT REVIEW
# ON THE VACATION OF ALL CHARGES
# AGAINST ERIC ANDERSON

## WAYNE COUNTY SENTINEL EVENT REVIEW TEAM

## November 2025







# Contents

Introduction ................................................................................................... 1

Executive Summary ........................................................................................ 3

Case Analysis, Contributing Factors and Recommendations ........................... 6

    Case Overview ........................................................................................... 7

        Robberies, Initial Investigation and Arrest ............................................ 7

        Subsequent Investigation and Alibi ........................................................ 9

        Preliminary Hearing, Plea-Bargain and Trial ...................................... 11

        Re-Investigating the Case: The Conviction Integrity Unit (CIU) Phase ....... 15

    Contributing Factors and Recommendations for Change ............................17

        Factors Related to Eyewitness Identification ......................................... 17

        Challenges for the DPD Investigation ................................................. 20

        Structural Complexities in Investigation .............................................. 24

        Pretrial Procedures, Potential Judicial Influence, and Lack of
        a Key Witness ..................................................................................... 26

        Conviction Integrity Unit Review Phase .............................................. 29

        Conflicting Polygraphs ........................................................................ 30

        Systemic and Structural Pressures on Investigation, Trial, and
        Post-Conviction Processes ................................................................... 30

Conclusion .................................................................................................. 33

Appendix A. Timeline .................................................................................. 34

Appendix B. Table of Contributing Factors and Recommendations ................... 45

Appendix C. Limitations of the SER ............................................................ 53

Appendix D. Participants in the SER ............................................................ 54

# Introduction

The Wayne County Sentinel Event Review Team (WCSERT) is a voluntary collaboration among the Wayne County Prosecutor's Office (WCPO), the Detroit Police Department (DPD), the Third Judicial Circuit Court of Michigan (Third Circuit), the Michigan State Appellate Defender Office (SADO) and the Cooley Innocence Project, coordinated by the Quattrone Center for the Fair Administration of Justice at the University of Pennsylvania Carey Law School (Quattrone Center or QC). Each of the agencies participating in the WCSERT seeks to encourage a culture of continuous quality improvement and learning from error. At the request of Wayne County Prosecutor Kym Worthy, the agencies participating in the WCSERT came together to evaluate a case in which an undesired outcome occurred – the need for the WCPO to vacate a conviction against Eric Anderson in the interest of justice. Mr. Anderson was convicted in 2010 of armed robbery and served roughly 8.5 years before a sworn confession from one of the actual perpetrators of the crime caused a subsequent investigation of the case by the WCPO's Conviction Integrity Unit (CIU). After an extensive investigation, the CIU found that two other men had committed the robberies and the WCPO moved to vacate Mr. Anderson's conviction. Mr. Anderson was released on April 30, 2019.

To review Mr. Anderson's case, the WCSERT used "blame-free"[1] principles of root cause analysis to identify factors that contributed to the identification, arrest, trial and conviction of Mr. Anderson (Contributing Factors or CFs), and then suggested consensus recommendations across each of their areas of influence to prevent those CFs from recurring. In so doing, the WCSERT seeks to prevent future convictions that cannot withstand rigorous investigative scrutiny.

It is important to note that neither the CIU investigation nor the WCSERT review identified any instance where any participant in Mr. Anderson's case acted with malicious intent, nor did they identify any instances of intentional misconduct. Mr. Anderson's conviction occurred despite the best efforts of each of the law enforcement officers, prosecutors, defense attorneys, judges, and jurors who participated in his case. As a result, preventing the identified CFs from occurring in the future cannot be achieved by punishing any of the system's actors. Recommendations needed to be designed that would help put good faith system actors in to positions where they are better able to succeed, and so the WCSERT sought to learn from and correct decisions that led to the undesired outcome and to make changes that will ensure that the criminal justice system operates fairly and justly for all.

---

[1] "Blame-free," when used in this context, continues to recognize professional standards, policies and procedures, and other system features that help to ensure quality in our criminal justice agencies. The agencies participating in the WCSERT used has their starting point the idea that this case achieved an undesired result despite the best effort of all involved, rather than assuming that one or more individual(s) had intentionally or negligently mismanaged the case. In this way, they sought to improve the system's ability to accurately investigate, adjudicate, and resolve criminal cases by enhancing the practices of each participating agency.

The WCSERT hopes that this review will shed light on systemic issues that can lead to problematic arrests and convictions, and aid in the promotion of a culture of accountability and transparency in the criminal justice system. A case timeline and narrative follow, as well as a set of contributing factors that combined to enable the inaccurate conviction, and a list of proposed improvements to the Wayne County criminal justice system designed to reduce opportunities for error in this jurisdiction.

# Executive Summary

This report provides the results of a Sentinel Event Review (SER) of the ~9-year incarceration of Eric Anderson, convicted in 2010 of armed robbery and sentenced to 30-50 years in custody, only to be released in 2019 after all charges against him were vacated and dismissed. The SER was conducted by the Wayne County Sentinel Event Review Team (WCSERT), a voluntary collaboration among the Wayne County Prosecutor's Office (WCPO), the Detroit Police Department (DPD), the Third Judicial Circuit Court of Michigan, the Michigan State Appellate Defender Office (SADO), and the Cooley Innocence Project coordinated by the Quattrone Center for the Fair Administration of Justice at the University of Pennsylvania Carey Law School (Quattrone Center or QC).

The WCSERT, and each of its participants, conducted this SER as a quality improvement exercise evaluating a number of undesirable outcomes that occurred in Mr. Anderson's case. The group identified various factors that came together to lead to:

- An eyewitness identification lacking certain indicia of reliability
- Miscommunications during the investigation
- Rushed and incomplete pretrial procedures
- The appearance of judicial influence
- The need for a Conviction Integrity Unit investigation and, ultimately
- The vacation of Mr. Anderson's conviction after around 9 years of incarceration.

The WCSERT used principles of root cause analysis to identify contributing factors, creating consensus recommendations for system improvements implementable by the participating organizations. These recommendations are intended to improve the quality and accuracy of the Wayne County criminal justice system by preventing the factors that contributed to Mr. Anderson's identification, conviction, and incarceration from occurring in future cases.

The WCSERT did not seek to punish or find blame with any individual or agency, but to learn from this wrongful conviction and make changes to avoid such errors again, helping the criminal justice system operate fairly and justly for all.

The WCSERT identified 40 distinct factors that contributed to Mr. Anderson's wrongful conviction and his wrongful incarceration for 9 years. (For a graphic breakdown of these contributing factors, please see the "fishbone diagram" set forth in Figure 1 below.) The WCSERT then discussed and agreed upon 25 consensus recommendations for changing the criminal justice system in Wayne County. These contributing factors andrecommendations are interspersed throughout the case analysis below, and collected in a table in Appendix B.

Mr. Anderson's wrongful conviction could not have happened without systemic errors occurring at every level of his case. Any inaccurate conviction must start with an inaccurate (though not necessarily intentional) misidentification and arrest. In addition, such convictions cannot occur without avoiding the system's other numerous checks and balances, including prosecutors and defense attorneys adjudicating it despite its inaccuracy and judges and juries tasked with objective fact-finding not detecting the inaccuracy of the charge(s), resulting in a judge presiding over an incorrect jury assessment of guilt.

Because each part of the system was unable to identify or prevent the error of Mr. Anderson's conviction, each agency in the WCSERT participated with numerous opportunities for quality improvement. recommendations are interspersed throughout the case analysis below, and collected in a table in Appendix B.

The recommendations focus on:
- Safeguarding the accuracy of arrests based on single-source identifications
- Corroborating identifications that lack certain indicia of reliability
- Gathering evidence as quickly as possible
- Improving case-management systems
- Documenting investigative steps
- Improving communication among investigators
- Exploring potential alibi evidence
- Maintaining courtroom decorum
- Leveraging pretrial procedures to ensure the availability of evidence and witnesses
- Improving community partnerships
- Carefully assessing polygraph results
- Ensuring adequate funding and
- Investing in training and oversight of counsel.

Ultimately, there was no one thing that caused the Wayne County criminal justice system to convict Mr. Anderson, only to believe that his conviction should be vacated later. Rather, a wide variety of "contributing factors" came together in ways that led all participating agencies at the time to conclude incorrectly that Mr. Anderson was guilty of armed robbery. Avoiding any of these contributing factors during the adjudication of his case might have averted his incarceration. A visual representation of specific contributing factors that occurred in Mr. Anderson's case is displayed in the "fishbone" diagram in Figure 1 below.

Figure 1. "Fishbone" diagram with contributing factors specific to the wrongful conviction of Eric Anderson



# Case Analysis, Contributing Factors and Recommendations

The WCPO chose the Anderson case as a useful candidate for a Sentinel Event Review (SER) based on the undesirable and unwanted outcome of a Wayne County resident serving almost nine (9) years in custody for a crime credibly confessed to by another man. They selected the Quattrone Center, which has deep expertise in conducting SERs in other exoneration cases,[2] to coordinate the review with other stakeholders in the Wayne County criminal justice system.

The Quattrone Center and representatives of Dechert LLP and Shook, Hardy & Bacon LLP[3] requested, received and reviewed thousands of pages of police files, court transcripts and appeals, and other materials, and interviewed seven individuals who participated in the case between 2010 and the present day.[4] Wherever possible, the WCSERT sought to avoid speculating about the motivations or intentions of the participants in the case's investigation and adjudication, and to understand the actual environment and awareness of the participants in the case at the time, so that the group's recommendations would be tailored specifically to the actual areas of confusion, miscommunication, or other challenges causing his arrest and conviction including:

- Eyewitness identification procedures
- Assignment and documentation of investigations
- Consideration of alibi evidence
- Communication among various criminal justice system participants
- Pretrial case preparation and
- Careful adversarial testing.

---

[2] See, e.g., *https://www.law.upenn.edu/institutes/quattronecenter/sentinel-event-review/*

[3] These law firms provided substantial resources on a pro bono basis to assist in the review of documents and interviews with participants, as well as the discussion of contributing factors and recommendations. The members of the WCSERT warmly acknowledge this important contribution to the WCSERT's work.

[4] A limitation of this SER was the inability to speak to every criminal justice system professional who participated in the case; notably, both the judge at Mr. Anderson's trial and Mr. Anderson's defense attorney passed away prior to the initiation of the SER, and the prosecutor of the case at trial did not respond to multiple requests for participation.

# CASE OVERVIEW

## Robberies, Initial Investigation and Arrest

On April 18, 2010, at approximately 3:15 A.M., two individuals were robbed at gunpoint by two masked assailants as they exited a vehicle in the driveway of the home of one of the victims in northwest Detroit. According to the first victim (Victim 1), one assailant placed him in a headlock, held a gun to his head, and pistol-whipped him while demanding his keys and money. The second assailant held his gun to the head of the second victim (Victim 2), but the gun appeared to jam when he attempted to fire.

One of the assailants took car keys from the Victim 1 and pressed the "unlock" button on the fob. This inadvertently triggered the alarm of a different car sitting in Victim 1's driveway, waking his mother and prompting her to go outside to investigate. By that time, the assailants had instructed the victims to run while they fled in the opposite direction. The victims ran to a gas station about half a mile away, where they called for police.

Police arrived at the home at approximately 3:39 A.M. and Victim 1's mother provided descriptions of the perpetrators to responding officers: both men were Black and wore masks. One was taller, wearing a mask and dark clothes; the other was shorter, wearing a tan mask and beige T-shirt. Neither victim spoke with police at this time. After the police had left, Victim 1 sought treatment at Sinai Grace Hospital for injuries to his face and head.

The robbery investigation was initially assigned to the DPD 8th Precinct as a standard robbery case. At an unknown time thereafter, it was transferred to the non-fatal shooting team in the precinct,[5] and assigned to a detective from the department's night response team, which handled shootings.

Nine days later, on April 27, 2010, the first victim gave a formal statement to police in which he identified Eric Anderson as one of the two individuals involved.[6] The DPD officer who took the statement was not the assigned officer who ultimately signed the warrant for Mr. Anderson's arrest, a role filled by the "responsible officer." However, because the responsible officer was working nights, all witness interviews and suspect interrogations were conducted by officers in the non-fatal shooting team who worked days. All DPD testimony at trial was from the DPD Officer who took the victim's

---

[5] The exact rationale and procedure for transferring the case to the non-fatal shooting team is unclear from the documentary record and was unknown to the participants in the case or the SER reviewers. While the first victim and his mother did give statements to DPD officers that they heard "gunshots" (from the victim) and "three gunshots" (from the victim's mother) as the perpetrators ran away, these statements were dated after the transfer of the case to the non-fatal shooting team. No earlier statements or notes were included in the DPD file to explain this transfer of investigational authority.

[6] Although it is not documented in the file, it appears that the victim and a DPD officer had at least one conversation prior to this statement, as the record suggests the statement was scheduled by the victim and officer. No one interviewed as part of the SER had any recollection of such a conversation.

statement and otherwise coordinated the investigation, and testimony at trial suggested that the "responsible officer" was simply an administrative role in this case limited to typing up the arrest warrant and potentially other documents.

As part of his statement on April 27, Victim 1 stated that he had been talking to a "friend" who had previously dated Anderson, and that she assisted Victim 1 with his identification of Anderson, whom she said she knew "liked to rob people." With this assistance from his friend, Victim 1 had located a picture of Anderson and his ex-girlfriend on the ex-girlfriend's Facebook page. Victim 1 printed this photograph on April 27th and brought it with him to the police station.[7]

Victim 1 also reported that later in the morning on April 19, while he was receiving treatment at the hospital for the injuries to his face, he observed the second assailant being treated for a hand injury. He also stated that while he was there, a nurse at the hospital told him that one of the individuals involved in the robbery was also being treated for a gunshot wound to the foot. Victim 1 did not ever see this individual at the hospital.

During the interview on April 27, Victim 1 described the first assailant (i.e., Mr. Anderson) as approximately 5'8", 150 pounds, with short hair, and described the other assailant as 5'9", 200 pounds, with braids. He also stated that as he fled the scene, he heard gun shots from behind him. He also stated that he looked at his phone while fleeing, noticing that it was 3:19 A.M. The victims ran together approximately 0.5 miles to a gas station where they called for help before returning to Victim 1's house.

On April 28, 2010, the following day, Detroit police interviewed Victim 2, who stated that two men approached and pulled handguns on them. He described both individuals as black males, each carrying a black handgun, and estimated one of them to be about 6' to 6'1." Police also re-interviewed the first victim's mother, who reiterated that she had seen two individuals after the robbery. She described one as "small build, short, wearing a mask" and the other as "medium" and reported hearing three gunshots nearby as assailants fled the scene. No ballistic evidence was recovered.

Police conducted two other interviews on April 28. The first was Anderson's former girlfriend, who had told Victim 1 of her opinion that Anderson could be one of the assailants. She told officers that she received a call from Victim 1 around 3:30 A.M. on the morning of the incident and was told he had been robbed and pistol-whipped. She stated that she had previously gone to prom with Anderson and suspected him of the robbery because she knew he did that "kind of stuff," but

---

[7] Again, the record-keeping in the DPD file makes it difficult to know the precise sequence of events here, but the picture appears to have been printed from a non-DPD printer with a date stamp. The version reviewed by the WCSERT had Victim 1's signature on it with a notation that the man in the photo was Mr. Anderson, who robbed Victim 1. It was admitted as evidence in the trial.

confirmed that she had no direct knowledge that Anderson had participated in the robbery. She also reported that she had spoken with Anderson by phone on April 19, 2010, the day after the robbery. During that call, Anderson denied involvement, saying he had been shot in downtown Detroit in the early morning hours of April 18 and thus could not have committed the robbery.

Police also interviewed Victim 1's mother twice, once immediately after the robbery in response to a 911 call and again on April 28. She stated that on the night of the robbery, she had been awakened by the sound of her van starting up. She looked out the window and saw two black males standing on either side of her son's vehicle. She yelled at the men, and they left. She described one of the men as 18-20 with a small build, short, and wearing a mask. She added that she heard approximately three gunshots as the men ran off.

Based on Victim 1's statement and with the support outlined above, DPD officers consulted with an Assistant County Prosecutor working closely with the DPD non-fatal shooting section. The Responsible Officer signed a written arrest warrant that was signed by a judge and issued for Anderson's arrest on April 28, 10 days after the robbery. Mr. Anderson, who is 6'0" tall and had short hair, was arrested that same day.

### Subsequent Investigation and Alibi

Following his arrest, Anderson gave two statements to DPD officers. In each interview, he denied any involvement in or knowledge of the robbery, stated that he did not know either of the victims, and provided an alibi: he had been shot at a Coney Island restaurant at roughly the same time the robberies had taken place, and had immediately been taken by a friend to Sinai Grace hospital for treatment, making it impossible for him to have committed the robberies at the time reported by the victims.

In the first interview, Anderson stated that he had been shot downtown and had driven back to Sinai Grace Hospital for treatment.[8] The following day, he elaborated that he had entered a Coney Island downtown around 3:00 A.M. to use the restroom. Immediately upon entering, he was struck in the foot by a stray bullet during what appeared to be an unrelated altercation between patrons already inside the Coney Island. He provided investigators with the name of the friend who had driven him from the Coney Island to the hospital and described his clothing as wheat-colored Timberland boots, dark Ed Hardy jeans with a distinctive multi-colored back-pocket design, a hoodie, and a Detroit Tigers baseball cap.

---

[8] In subsequent testimony Anderson explained that his wound was not life-threatening, and Sinai Grace was located much closer to his home, allowing him to get home much more easily after his release in the early morning hours. The prosecutor at trial used the treatment at Sinai Grace instead of Detroit Receiving Hospital or Henry Ford, which were very close to the Coney Island, to cast doubt on Anderson's alibi.

- 9 -

Mr. Anderson had also provided a statement to officers in the early morning hours of April 18 while he was being treated at Sinai Grace, as it is standard procedure for DPD officers to interview any gunshot wound victims at the hospital. His statement about the Coney Island was virtually identical to the later statements he gave after his arrest – that he had taken only a few steps into the Coney Island when he was shot in the left foot, and that he could not identify the shooter.

To investigate Mr. Anderson's alibi, DPD obtained surveillance footage from the Coney Island for the night of April 18 as well as Mr. Anderson's medical records from Sinai Grace for the same night.

The video (which has no audio) has footage from two cameras. One, in the back of the Coney Island, shows two men with guns leaving through the back of the restaurant. One is shorter and wearing a tan T-shirt and Timberlands. The other is taller and wearing a long sleeve, green and blue plaid collared shirt, and white sneakers. The second camera is positioned above the inside of the front door to the Coney Island and is facing inward into the restaurant. This video shows people scattering and ducking for cover, while a man enters the restaurant wearing a hoodie and jeans that matched the description given by Mr. Anderson. The man takes one or two steps into the camera's range before he flinches and pivots (presumably because shots have been fired, though you cannot hear the shots). The man immediately turns and exits out of the camera's view. At no time was the man's face visible, as his back was to the camera and his hood was up, but the clothing matched the description provided by Mr. Anderson.

A second individual was also shot during the incident at Coney Island and was named in some of the DPD interrogation of Mr. Anderson, but no materials obtained by the review team contained any information about any further investigation of the shooting at the Coney Island.

Medical records confirm that Anderson was admitted to Sinai Grace Hospital at 3:33 A.M.[9] with a gunshot wound to the left foot. X-rays and a medical examination showed that the bullet had entered the instep of the foot behind the big toe, and exited out of the sole foot in the middle of the sole, between the third and fourth toes

On May 10, 2010, Anderson submitted to a polygraph examination administered by DPD. The analyst concluded that Mr. Anderson was not being truthful when he stated he did not commit the robbery.

It appears that DPD did not interview the man that Mr. Anderson said drove him to the hospital until May 12, 2010, about two weeks after Anderson's arrest.[10] Police interviewed Anderson's

---

[9] It is not known what time Mr. Anderson was dropped off at Sinai Grace, though the reviewers acknowledged that the time of admission recorded was likely later than Mr. Anderson's time of arrival in the Emergency Room.

[10] The individual's statement to DPD is dated "5/12/12," and reviewers assume this is a typographical error.

friend who stated that he had picked Anderson up around 11:00 p.m. and that the two had driven downtown but were unable to get into a club. After riding around for several hours, they stopped at the Coney Island around 2:30 a.m., where Anderson was shot. He reported that he then drove Anderson to the hospital.

While the robbery for which Anderson was convicted was under the jurisdiction of the 8th precinct, the Coney Island shooting that constituted Anderson's alibi fell under the jurisdiction of the 3rd Precinct. As a result, the robbery and the shooting were investigated separately by different precincts, and there was no documentation available to the review team regarding any further investigation into the Coney Island shooting.

### Preliminary Hearing, Plea-Bargain and Trial

Anderson was arraigned on June 9, 2010, and entered a plea of not guilty. Anderson was represented by court-appointed counsel who was experienced in the jurisdiction. At that hearing, the court responded to counsel's statement that Anderson was competent by stating, "[a]lthough poor in judgment, huh?" The court expressed the opinion that bond had been set too low, asking "[h]ow did the magistrate make such a mistake?" The court further opined that Anderson's criminal history was "more here than what meets the eye. Or your eye. It's not going to get by mine, though." He then vacated the existing bond.

A pretrial hearing was held on September 15, 2010, where the court learned that Anderson had turned down an offer to plead guilty to unarmed robbery and receive a sentence of three years' probation. The court asked Anderson, "Are you stupid or what?" and asked what his level of education was and which high school he had attended. Anderson stood by his refusal to plead and the court stated, "there will be no pleas accepted after today."

The trial started on November 2, 2010. The prosecution opened its case with the testimony of Victim 1, who stated that he had been robbed and pistol whipped by two assailants, one of whom was wearing dark clothes and the other of whom was wearing jeans and a tan shirt. Victim 1 testified that the robbers had had their faces covered, but said he saw their faces without coverings when he first pulled up to his house in his car and they were just walking down the street normally. He stated that he had seen the robbers before hanging out in his neighborhood. Victim 1 further related that the robbers had told him to get away from the house and he had run to a gas station; on the way he heard two gunshots that sounded like they were coming from near his house. According to Victim 1, he had not known Anderson's name but learned it from a female friend and then found a photo of Anderson and that same female friend on Facebook. Victim 1 printed that photo out and took it to the police. The photo was admitted into evidence at trial and Victim 1 identified Anderson as his assailant in open court.

- 11 -

During cross-examination of Victim 1, Anderson's attorney sought to clarify the timeline of the crime. Victim 1 testified that he knew the crime occurred around 3:19 A.M. because he looked at his phone while he was running away from his house after the robbery. Anderson's attorney also obtained an admission that Victim 1 had not told his mother that he knew who had robbed him on the night of the crime; Victim 1 said he "wasn't thinking" because he "was in too much pain." In addition, Victim 1 testified on cross that, while he was at Sinai Grace hospital after the robbery, a nurse had told him that Anderson was there being treated.

Victim 2 was next to testify. He stated that he could not identify either of the robbers or describe what they were wearing. He said, "when they had the gun in my face I couldn't remember nothing at all." In response to questioning by the court (in Wayne County, it is customary for the court to ask witnesses questions, including questions from the jurors that it has screened), Victim 2 stated that the lighting at the time of the robbery was "[a]bout a three" on a scale of zero to ten, "if zero was pitch black to where you can see absolutely nothing and ten is bright as noon on a clear summer day."

The prosecution next called one of the investigating police officers, who testified that he had investigated Anderson's alibi and confirmed that there was a shooting at the Coney Island on the night in question, but was not able to confirm based on surveillance video that anyone was actually shot during that incident. The officer also confirmed that Anderson became a suspect because Victim 1 brought in the Facebook photo of him and stated that he was one of the robbers. On cross examination, the officer acknowledged that Anderson had provided him with a description of his clothing that was consistent with what the officer saw in the surveillance video. Specifically, he saw someone in the video wearing dark jeans with a print on the back pocket and wheat Timberland boots, as Anderson had described. The officer stated that the shooting at the Coney Island occurred around 3 A.M. He estimated that it would have been a 10–15-minute drive from there to Sinai Grace hospital, and hospital records showed Anderson went into triage at 3:34 A.M.

In response to questioning from the court, the investigating officer testified that if a semi-automatic handgun jams, it sometimes goes off accidentally afterward. He stated that Victim 1 had told him one of his assailant's guns had jammed.

Victim 1's mother was the prosecution's final witness. She testified that she did not actually see the robbery, but she saw Anderson at the scene; although his face was covered, she recognized him because he was wearing the same beige shirt he had on earlier in the day. In response to questioning from the court, Victim 1's mother stated that after the robbers left her front yard, she heard two gunshots from around the corner. She also characterized the lighting at the scene as a 9 on a scale from 0 to 10, with 10 being brightest.

Before the prosecution rested its case, the court noted that there were a number of other witnesses on its list that it had not called to testify. The court asked if the prosecution had spoken with the defense about those witnesses, and the prosecution said they were all available for the defense to call except for Victim 1's female friend who had told him Mr. Anderson's name. The court suggested that the defense might want a "512 instruction," whereby it would "instruct this jury they're going to be advised of the fact that had these people testified they would have given testimony contrary to the position of the People." Mr. Anderson's counsel requested such an instruction with regard to Victim 1's female friend (who also happened to be Mr. Anderson's ex-girlfriend). The prosecution admitted that this witness had not been subpoenaed. The court asked if she was a "res gestae witness" (meaning one who was present for the crime) and defense counsel acknowledged she was not, leading the court to say her absence was "kind of a non-issue." Defense counsel pointed out that "she's the one that allegedly gave the name of Mr. Anderson to [Victim 1] and that was basis upon from which we understand [Victim 1] then went to the Facebook and got this picture." He posited that Victim 1 "didn't know who anybody was" and was "relying on what the police officer went out and took a statement from this young lady who said... Mr. Anderson is the one that robbed him." The court responded that it did not "make any difference from whom [Victim 1] had obtained that information" because it merely "confirmed his not his suspicion but presented a message that he could process through his own thinking." Counsel argued that it was "still important that we would of had her here to cross examine her as to the veracity and truthfulness of" Victim 1, but the court denied the 512 instruction, stating "her testimony would ostensibly not be that important to this case."

After the close of the prosecution's case, Mr. Anderson made a motion for a directed verdict, which the court denied. In regard to Mr. Anderson's alibi, the court stated, "you know it probably would have been better had we had the video so we could all see it." The court characterized this as "instrumental evidence that the jury should be capable of perceiving themselves as opposed to being inter[preted] if you will by" the investigating officer. Nevertheless, defense counsel did not introduce the surveillance video or any stills taken from it during the defense case.

The defense presented alibi testimony from Mr. Anderson's friend who had taken him to the Coney Island. The friend testified that he had driven Mr. Anderson to the Coney Island. Five to ten minutes after Mr. Anderson got out of the car at the Coney Island, the friend heard gunshots and then saw Mr. Anderson hopping and falling to the ground. Mr. Anderson's friend said he got Mr. Anderson in the car and took him to "the nearest place where I knew we could go," Sinai Grace hospital. The friend also corroborated that Anderson had been wearing jeans with gold designs on the back pockets and tan Timberland boots when he entered the Coney Island.

Next, the defense introduced Mr. Anderson's medical records from Sinai Grace hospital. It did not present a witness to talk about the records or otherwise attempt to explain their significance to the

jury. And those records did not contain images or drawings to show the entry and exit wounds, making them difficult to interpret without medical training.

The defense also presented testimony from another one of Mr. Anderson's friends that he received a call between 2 and 2:30 A.M. telling him that Mr. Anderson had been shot and went to meet him at the hospital. This friend's mother also testified that she had driven her son to meet Mr. Anderson at the hospital around that time.

Mr. Anderson testified in his own defense. He stated that on the night of the robbery, he had gone downtown with friends to try to get into a club. When they couldn't get in, they drove around for a while. At 2 A.M., the clubs closed, and Mr. Anderson wanted to find a bathroom. His friend stopped the car at the Coney Island for him. Mr. Anderson walked about four or five steps into the building and heard gunshots and then felt that he had been shot in the left foot. He hopped outside and his friend helped him into the car and drove him to Sinai Grace hospital. He was admitted at 3:33 A.M.

During closing arguments, the prosecution stressed Victim 1's identification of Mr. Anderson as his assailant and the fact that he said he knew Mr. Anderson from the neighborhood. It also argued that "defendant was shot as he fled the scene of the robbery," citing "testimony from [the investigating officer] regarding guns and how guns can misfire, if a gun is discharged if it does not fire correctly that it could accidently go off." For its part, the defense stressed that the investigating officer had identified clothing consistent with Mr. Anderson's in the surveillance video of the Coney Island shooting and that hospital records showed Mr. Anderson was treated at 3:33 A.M. It also questioned the timing and strength of Victim 1's identification.

On November 5, 2010, the jury returned a verdict of guilty on all charges.

### Re-investigating the case: The Conviction Integrity Unit (CIU) Phase

In March 2018, Anderson submitted a petition to the WCPO Conviction Integrity Unit (CIU), claiming actual innocence of the crimes for which he had been convicted in 2010 and asking the CIU to re-investigate his case. The petition was accompanied by a sworn affidavit from another individual (the Affiant) who confessed to committing the robbery for which Anderson had been convicted. The Affiant stated that he and a second person—not Anderson—were responsible for the robbery and indicated a willingness to provide further information.

Over the course of 2018, the CIU gathered and reviewed evidence as it investigated Anderson's claims of innocence and Affiant's affidavit of confession. It is not unheard of for individuals serving lengthy sentences to confess falsely to crimes they did not commit in an effort to help others get released, and so the CIU engaged in its investigation with some skepticism about the validity of the affidavit. At the same time, because the CIU's investigation was focused on proving or disproving Affiant's affidavit, rather than starting with a focus on Anderson generated by the victim's eyewitness identification, the CIU pursued information differently, and was in a position to assemble the available information into a very different set of facts than those that led to the arrest of Mr. Anderson.

CIU investigators obtained Anderson's case file from the Michigan Innocence Clinic, subpoenaed his medical and radiology records, and conducted a detailed forensic review of the surveillance footage from the Coney Island where Anderson reported being shot.

After independently reviewing the medical records, the CIU concluded that Anderson's gunshot entry wound entered the side of the foot, not the top, and therefore was likely to be inconsistent with a self-inflicted wound suffered from an accidental discharge while running away from the scene.[11] The entry into the instep of the foot and out the sole was deemed to be more horizontal and less vertical in angle, and thus more consistent with the injury Anderson claimed, in which he was shot from some distance while entering the Coney Island as others were shooting.

Going beyond the surveillance video from the Coney Island, the CIU obtained the jeans Anderson had claimed to be wearing from Anderson's father and submitted them to a DPD forensic video analyst for review. That review compared the jeans Anderson said he wore to those visible in the surveillance footage and found multiple specific points of similarity, suggesting strongly that the individual in the video was Anderson and he was at the Coney Island. (The DPD analyst was the same person who had originally obtained the surveillance video from the Coney Island in 2010).

---

[11] It was also noted at the review that there was a single gunshot wound and that both Victim 1 and his mother had reported multiple shots; while it is certainly possible for one shot to miss the assailant's foot as he was running away, it seems unlikely that an accidental discharge caused by jamming at the scene would result in multiple shots being fired from the gun.

- 15 -

The CIU also determined that Victim 1's identification of Anderson may have been influenced by suggestions from his Victim 1's friend (Anderson's ex-girlfriend) rather than firsthand observation by the original witness.

The CIU also interviewed Affiant directly, who reaffirmed his written statement during an interview with the CIU and passed a polygraph examination in which he stated not only that he had committed the robbery, but that Anderson had had no involvement in it.[12]

Affiant's statement was not true in all respects. He initially named a person who was deceased as his accomplice in the robbery, an act that was suspected by the CIU to ensure that Affiant was not "ratting on" anyone. Later, however, he identified someone else as the second perpetrator; again, this person bore no resemblance to Mr. Anderson, who had been "Assailant 1" in the Victim's testimony and thus in Affiant's position during the robbery.[13]

The CIU ultimately identified both the actual perpetrator and another man with a gun in the surveillance footage of the Coney Island, noted that the description of the two men matched the description of what Assailant 1 and 2 had been wearing in the contemporaneous descriptions provided by Victim 1 and his mother, and confirmed that the Affiant and the second man (who was also incarcerated at the time of the CIU investigation) had engaged in a pattern of similar robbery and carjacking offenses in the past.

Based on the totality of new evidence, including the confession, corroborating video, and medical documentation, the CIU concluded that Anderson had been misidentified and that Affiant's confession that he committed the crime with another person who was not Anderson was truthful. Although the investigation revealed that Anderson and others had provided false, incomplete or misleading statements at various points, including at trial and during the CIU review, these inconsistencies did not alter the CIU's conclusion that Anderson was innocent of the crime.

On April 30, 2019, a Wayne County judge signed a stipulated order granting relief from judgment and dismissing the charges against Anderson. He was released from custody that same day.

---

[12] As discussed below, this polygraph conflicted with a polygraph taken by Mr. Anderson after his arrest and before his trial.

[13] The CIU had long been skeptical that the first-named individual was involved, noting that he was deceased and did not resemble anyone visible in the surveillance footage. Anderson later acknowledged that he, the confessor, and another acquaintance had previously discussed naming that individual as the second perpetrator.

## CONTRIBUTING FACTORS AND RECOMMENDATIONS FOR CHANGE

### Factors Related to Eyewitness Identification

Reviewers noted a number of factors that affected the potential accuracy of the identification of Mr. Anderson by Victim 1. While none of these issues categorically exclude Mr. Anderson, individually and collectively they serve as indicators that additional corroborating evidence would be useful to ensure the accuracy of the identification. These factors include:

*Contributing Factor 1:* Mr. Anderson was arrested and convicted on the eyewitness testimony of a single individual without any corroborating physical evidence.[14]

*Contributing Factor 2:* System variables exist that made the identification more challenging for the victims, including:

    2a. The assailants wore masks during the robbery

    2b. It was dark and there was no streetlight

    2c. The assailants had weapons

    2d. Victim 1 was hit in the face with a weapon and was bleeding in ways that may have impaired his vision

*Contributing Factor 3:* Victim 1's eyewitness identification of Mr. Anderson was made using a non-contemporaneous photo of Mr. Anderson, suggested by a potentially biased source with no actual knowledge of the events in question.

*Contributing Factor 4:* No photo array or other procedure was conducted to verify the victim's ability to identify Anderson.

*Contributing Factor 5:* The process leading Victim 1 to find the photo used to identify Mr. Anderson, searching a specific social media account looking for a known person at the suggestion of Victim 1's friend, was inherently suggestive, and the victim's limited prior familiarity with Anderson raises questions about the strength and reliability of the identification.

---

[14] Participants in the review disagreed about the weight to assign this contributing factor, and several felt strongly about the need to limit it to this specific fact pattern in determining recommendations based on it. While a significant number of wrongful convictions detailed in the National Registry of Exonerations (https://exonerationregistry.org/) were based upon the testimony of a single eyewitness without corroborating physical evidence, not all such cases should be ignored. In fact, many cases cannot generate more evidence and nonetheless demand a thoughtful, thorough review by police and prosecutors alike. For example, sexual assault cases often fall in this category. Thus, while the reviewers noted that the evidence of a single eyewitness combined with no corroboration in an armed robbery was far from an ideal evidentiary scenario in Mr. Anderson's case, it is important not to overextend this contributing factor to other cases.

*Contributing Factor 6:* *No witness statements were taken until nine (9) days after the robbery, reducing the recency of the identification and reducing the likelihood of finding any physical evidence at the scene.*

*Contributing Factor 7:* *An Assistant Wayne County Prosecutor working closely with the DPD Non-Fatal Shooting group did not identify or question any of the potential weaknesses of the victim's eyewitness identification.*

*Contributing Factor 8:* *A Third Circuit Judge approved the arrest warrant notwithstanding its thin evidentiary foundation.*

**Reviewer Discussion.** Reviewers agreed that the eyewitness identification of Mr. Anderson by Victim 1 had several "warning signs," outlined in the CFs above. At the same time, because Victim 1 claimed to know Mr. Anderson from the neighborhood, many of the procedures that would normally be used to verify a "stranger identification" were deemed not necessary for this "known suspect identification." Given that Victim 1 knew Mr. Anderson from the neighborhood, any photo array or other verification would have been redundant and unnecessary.

It was also understood by all reviewers that even under laboratory conditions eyewitnesses often make mistakes in their descriptions of perpetrators, and these were not ideal conditions. The fact that the assailants' faces were covered, the dim lighting, the presence of weapons, which can distract witnesses from looking at assailant's faces – any of these could have been the cause of a mistaken identification. Each of these elements that could weaken confidence in the identification was raised for the jury's assessment at trial.

Victim 1, Victim 2 and Victim 1's mother all differed in their descriptions of the height and weight of the assailants, and it was deemed noteworthy by some reviewers that Mr. Anderson's physical description did not conform to any description of the two assailants: Victim 1's mother described the first assailant as "short" and Affiant was 5'5" tall compared to Mr. Anderson's height of 6'0", while assailant 2 had braids which Mr. Anderson did not have. These differences did support the truth of Affiant's confession and Mr. Anderson's claims of innocence in retrospect, though several reviewers were unpersuaded by the height differences reported in particular, noting how common it is for eyewitnesses to make mistakes in their physical descriptions of people, and the need to include such descriptions as only one factor in an identification that leads to an arrest warrant.

Another issue in the reliability of the identifications and investigation was the 9-day gap between the commission of the crime and the first written witness statement. A lack of documentation in the case file made it impossible for reviewers to evaluate what caused this delay. Nonetheless, the 9-day interval between the event and witness interviews reduced the recency of the identifications and further complicated DPD's ability to search for any physical evidence that might have corroborated or disproved the identification.

- 18 -

All in all, it appears that DPD investigators, the WCPO Assistant County Prosecutor, and the judge signing the arrest warrant chose to rely on Victim 1's "known identification" as accurate despite all of the other potential signs of the identification's weakness. While Reviewers acknowledged these challenges, most felt that the evolution of investigational technologies would have given DPD investigators in such a situation today additional tools to address the concerns expressed about Mr. Anderson's identification. While such technologies certainly can provide additional assistance, nothing in the record or in the review suggested that the various participants in the case, including law enforcement, the attorneys, or the judge, expressed concern about the limitations of the identification, and all were willing to proceed notwithstanding the minimally reliable evidence pointing to Mr. Anderson's participation in the robberies. Thus, each participating agency in the SER has an opportunity to use this case as a learning tool about the potential risks of a "known subject" eyewitness identification that lacks additional corroborating evidence.

<u>Recommendation 1:</u> DPD should implement policies[15] that seek to identify supporting evidence that strengthens probable cause on single-source identifications where the parties are not known to one another unless exigent circumstances exist or unless the identification has particular credibility. Supervisors should ensure that all possible avenues are explored for corroborating evidence before approving arrest warrants based on single-source uncorroborated identifications. When such identifications are used, they should be accompanied by documentation justifying the exception and reviewed by a supervisor.

Reviewers noted that there are instances, including domestic violence allegations, where the "known suspect" is very well known to the victim and where single-source eyewitness identifications may be the only admissible evidence. This recommendation is not intended to create a blanket rule banning such identifications from their uses in criminal cases, but to ensure that additional independent assessments are provided from within DPD and WCPO given the increased potential for misidentifications in cases like Mr. Anderson's, where the relationship between victim and assailant is much more attenuated.

One investigational step that could have been taken to corroborate the identification would have been a subsequent interview with the victims and Victim 1's mother regarding the clothing worn by the assailants. The descriptions of the assailants did not mention any distinctive clothing, only one dressed in tan and one dressed in black clothes. By contrast, Mr. Anderson's description of his jeans, verified by the video of the Coney Island, could have been a useful tool for his defense. Neither DPD nor, importantly, Mr. Anderson's defense attorney chose to take the approach at any time after Mr. Anderson's arrest or at trial.

---

[15] After Anderson was arrested and unrelated to his case, DPD independently implemented protocols for the administration of photo arrays in criminal investigations. See Detroit Police Special Order 22-53, effective Date 12/16/2022. However, it is not known whether these protocols would have prevented Anderson's arrest, as police at the time treated the arrest as a "known suspect ID" given the victim's assertions that he recognized Anderson "from the neighborhood."

Recommendation 2: DPD and WCPO should develop joint charging guidance that elevates the evidentiary threshold when a case relies solely on a single eyewitness identification. The guidance should discourage prosecution in the absence of corroboration unless clear, documented indicators of reliability are present. Charging decisions should be supported by an assessment of whether the witness had a meaningful opportunity to observe the suspect and whether any corroborating evidence (e.g., physical evidence, video, or motive) is available or has been reasonably ruled out. Absent such indicators, charging should be deferred until further investigative steps are taken.

Recommendation 3: In cases where the suspect was masked, visually obscured, or viewed only briefly, WCPO should seek additional corroboration or validation of the identification before charges are authorized based on that identification alone. In such cases, prosecutors should be required to confirm whether corroborating evidence has been sought or whether the witness's visual capacity was meaningfully impaired.

Recommendation 4: DPD should include "visual conditions" as a prompt in ID documentation forms—asking investigators to record whether the witness could clearly view the suspect's face, lighting conditions, duration of observation, and whether a mask or obstruction was present.

Recommendation 5: DPD should endeavor to investigate the scene of a shooting and take detailed witness statements as soon as reasonably possible and should evaluate cases where that standard is not met.

Recommendation 6: When a photograph used for identification comes from sources other than police databases, DPD & WCPO should require that photo identification acquisition history is included in the warrant request report and they and any approving judge should review it for potential influence or bias during pre-charge decision-making.

Recommendation 7: In cases relying solely on uncorroborated eyewitness identification, DPD should consider requiring a secondary supervisor review before an arrest warrant is authorized by DPD and/or before the case is accepted for prosecution by the WCPO.

## Challenges for the DPD Investigation

The Anderson case was reviewed twice – once by DPD, starting from the position of a robbery with three eyewitnesses who provided only a very vague physical description of the robbers and no additional information, and a decade later by the WCPO CIU, using all of the information from the case to date plus a suspect's newly-made confession. Under the circumstances, it can be seen how the CIU might have more easily reached the conclusion that Affiant committed the robbery than the DPD investigators in 2010.

- 20 -

At the same time, reviewers attempted to put themselves in the shoes of DPD investigators as they investigated the case and noted a number of areas that might have contributed to the arrest of Mr. Anderson.

*Contributing Factor 9: The file lacked documentation to suggest that DPD conducted any investigation into the identity of the second assailant. This gap limited DPD's ability to explore whether another individual, rather than Anderson, may have been involved.*

*Contributing Factor 10: The DPD file was incomplete and at times apparently inaccurate, complicating the ability of downstream stakeholders in DPD, WCPO, and defense attorneys to fully evaluate the strength of the case against Mr. Anderson.*

*Contributing Factor 11: Neither Victim 1 nor Anderson's ex-girlfriend were fully questioned about her role, relationship, or assistance in identifying Anderson or any possible ulterior motive she would have in suggesting Anderson as the perpetrator of the robbery. The potential for bias in her identification of Anderson was never documented (and potentially never evaluated) by DPD.*

Reviewers noted that the documentary record reviewed by the WCSERT had several gaps and errors. Police reports were rife with typographical errors, including inaccurate names and dates. In one statement, Mr. Anderson was apparently incorrectly described repeatedly by the police officer taking the statement as "Johnson," making it unclear whether the statement was actually describing Mr. Anderson. The case notes of activities conducted by DPD Investigators were not part of the police file – or at least the portion provided to prosecutors and to the WCSERT Review Team – making it difficult to follow the path of the investigation with accuracy and precision and difficult to know whether supervisors, including but not limited to the Responsible Officer, was able to follow along and be a well-informed critical assessor of the investigation.

Reviewers acknowledged this issue as important both for case management and supervision in real time, and for the ability to review cases later on. In 2016, DPD updated its case management system to provide supervisors with additional ability to identify documentation "gaps" in an investigation.[16] DPD reviewers believe that the gaps in documentation in the Anderson case would have been unlikely to occur had this system been in place in 2010, because case metrics requiring supervisory sign-off and automatic flags illustrating gaps in documentation would be caught by overseers at high levels in the DPD organization and further direction would be given to officers who repeatedly fail to provide the necessary documentation.

---

[16] This upgrade was a quality improvement effort conducted by DPD that was separate from the Anderson case.

<u>Recommendation 8:</u> Continued investment in DPD case management systems—with searchable notes, case-linking alerts, and real-time supervisor dashboards—should be paired with department-wide training to promote consistent use and oversight. Improvements to shift structures and email notification systems that enable timely OIC involvement should be sustained and evaluated for effectiveness. Regular audits and ComStat processes should be used to verify documentation compliance and flag potential investigative gaps in real time.

*<u>Contributing Factor 12:</u> The investigation took place at a time when it was not policy to record witness interviews or suspect interrogations, and no such recordings were made.*

It was not official DPD policy in 2010 to record witness interviews nor suspect interrogations, and no interviews or interrogations in the Anderson case were recorded on audio or video. As a result, the review was limited to the written record and could not evaluate the process by which the statements were taken or the accuracy of the written reports. DPD has revised its policies on recording interviews in the intervening years[17], but it bears reviewing these policies to ensure that "best practices" of investigating are used throughout to minimize confirmatory bias and other potential generators of inaccuracy.

*<u>Contributing Factor 13:</u> A community and Department focus on successfully closing non-fatal shooting cases may have contributed to the speed with which Mr. Anderson was arrested.*

*<u>Contributing Factor 14:</u> DPD's practice of marking a case "closed" for statistical purposes when an officer signed an arrest warrant may have created a disincentive for officers to conduct additional investigation on a case after arraignment, even if such investigation would have strengthened the case for WCPO prosecutors.*

Multiple people interviewed for the SER noted that during the 2010 time period, community members, including DPD, were very concerned about gun violence in Detroit and an emphasis was placed on increasing the closure rates of gun violence cases. This public focus on closure rates may have played a part in the speed (<48 hours) with which Mr. Anderson's case went from an eyewitness identification to an arrest despite some of the areas of weakness identified above. It should be noted, however, that the participants in the case who agreed to be interviewed did not feel that they had moved too quickly in this case given the information available to them at the time.

DPD and WCPO collaborated such that DPD would issue, and WCPO would accept, arrest warrants based on a standard of "probable cause" that the individual arrested was the perpetrator of the crime in question. Such a policy could provide DPD investigators with an incentive to generate arrest warrants before a case has been fully investigated, leaving gaps in the case that could plague

---

[17] See DPD Manual Directive Number 203.13, "Electronic Recordings of Interviews and Interrogations," effective 12/09/2022.

prosecutors' efforts to secure righteous convictions or, as in this case, allow an arrest with substantial concerns about accuracy to proceed and lead to an unjust incarceration. It is an important feature of management to balance the risk of incentivizing investigational speed – especially in service of the laudable goal of reducing gun violence – by reinforcing a culture of thoroughness and accuracy in the generation of arrest warrants. Current WCPO practice is to accept warrants only when the arrest is deemed to have evidence showing that the arrestee is the perpetrator "beyond a reasonable doubt," but WCPO and DPD should continue to collaborate and provide additional investigational resources where necessary, even after a case has been "closed" based on DPD's metrics.

Recommendation 9: DPD should require documentation of all investigative steps taken to identify any suspect described in victim or witness accounts. Case files should include notation of follow-up actions—even if no new leads are developed—to reduce premature narrowing of investigative focus and to allow for appropriate supervisory review prior to the issuance of an arrest warrant. Supervisory check-ins should be encouraged when only one of multiple suspects described has been identified or investigated, especially prior to submitting an arrest warrant.

Recommendation 10: When a witness's identification of a suspect involves assistance from another individual, such as providing a name or directing them to a photo, DPD should ensure that any follow-up captures any potential motive the second individual might have in providing the assistance. Interviews with both the witness and the assisting party should explore the timing, content, and potential influence of those conversations.

*Contributing Factor 15: Technologies like ShotSpotter, Project Green Light (license plate tracking), doorbell cameras, facial recognition, and continuous GPS-based phone location data were not available to DPD in 2010. As a result, there was no independent method to test Anderson's claim that he had been shot elsewhere, to cross-reference timelines, or to capture surveillance footage.*

Reviewers noted that to some extent, the DPD investigators were limited by the technologies then available in 2010. DPD – and therefore prosecutors and defense attorneys – lacked shot spotter technology now in place that could have corroborated witness statements that shots were fired as the assailants ran away; there were no Ring doorbell cameras or other technologies that could have provided views of the robbery itself, or security cameras at Sinai Grace Hospital that could have supported Mr. Anderson's alibi; continuous phone location features and license plate tracking were not available to corroborate Mr. Anderson's alibi; etc. Reviewers acknowledged that these technological tools are now routinely used by DPD in both investigation and charging, suggesting that Mr. Anderson's alibi might have received a more favorable hearing from investigators today. Continued investment in such technologies and training for all parts of the criminal justice system in their capabilities and applications were broadly supported by all reviewers.

## Structural Complexities in Investigation

Reviewers noted some structural complexities of the DPD investigation of Mr. Anderson.

First, the "responsible officer" was largely absent from the file. Cases were somewhat randomly assigned at this time, and the assignment of the case to an officer on the night shift meant that whatever investigation needed to be done during daylight hours would be delegated to another detective in the group. In this case, all interviews were done during working hours and the detective who effectively became the lead investigator was not the detective who drafted and signed the arrest warrant, creating the potentialfor gaps in the transmission of information that might have highlighted or addressed the weaknesses in Mr. Anderson's identification.

In addition, the shooting in the Coney Island and the robbery for which Mr. Anderson was convicted occurred in two different DPD districts and so were investigated by different groups within DPD. The SER disclosed no evidence that the two groups were sharing information about the investigation, or indeed whether the shooting in the Coney Island progressed beyond officers taking Mr. Anderson's statement later that night at Sinai Grace Hospital. A collaborative investigation, complicated by the district separation, could conceivably have led police to Affiant, potentially yielding information that was not available to the DPD investigators involved in the case in 2010.

*Contributing Factor 16: Subsequent investigation of Mr. Anderson after his arrest was limited to disproving his alibi rather than seeking out other possible perpetrators.*

*Contributing Factor 17: The robbery and the Coney Island shooting were investigated by separate DPD teams in different precincts, limiting investigators' ability to recognize possible links between the two incidents, including the plausibility of Anderson's alibi.*

*Contributing Factor 18: Gaps in supervision and information sharing limited coordination across the investigative team. The Officer in Charge (OIC) had broad discretion to lead the investigation, but rotating shift structures limited continuity in investigative leadership. At the same time, DPD lacked centralized systems for case note tracking, real-time documentation review, and automated alerts linking related cases. These structural and technological limitations contributed to silos in investigative efforts and impaired supervisory visibility.*

Recommendation 11: DPD should continue expanding cross-precinct review procedures and case-linking prompts. When shared individuals or locations appear across incident types, supervisory review should be triggered to evaluate potential links and ensure coordinated follow-up.

Reviewers noted also that the DPD's investigation into the case after Mr. Anderson's arrest focused on assessing and disproving his alibi, and did not attempt to identify the second assailant. The only interview with people who could have corroborated his whereabouts earlier in the evening was conducted almost two weeks later. Certain facts at trial, including Victim 1's assertion that he recalled looking at his phone as he escaped from the scene and noted that it was 3:19 A.M., or the prosecution's theory of the case that Mr. Anderson's gunshot wound was likely caused by a misfire while he ranfrom the scene, or the lead investigator's testimony at trial that he could not confirm Mr. Anderson's presence at the Coney Island despite the video, seemed to some reviewers to be tailor-made to disprove the alibi.

Reviewers also noted some decisions made by Mr. Anderson's defense attorney with which they disagreed. First, many reviewers from several agencies commented on the defense attorney's decision not to show the video in the Coney Island. This decision was viewed with surprise by a number of reviewers as well as participants in the case who were interviewed as part of the SER, and the trial judge also made an indirect reference to the lack of showing the video to the jury and how it might have been helpful to Mr. Anderson's case in a sidebar conversation with both attorneys. The death of Mr. Anderson's defense attorney and the trial judge made gathering additional information on this point impossible, but reviewers noted that showing the video and linking the pants to Mr. Anderson would likely have gone a long way toward supporting his alibi in the eyes of the jury, even though his face was not visible in the video.

Other reviewers noted that they would have hoped that the defense attorney at least consulted with a medical expert regarding Mr. Anderson's gunshot wound to contest the prosecution's theory of a misfire being its cause rather than the shooting from a greater distance at the Coney Island. Reviewers disagreed about whether an expert witness would have been able to be qualified in the case but noted that often defense attorneys are hesitant to call experts for budgetary and other reasons.

The CIU was able to bolster Mr. Anderson's claims of innocence and help confirm Mr. Affiant's confession of guilt with a more detailed forensic assessment of the jeans conducted by the same DPD analyst who originally secured the video in the Coney Island. Apparently neither prosecutors nor the defense attorney had asked Mr. Anderson or his family to provide the jeans in question. Reviewers noted that such an analysis would have to have been conducted by the defense, as the analyst in question was the only one in the department at the time and his caseload was frequently backlogged.[18] Additional contributing factors regarding why the defense did not make this request could not be verified due to the inability to interview the attorney.

---

[18] DPD has since expanded access to video analysis and embedded forensic video analysts in multiple precincts. Continued support for centralized video review capacity and clear case intake triage should be maintained.

*Contributing Factor 19:* Mr. Anderson, who was under no obligation to do so, chose not to provide names of any other individuals who could have corroborated his whereabouts on the night in question.

*Contributing Factor 20:* Neither DPD nor WCPO nor Mr. Anderson's defense attorney investigated Mr. Anderson's alibi thoroughly. Important details about the jeans suggesting the truth of Anderson's presence at the Coney Island were not submitted into evidence or shown at trial, nor was the video of the shooting shown at trial.

*Contributing Factor 21:* Defense counsel did not play available video evidence that may have had probative value.

*Contributing Factor 22:* Defense counsel did not attempt to use an expert to evaluate the medical records of Mr. Anderson's gunshot to contest the prosecution theory of a misfire from waist level while running being the cause of the wound.

*Contributing Factor 23:* Only one video expert was available within DPD at the time, limiting the department's ability to timely review, enhance, or assess the relevance of surveillance footage from the Coney Island incident.

Recommendation 12: DPD should develop internal guidance to prompt early and complete follow-up when a suspect names an alibi witness. Where feasible, more than one point of corroboration should be sought, and the results—positive, negative, or inconclusive—should be documented prior to charging.

Recommendation 13: Defense attorneys should actively investigate any potentially exculpatory information that appears credible and can be independently verified, particularly when it may corroborate a defendant's stated alibi. Early, proactive follow-up increases the likelihood of preserving supportive evidence and identifying corroborating witnesses.[19]

## Pretrial Procedures, Potential Judicial Influence, and Lack of a Key Witness

Reviewers observed that the pretrial procedures seemed rushed in some respects and that the trial judge made some pretrial comments that came across as skeptical of the defense. The court's reaction to Mr. Anderson's rejection of a plea deal—asking if he was "stupid"—was a notable example. In

---

[19] Prosecutors in Michigan are bound to follow the requirements of Michigan Code of Professional Conduct 3.8, which sets forth the special responsibilities of a prosecutor to refrain from pursuing charges without probable case, to provide in a timely fashion any exculpatory information known about the defendant, and other related obligations.

addition, although it is not unusual in Wayne County for a judge to ask questions of witnesses, some of the trial judge's questions could be construed as supporting the prosecution's theory of the case.

*Contributing Factor 24: The courtroom environment was perceived as unfavorable to the defense, with judicial comments and interventions that may have affected how the jury viewed defense counsel and the defense's case. The tone and conduct of courtroom proceedings may have signaled skepticism toward the defense, undermining jury perceptions of fairness even absent formal error.*

<u>Recommendation 14:</u> Trial judges should be encouraged to reflect on how tone, timing, and frequency of interventions may influence jury perception, especially when overseeing criminal trials with credibility-based defenses.

Reviewers focused on the confluence of events that led a witness the defense viewed as key to be absent at trial. The case proceeded relatively quickly from arraignment to trial and the court resolved a variety of issues summarily. Mr. Anderson's ex-girlfriend, who Victim 1 credited with giving him Mr. Anderson's name as one of the people who robbed him, was not subpoenaed, apparently due to a miscommunication. Defense counsel failed to raise witness issues at the pretrial conference and only highlighted the ex-girlfriend's absence at the close of the prosecution's case. (Reviewers pointed out this could have been a strategy to create an appellate issue.) At that point, the judge understandably did not wish to delay the trial and denied a jury instruction that the witness's testimony would have been favorable to Mr. Anderson, deeming the witness unimportant because she was not present for the robbery.

*Contributing Factor 25: A breakdown in communication occurred between prosecutors and between the WCPO and DPD, who was handling the service of subpoenas for witnesses in the Anderson case, regarding the subpoena status of a key witness, causing the witness not to be available at trial.*

*Contributing Factor 26: Anderson's ex-girlfriend, who provided the lone data point connecting Anderson to the case and also stated to police that she had no direct knowledge of his involvement in the robbery, was not subpoenaed for trial.*

*Contributing Factor 27: Anderson's defense attorney did not raise the ex-girlfriend's absence from the trial until the end of the second day despite knowing that she was a student at Michigan State and additional steps to secure her appearance might be needed.*

*Contributing Factor 28: The trial judge allowed the trial to proceed to the jury without a key witness to the case over defense objections.*

- 27 -

*Contributing Factor 29: Judicial emphasis on speed and docket efficiency may have placed procedural pressure on counsel and may have limited the court's support for or flexibility in resolving evidentiary issues or delays at trial.*

*Contributing Factor 30: No clear procedural steps were taken by either the prosecution or defense to ensure that Anderson's ex-girlfriend would testify at trial.*

*Contributing Factor 31: The witness that provided the sole linkage of Mr. Anderson to the robbery, despite stating to police that she had no actual knowledge connecting Mr. Anderson to the robbery, did not testify at trial.*

<u>Recommendation 15:</u> Third Circuit Court judges should oversee and enforce structured pretrial hearings to ensure witness coordination and trial readiness. An in-person scheduling hearing no later than 30 days before trial should confirm all witness endorsements, designate which party is responsible for securing each witness, and address unresolved logistical issues. A final scheduling conference one week before trial should verify that all subpoenas have been served, witnesses are expected to appear, and exhibits are ready. Witness lists must be submitted by court-imposed deadlines, and judges should actively track attorney compliance and take corrective action if lists provided by attorneys are incomplete or untimely. Any gaps or inconsistencies identified at either stage should be documented and addressed before trial proceeds.

<u>Recommendation 16:</u> Defense counsel should take proactive steps to ensure the attendance of any witness central to the defense theory. Third Circuit Court judges should support this responsibility by clearly assigning obligations during pretrial scheduling and ensuring that procedural mechanisms—such as deadline enforcement and judicial oversight—help both parties follow through on securing their respective witnesses.

<u>Recommendation 17:</u> WCPO should reinforce existing internal case transfer protocols that include documentation of pending tasks—such as unresolved subpoenas—and assign clear responsibility for follow-up when cases are reassigned. When transfers of cases occur, witness logistics should be treated as a formal checkpoint requiring signoff from incoming and outgoing prosecutors.

<u>Recommendation 18:</u> Third Circuit Court judges should remain mindful of how efforts to manage efficiency, including the transfer or rescheduling of cases, may impact the ability of counsel – both prosecutors and defense attorneys – to respond to evolving logistical or evidentiary issues. Even in time-sensitive dockets, maintaining space for reasonable adjustments can promote fairness without compromising overall case flow.

## Conviction Integrity Unit Review Phase

As noted above, the CIU began its investigation into Mr. Anderson's case from a different starting point – an affidavit signed by Affiant with Affiant's confession to the crime, and his assertion that Mr. Anderson was not involved. Affidavits in which an individual is serving a sentence of life in prison, as Affiant is, falsely confess to the commission of a crime on behalf of another inmate are sometimes submitted to the CIU, and so the CIU investigated to provide additional indicia of its truthfulness before speaking to Affiant or to Mr. Anderson about the claim. In addition, Mr. Affiant claimed to have committed the crimes with another individual who was deceased as of the date of the affidavit, creating further suspicion about its truthfulness. Indeed, while the CIU did ultimately come to believe the truth of Mr. Affiant's confession, they also came to believe that his affidavit falsely identified the second assailant, who was yet another individual who had already been incarcerated for other violent crimes.

Because they were starting from the position of investigating Affiant, the CIU was able to compile a list of "known associates" and conduct interview with other individuals about the shooting at the Coney Island and the robberies, providing them with additional context and information that had not been available to the original DPD case investigators.

It is hardly surprising that these individuals did not volunteer this information in 2010, when doing so would have subjected them or others they knew to criminal charges and incarceration. At the same time, the ability of DPD and all the other participants in Mr. Anderson's case to achieve an accurate result was limited by this lack of information, and the other recommendations in this report are designed to improve the ability of DPD, WCPO, the defense bar, and the bench to gather trustworthy information in similar cases in the future.

*Contributing Factor 32: The actual perpetrator did not confess to the robbery until 2018, eight years after Anderson's conviction.*

*Contributing Factor 33: Other individuals with relevant information involving the robberies did not come forward at the time of trial or in the years that followed. Several witnesses, including those present on the night of the incident, did not initially disclose what they knew. Some spoke only when contacted during the CIU's later review, limiting the opportunity to test Anderson's account in real time.*

*Contributing Factor 34: Conflicting statements and credibility concerns—both from the actual perpetrator and other witnesses—initially undermined the confession's impact and contributed to delays in post–conviction relief. Witnesses changed their accounts over time, and some offered statements that conflicted with prior trial testimony. These discrepancies complicated the CIU's ability to evaluate the confession and required extended investigation.*

*Contributing Factor 35: A general reluctance among individuals with relevant case knowledge to speak openly with police, counsel, or CIU hindered the flow of information. Although not uncommon in serious cases, the hesitancy of certain individuals to come forward—whether due to fear, mistrust, or perceived risk—limited the ability of both defense counsel and investigators to fully evaluate competing narratives. These dynamics persisted through the investigation, trial, and post-conviction phases.*

Recommendation 19: Agencies should continue to develop, invest, and build partnerships with community intermediaries who can support information-sharing in a safe and trusted environment.

## Conflicting Polygraphs

Participants in Mr. Anderson's original case often used polygraphs as an investigative tool, believing in their ability to separate truth from falsehood. After Mr. Anderson's arrest, on May 10, 2010, a State Police polygraph technician conducted a polygraph of Mr. Anderson and concluded that Mr. Anderson's statement that he did not participate in the robbery was false. This polygraph was not admitted at trial, as polygraphs are inadmissible as evidence in all 50 states, but it reinforced the conclusion of some that Mr. Anderson was guilty of the robberies.

On February 15, 2019, the CIU commissioned a polygraph of Affiant from a private polygraph provider. The provider concluded that Affiant was telling the truth when he confessed to the robberies, and when he stated that Mr. Anderson had no part in the robberies. Reviewers noted that both scenarios could not be true, but were unable to discern which polygraph had greater reliability. One reviewer commented that this was why polygraphs were inadmissible, though other reviewers continue to believe they have evidentiary value.

*Contributing Factor 36: The actual perpetrator's confession was complicated by inconsistent polygraph results.*

Recommendation 20: Criminal justice professionals should approach polygraph results with great caution and should continue to pursue other indicia of guilt or innocence when determining how to proceed in the investigation or adjudication of a criminal case.

## Systemic and Structural Pressures on Investigation, Trial, and Post-Conviction Processes

At several points in the review, reviewers commented on institutional dynamics – including disparities in resources, gaps in coordination within and across organizations, and the absence of rigorous and/or formal oversight – affected the investigation, prosecution, defense, and adjudication of this case.

On the law enforcement side, investigative and prosecutorial teams operated within resource-constrained environments and faced pressures to maintain case throughput. These shortfalls in resources persist today, particularly for the WCPO, which struggles to retain mid-level and more senior prosecutors due to salary structure and budget limitations. Reviewers discussed how the lack of more seasoned prosecutors can force less experienced prosecutors into roles in more serious cases that demand greater awareness, skill development and discretion and decision-making than can be expected of a junior attorney. In addition, it was observed that when DPD is fully staffed, its officers will bring more arrests to the WCPO – thereby *increasing* the workload at the WCPO at a moment when it is not funded to have the appropriate number of resources to handle the incoming caseload.

Reviewers discussed the process of "embedding" an Assistant County Prosecutor in a particular office with DPD officers. The practice was viewed by most as desirable to provide an independent view of an investigation and ensure a high-quality, thorough assessment of evidence and its admissibility prior to filing an arrest warrant. At the same time, reviewers noted that when prosecutors and police work together in close proximity and conducting repetitive types of cases, there is some risk of a loss of objectivity, developing "groupthink" that could undermine an independent review.

On the defense side, reviewers noted several questionable decisions made by the defense attorney. This attorney was well-known in the defense bar and thus was a more experienced practitioner than many, but reviewers noted that any licensed attorney can represent defendants in criminal cases in Michigan, and that the private bar does not provide the structures for supervision, training, or access to institutional knowledge that public defense offices (theoretically) provide.

In terms of judicial caseload, reviewers noted that different judges approach their dockets differently, but that the difference in approaches are known to attorneys who appear regularly in the Wayne County courts, and they can have an impact on strategicdecisions like whether and how to plea bargain, what evidence to submit, and other questions.

These systemic factors do not reflect individual failings but highlight opportunities to strengthen capacity, consistency, and safeguards across roles.

*Contributing Factor 37: Clearance pressures associated with non-fatal shootings may have accelerated the investigative timeline and case progression. DPD, working under pressure to resolve non-fatal shooting cases, moved cases forward quickly. While such efforts supported community safety goals, they may have limited the time available to fully develop alternative theories or follow up on emerging leads.*

**Recommendation 21: Agencies should be funded and structured to support both efficiency and thoroughness. Investigative teams need sufficient resources and staffing to pursue all relevant leads without being constrained by clearance targets or volume-based expectations.**

*Contributing Factor 38:* Resource limitations, staffing transitions, and experience gaps affect WCPO's prosecutorial capacity. As DPD resolves more cases and refers them for prosecution, WCPO faces constraints in absorbing and reviewing the resulting caseload. Turnover and limited staffing make it more difficult to ensure experienced attorneys are assigned to complex matters, potentially impacting the depth and continuity of case review.

Recommendation 22: Each agency within the system should be supported and funded in proportion to its role, and resource studies should be periodically conducted (e.g., every x years) to assess funding levels relative to caseloads. When DPD is equipped to pursue and clear more cases, WCPO should be resourced accordingly to maintain balance and avoid downstream bottlenecks.

Recommendation 23: WCPO should continue efforts to retain and assign experienced attorneys to review and supervise cases involving serious charges. Supporting long-term staffing and supervisory continuity will help strengthen review quality and institutional knowledge.

*Contributing Factor 39:* An Assistant Prosecuting Attorney (APA) worked closely with the non-fatal shooting team, potentially limiting independent prosecutorial review. Having an APA working within the DPD offices facilitates efficient review and collaborative case development, but it may reduce the space for independent assessment over time. Proximity and familiarity between the supporting APA and investigative teams can gradually diminish the "second set of eyes" function that helps catch issues early.

Recommendation 24: WCPO should consider formalizing assignments of APAs to consult with DPD on legal standards for charging with scheduled rotations and structured role definitions. Clear expectations regarding independence and periodic reassignment can help preserve critical oversight while maintaining collaboration with investigative teams.

*Contributing Factor 40:* No formal supervisory structure existed for private defense counsel. Without standardized oversight, private attorneys may lack the institutional support, guidance, or accountability necessary for preparing complex cases.

Recommendation 25: The Michigan Bar Association and other relevant state bodies should consider developing supervisory models for private defense counsel handling serious criminal matters. This could include mentorship, reporting mechanisms, requiring the completion of, e.g., a certain number of criminal misdemeanor cases before being allowed to represent clients in felony cases, or other structures that promote consistency while respecting attorney independence. Certification or continuing education requirements focused on trial preparation, evidence review, and case management could enhance the overall quality and consistency of defense representation.

## Conclusion

Eric Anderson's 2010 conviction of armed robbery suffered from miscommunications in the investigation process, evidentiary weaknesses, and flawed pretrial and trial procedures that ultimately led to the charges being vacated and dismissed in 2019. Through the SER, which included review of key documents, interviews with participants in the initial legal processes, and discussions among stakeholders in the Wayne County criminal justice system, WCSERT identified dozens of contributing factors and recommendations. In particular, WCSERT found support for measures safeguarding the accuracy of identifications, improving investigation management and documentation, leveraging pretrial procedures to ensure the availability of evidence and witnesses, improving community partnerships, ensuring adequate funding, and investing in training and oversight of counsel. WCSERT hopes these recommendations can be successfully implemented to help prevent future events like Mr. Anderson's flawed conviction.

# Appendix A. Timeline.

| DATE | EVENT |
|---|---|
| 4/18/10 ~3 A.M. | A shooting takes place at a Coney Island restaurant on Woodward Avenue in Detroit. In video footage from security cameras inside the Coney Island, a man who appears to be Eric Anderson is seen entering the Coney Island while gunfire comes from a group of individuals who are retreating to the back exit of the restaurant several yards away. When the gunfire begins, the person flinches twice. Just before the second flinch, the figure pivoted to his left before leaving the frame towards the entrance/exit of the Coney Island.<br><br>The shooter(s) are visible from a security camera in the back of the Coney Island. One is later identified as the Affiant who confessed to the shooting on Archdale St for which Anderson was convicted. A companion of the Affiant also appears to have fired shots.<br><br>This shooting forms the basis of Mr. Anderson's alibi. |
| 4/18/10 ~3:20-3:40 A.M. | Victim 1 and Victim 2 are robbed at gunpoint on the street outside Victim 1' house at 18500 Archdale in Detroit. Omeaka Taylor, Victim 1's mother, is inside the house and is awoken when the robbers inadvertently set off her car alarm. She looks out the window and yells at the robbers, then runs outside the house as the robbers run away from the scene.<br><br>This robbery is the criminal event for which Mr. Anderson was convicted. |
| 4/18/10 3:33 A.M. | Mr. Anderson is treated for a gunshot wound to foot at Sinai Grace hospital. Per medical records, he is admitted at 3:33 A.M., examined at 4:00 A.M., and has an x-ray on his wounded foot at 4:48 A.M.. |
| 4/18/10 4:34 A.M. | Victim 1's mother provides a description of the robbers to first-responding DPD officers. She says Suspect 1 as taller and was wearing a mask over his face. She describes Suspect 2 as shorter than Suspect 1, wearing a tan mask and beige t-shirt.<br><br>Victim 1 and Victim 2 are not interviewed by DPD at this time, despite being at the house when the first DPD responders arrive and interview Victim 1's mother. |
| 4/18/10 4:53 A.M. | Victim 1 is treated at Sinai Grace hospital for face injuries from pistol whipping. He is admitted to Sinai Grace at 4:53 A.M. and receives a CT scan at 5:48 A.M.. |

| DATE | EVENT |
|---|---|
| 4/18/10<br>5:10 A.M. | Mr. Anderson is interviewed by a DPD officer at Sinai Grace about his gunshot wound; Mr. Anderson states that he was shot just as he entered the Coney Island. He further states that he did not see the person who shot him. |
| 4/18/10<br>7:02 A.M. | Victim 1 is discharged from Sinai Grace hospital. |
| 4/18/10<br>7:36 A.M. | Mr. Anderson is discharged from Sinai Grace hospital. |
| 4/27/10 | Nine days after the robbery, Victim 1 gives a statement to DPD identifying Mr. Anderson as one of his assailants. Victim 1 also states that he saw the other assailant at Sinai Grace Hospital after the attack, and that he was told by a nurse that Mr. Anderson was being treated there with a gunshot wound.[20]<br><br>In Victim 1's statement, he said that he recognized Mr. Anderson "from the neighborhood." He was aided in his identification by a female friend of his who was also Mr. Anderson's former girlfriend. Victim 1 then looked at his friend's Facebook page, found a picture of her and Anderson and provided it to the DPD. Until this moment, DPD did not know who Mr. Anderson was and had not linked him in any way to the robbery on Archdale St. |
| 4/28/10 | A DPD officer interviews Victim 2. Victim 2 states that after he and Victim 1 parked in the driveway and got out of Matthew's car, they saw friends in another car. As Victim 2 was getting into his car parked on the street, Victim 1's was walking towards "the car" with the friends and then two men walked up to them and pulled guns. The friends then took off. After the robbery, the two men told Victim 2 and Victim 1 to "walk to the corner," which they did. When they got there, Victim 2 called 911. Victim 2 described both assailants as black males between 19-23 with black handguns and one as 6'-6'1". |
| 4/28/10 | A DPD Sergeant interviews the mother of Victim 1. She states that she saw the assailants after the robbery, but does not provide any further identification. |

---

[20] Note: There is no physical evidence supporting either of these assertions, and Victim 1 testified that he did not see Mr. Anderson at the hospital at any point.

| DATE | EVENT |
|---|---|
| 4/28/10 | A DPD Sergeant interviews the female friend of Victim 1 who provided him with the identification of Mr. Anderson. The friend states that she received a phone call from Victim 1 at approximately 3:30 A.M. on 4/18/10, during which Victim 1 told her that Victim 1 had been robbed and pistol whipped. The friend stated that she had attended prom with Mr. Anderson and suspected him of the robbery because she knew he did that "kind of stuff." She also stated that she spoke with Mr. Anderson on the phone on 4/19/10, the day after the shooting. At that time, Mr. Anderson denied the responsibility for the robbery and said that he had been shot in downtown Detroit at that time.<br><br>The DPD Sergeant asked the female friend if she had direct knowledge of Mr. Anderson's involvement in the robbery, and she had none. |
| 4/28/10 | DPD issue and receive a signature for an arrest warrant for Mr. Anderson for the Archdale St. robbery. |
| 4/28/10 | A DPD Officer interviews Mr. Anderson. Mr. Anderson denies any presence at or involvement in the Archdale St. robbery and states that he was downtown, got shot, and went to Sinai Grace hospital that night. |
| 4/29/10 | Mr. Anderson is interviewed by a DPD Sergeant. Mr. Anderson states that during the night of the robbery Mr. Anderson was shot at the Coney Island on Woodward Ave. near the Western Union. Mr. Anderson was with his friend at the time (the Driver). Mr. Anderson was wearing wheat brown Timberlands, black jeans with artwork on the back pocket, a gray or green hoodie, and a black Tigers baseball cap with a gray bill.<br><br>After being shot, Mr. Anderson had the Driver drop him off at Sinai Grace hospital to be treated for his wound. |

| DATE | EVENT |
|---|---|
| 5/12/10[21] | The Driver is interviewed by a DPD Officer. The Driver states that on the night of the robbery, he picked Mr. Anderson up around 11 P.M. to go to a club downtown. They were unable to enter the club and rode around downtown until the clubs let out. Around 2:30 A.M. they went to the Coney Island on Woodward, where Mr. Anderson was shot in the foot. The driver corroborates that he took Mr. Anderson to Sinai Grace hospital. |
| 6/2/10 | A preliminary hearing is conducted in Mr. Anderson's prosecution. Victim 1 testifies and identifies Mr. Anderson as his assailant. A DPD Sergeant testifies that after reviewing the Coney Island video, he was not able to establish that Mr. Anderson was at the Coney Island or was shot there. The Court holds Mr. Anderson's case over. |
| 8/5/10 | Hearing on Defendant's motion to quash evidence related to Victim 1's identification of Mr. Anderson; the motion is denied. The court notes that a witness list should have been presented to the defense but has not been. The court also rejects bond for Mr. Anderson despite changes in the trial schedule. |
| 9/15/10 | Mr. Anderson rejects a plea bargain that would have provided him probation with two unarmed robbery charges on the basis that he is innocent of all charges. The judge aggressively questions Mr. Anderson's intelligence and concludes the hearing by saying "there will be no pleas accepted after today." |
| 11/2/10 | Jury selection is conducted for Mr. Anderson's trial. |

---

[21] Note: The statement is dated 5/12/12, but it appears that it is dated incorrectly (as opposed to occurring after Anderson's trial).

| DATE | EVENT |
|---|---|
| 11/3/10 – 11/4/10 | Jury trial of Mr. Anderson for the robberies at Archdale St. Victims 1 and 2 testify and Victim 1 identifies Mr. Anderson as the robber. A DPD Sergeant testifies as he did in the preliminary hearing and states that the alibi is not strong as one could get from the Coney Island at the time of the shooting to Archdale St. in time to commit the robbery at the time it was reported by Victim 1. The Sergeant also advances a theory that Mr. Anderson's gunshot wound was the result of a self-inflicted gunshot as he ran from the scene of the robbery.<br><br>The Driver and an associate of Mr. Anderson's both testify to Mr. Anderson's presence at Sinai Grace for treatment for a gunshot wound on the night of the robberies.<br><br>The female friend of Victim 1 who provided the original linkage of Mr. Anderson to the robberies does not appear at the trial, and the video footage from the Coney Island is not shown by either party. |
| 11/5/10 | Jury returns verdict finding Mr. Anderson guilty of two counts of armed robbery, one count of assault with intent to rob, and one count of weapons felony firearm. |
| 11/19/10 | Mr. Anderson's counsel makes a motion for judgment notwithstanding the verdict, highlighting the alibi evidence. The motion is denied.<br><br>A sentencing hearing is held for Mr. Anderson. Mr. Anderson maintains his innocence on all charges. The court sentences him to 13-20 years concurrent on the first three counts and 2 years consecutive on the fourth count (weapons felony firearm.) |

| DATE | EVENT |
|---|---|
| 8/16/12 | The Michigan Court of Appeals affirms Mr. Anderson's conviction but remands the case for resentencing. The Court found that<br><br>• Viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence to support the victim's identification of Mr. Anderson as one of the robbers<br><br>• Although it might have been appropriate to add a "missing witness" instruction to the jury instructions in Mr. Anderson's case regarding Mr. Anderson's former girlfriend, who did not appear as a witness in the case, any error did not result in a miscarriage of justice<br><br>• Defense counsel was not ineffective for failing to suppress Victim 1's identification of Mr. Anderson or for failing to present additional corroboration for Mr. Anderson's alibi. |
| 7/28/14 | Mr. Anderson files a habeas petition in the United States District Court for the Eastern District of Michigan. He claims that:<br><br>• The failure to give a "missing witness" jury instruction regarding his former girlfriend violated his rights to due process; and<br><br>• His trial counsel was ineffective for failing to move to suppress the identification, failing to compel the production of his former girlfriend at trial, and failing to adequately present his alibi. |
| 3/29/17 | The federal District Court denies Mr. Anderson's habeas petition, finding that Mr. Anderson did not establish that Arielle Johnson's testimony would have exculpated him. The Court also rejects Mr. Anderson's claim of ineffective defense counsel. |
| 4/24/17 | Mr. Anderson files a pro se motion for certificate of appealability on district court's denial of habeas, focusing on his ineffective assistance of counsel claim and arguing that he is actually innocent. |
| 10/25/17 | The United States Sixth Circuit Court of Appeals denies Mr. Anderson's motion. |

| DATE | EVENT |
|---|---|
| 3/2018 | Mr. Anderson files a petition for assistance with the Wayne County Prosecutor's Conviction Integrity Unit (CIU). He provides new evidence of his innocence in the form of an affidavit from the Affiant. The affidavit, dated 3/9/18 and attached to the questionnaire, states that the Affiant and another man committed the Archdale St. robberies for which Mr. Anderson was convicted, and that Mr. Anderson did not participate in the robberies. Mr. Anderson's petition further states that the Affiant is willing to discuss the case in more detail with prosecutors. |
| 3/16/18 | The Director of the CIU confirms receipt of Mr. Anderson's submission. |
| 3/29/18 | The CIU requests the police file in Mr. Anderson's case from DPD. |
| 8/30/18 | The CIU confirms that the Michigan Innocence Clinic does not represent Mr. Anderson at this time. |
| 9/10/18 | The Michigan Innocence Clinic sends the CIU a copy of its file from its prior representation of Mr. Anderson. |
| 10/29/18-11/2/18 | A CIU investigator begins reviewing Mr. Anderson's case file and subpoenas Anderson's medical records from Sinai Grace Hospital. |
| 11/15/18 | A CIU investigator drafts an initial report laying out the facts of Mr. Anderson's case and trial. He notes the affidavit as new evidence. |
| 11/16/18 | The CIU writes to the Michigan Department of Corrections requesting photos of Anderson's foot, a jail call list, emails, JPAY records, and visitor's list records from 2015 through the present. |

| DATE | EVENT |
|---|---|
| 11/19/18 | CIU investigators:<br><br>• Review security footage from the Coney Island and identify Affiant as one of the shooters and Mr. Anderson as the individual in the distinctive jeans in the footage. The investigators note that Affiant is "especially short," and is wearing a tan patterned t-shirt. These facts match the initial description of Suspect 1 in the robbery given by Victim 1's mother, and they do not match a description of Mr. Anderson.<br><br>• Review medical records, including photos and a radiology report of Anderson's bullet wounds and scars. They determine that it is not likely the wounds were self-inflicted based on the entry/exit wounds and angle.<br><br>• Rereview video footage from the Coney Island and conclude that with Anderson turning to the left, the bullet could have struck the inner side of the left foot at a right to left angle, downward. |
| 11/19/18 | Investigators from the CIU interview the Affiant by phone. The Affiant confirms his confession to the robberies and states that his phone records would place him at the scene of the crime. The Affiant acknowledged that he had come in contact with Anderson on a van ride to the Michigan Department of Corrections. The Affiant says that he created the content of the affidavit himself, working on it in the law library, because he didn't want an innocent person to be in jail for something that he did. |

- 41 -

| DATE | EVENT |
|---|---|
| 12/5/18 | The CIU interviews the Affiant a second time. The Affiant states that he was with Mr. Anderson the night of the robbery. They went to a club downtown and then to the Coney Island where Mr. Anderson was shot. The Affiant then drove away from the Coney Island with three other men. After dropping off two other men near Archdale St., the Affiant and a known associate (Known Associate) drove past Victims 1 and 2 on Archdale St. The Monte Carlo owned by Victim 1 stood out to the Affiant and his associate, because Affiant wanted some parts from this car for his own Monte Carlo. Affiant stated that Affiant and Known Associate then robbed Victims 1 and 2 at gunpoint, taking from them money, phones, and car keys. When Known Associate used the starter on the car keys, a van in the driveway started, a woman yelled at them from inside the house and turned on a porch light, and Affiant and Known Associate ran away. |
| 12/20/18 | The CIU interviews the Driver who took Mr. Anderson to Sinai Grace from the Coney Island. The Driver confirmed his prior statements to DPD that he accompanied Mr. Anderson to Sinai Grace after Mr. Anderson was shot at the Coney Island. that he was with Anderson the night of the robbery. |
| 1/4/19 | A CIU Investigator drafts a case memo for the CIU Director, reporting that:<br><br>• Affiant has confessed to the crime for which Mr. Anderson was convicted, also implicating Known Associate, who is deceased;<br><br>• Mr. Anderson's medical records seem inconsistent with the prosecution's theory of a self-inflicted gunshot wound; and<br><br>• Surveillance footage from the Coney Island makes clear that both Mr. Anderson and Affiant were present, Affiant as one of the shooters and Mr. Anderson as an apparent shooting victim. |
| 1/10/19 | The CIU submits to DPD a request for forensic analysis of the video footage from the Coney Island as well as a comparison of pants provided by Mr. Anderson's parents to the jeans worn by the shooting victim in the video who is believed to be Mr. Anderson. |

- 42 -

| DATE | EVENT |
|---|---|
| 1/17/19 | A DPD Sergeant who specializes in forensic video analysis completes a forensic analysis report. The Sergeant compared the submitted pants to still shots of the pants worn by the individual purported to be Anderson and after noting several points of comparison between the two submissions, concluded that he "cannot exclude the known pants from consideration as being the same pants seen in the images" from the surveillance video.<br><br>The report also an individual in a tan t-shirt (identified elsewhere as Affiant) that can be seen holding a possible handgun on his left hip and a second individual in a black hooded sweatshirt and a baseball hat who can be observed holding a firearm in his left hand and discharging the weapon. The sparks from that firing were captured by the camera system.<br><br>The analyst in this case was the same analyst who procured the video from the Coney Island during the original investigation. |
| 2/16/19 | A private polygraph agency conducts a polygraph on Affiant, who is indicated as giving truthful responses to committing the robberies and to Mr. Anderson having no role in them. |
| 3/1/19 | The CIU interviews Mr. Anderson. Mr. Anderson repeats his whereabouts throughout the night, which have not deviated from his original interview at Sinai Grace on April 18, 2010. Mr. Anderson states that it is his understanding that Affiant and a Known Associate of Affiant committed the robberies. |
| 3/7/19 | The CIU interviews Anderson a second time. Anderson repeats his account of the night of the robbery. He states that, although he does not have firsthand knowledge, he has learned from a third party that Affiant committed the robbery. As to the second assailant, Mr. Anderson states that he has heard a couple of names as the second robber, but says that he "did not inquire too hard" and says he believed that Affiant would first try to inaccurately identify a deceased associate as the second assailant. |

| DATE | EVENT |
|---|---|
| 3/14/19 | A CIU investigator sends the CIU Director a final recommendation for relief memorandum. The memorandum:<br><br>• Recommends the exoneration of Mr. Anderson, as the CIU investigation both indicates Mr. Anderson is innocent of the crime and identifies the likely perpetrators.<br><br>• The medical records accompanied with the forensic analysis of the surveillance footage show a more plausible account of how Anderson sustained his injuries than that submitted by the prosecution.<br><br>• Analysis of the Coney Island footage corroborates Affiant's statements to the polygrapher that it was he and Known Associate who committed the robberies. The footage shows the two men armed with handguns with attire and heights that match the eyewitness description provided the night of the crimes by Victim 1's mother. That description does not fit Mr. Anderson.<br><br>• Victim 1's identification has many known weaknesses, including being tainted when his female friend (and Mr. Anderson's former girlfriend) suggested that Mr. Anderson was the perpetrator because he "does that kind of stuff."<br><br>• The case against Affiant is only strengthened when viewing Affiant's known criminal history at the time of the incident, as he was involved in other robberies, including with Known Associate. In addition, Affiant passed a polygraph taking credit for the crime and repudiated Anderson's involvement.<br><br>The memorandum continues that despite the evidence against Affiant and Known Associate, the WCPO is not in a position to charge them. First, Victims 1 and 2 were nonresponsive to the CIU's requests for interviews during this investigation and would most likely be uncooperative given their statements to CIU. Second, Victim 1 has already testified that two different individuals were his assailants, rendering a subsequent identification useless in court. Third, Known Associate is currently serving a prison sentence of mandatory life, making an additional trial inefficient. |
| 4/30/19 | Wayne County Judge Donald L. Knapp enters a stipulated order granting Mr. Anderson relief from judgment and dismissing the charges against him. |

# Appendix B. Table of Contributing Factors and Recommendations

| CONTRIBUTING FACTORS | RECOMMENDATIONS |
| --- | --- |
| 1. Mr. Anderson was arrested and convicted on the eyewitness testimony of a single individual without any corroborating physical evidence.<br><br>2. System variables exist that made the identification more challenging for the victims, including:<br>   a. The assailants wore masks during the robbery<br>   b. It was dark and there was no streetlight<br>   c. The assailants had weapons<br>   d. Victim 1 was hit in the face with a weapon and was bleeding in ways that may have impaired his vision<br><br>3. Victim 1's eyewitness identification of Mr. Anderson was made using a non-contemporaneous photo of Mr. Anderson, suggested by a potentially biased source with no actual knowledge of the events in question.<br><br>4. No photo array or other procedure was conducted to verify the victim's ability to identify Anderson.<br><br>5. The process leading Victim 1 to find the photo used to identify Mr. Anderson, searching a specific social media account looking for a known person at the suggestion of Victim 1's friend, was inherently suggestive, and the victim's limited prior familiarity with Anderson raises questions about the strength and reliability of the identification.<br><br>6. No witness statements were taken until nine (9) days after the robbery, reducing the recency of the identification and reducing the likelihood of finding any physical evidence at the scene. | Recommendation 1: DPD should implement policies[22] discouraging arrests based solely on single-source identifications unless exigent circumstances exist or unless the identification has particular credibility (e.g., domestic violence or sexual assault allegations where the accused perpetrator is well-known to the witness). Supervisors should ensure that all possible avenues are explored for corroborating evidence before approving arrest warrants based on single-source uncorroborated identifications. When such identifications are used, they should be accompanied by documentation justifying the exception and reviewed by a supervisor.<br><br>Recommendation 2: In non-fatal shooting cases, DPD and WCPO should develop joint charging guidance that elevates the evidentiary threshold when a case relies solely on a single eyewitness identification. The guidance should discourage prosecution in the absence of corroboration unless clear, documented indicators of reliability are present. Charging decisions should be supported by an assessment of whether the witness had a meaningful opportunity to observe the suspect and whether any corroborating evidence (e.g., physical evidence, video, or motive) is available or has been reasonably ruled out. Absent such indicators, charging should be deferred until further investigative steps are taken.<br><br>Recommendation 3: In cases where the suspect was masked, visually obscured, or viewed only briefly, WCPO should seek additional corroboration or validation of the identification before charges are authorized based on that identification alone. In such cases, prosecutors should be required to confirm |

---

[22] After Anderson was arrested and unrelated to his case, DPD independently implemented protocols for the administration of photo arrays in criminal investigations. However, it is not known whether these protocols would have prevented Anderson's arrest, as police at the time treated the arrest as a "known suspect ID" given the victim's assertions that he recognized Anderson "from the neighborhood."

| CONTRIBUTING FACTORS | RECOMMENDATIONS |
|---|---|
| 7.  An Assistant Wayne County Prosecutor working closely with the DPD Non-Fatal Shooting group did not identify or question any of the potential weaknesses of the victim's eyewitness identification.<br><br>8.  A Third Circuit Judge approved the arrest warrant notwithstanding its thin evidentiary foundation. | whether corroborating evidence has been sought or whether the witness's visual capacity was meaningfully impaired.<br><br>Recommendation 4: DPD should include "visual conditions" as a prompt in ID documentation forms—asking investigators to record whether the witness could clearly view the suspect's face, lighting conditions, duration of observation, and whether a mask or obstruction was present.<br><br>Recommendation 5:  DPD should endeavor to investigate the scene of a shooting and take detailed witness statements as soon as reasonably possible and in any event within [x] days of the event and should track and evaluate cases where that standard is not met.<br><br>Recommendation 6: DPD & WCPO should require that photo identification acquisition history is included in the warrant request report and they and any approving judge should review it for potential influence or bias during pre-charge decision-making.<br><br>Recommendation 7: In cases relying solely on uncorroborated eyewitness identification, DPD and WCPO should note the existence of a sole eyewitness and a lack of corroborating physical evidence and should provide a statement for supervisors on why they recommend moving forward with the case. To strengthen the integrity of this recommendation, departments should consider requiring a secondary review before an arrest warrant is authorized by DPD and/or before the case is accepted for prosecution by the WCPO |
| 9.  The file lacked documentation to suggest that DPD conducted any investigation into the identity of the second assailant. This gap limited DPD's ability to explore whether another individual, rather than Anderson, may have been involved.<br><br>10.  The DPD file was incomplete and at times apparently inaccurate, complicating the ability of downstream stakeholders in DPD, WCPO, and defense attorneys to fully evaluate the strength of the case against Mr. Anderson. | Recommendation 8: Continued investment in case management systems—with searchable notes, case-linking alerts, and real-time supervisor dashboards—should be paired with department-wide training to promote consistent use and oversight. Improvements to shift structures and email notification systems that enable timely OIC involvement at scenes should be sustained and evaluated for effectiveness. Regular audits and ComStat processes should be used to verify documentation compliance and flag potential investigative gaps in real time. |

| CONTRIBUTING FACTORS | RECOMMENDATIONS |
|---|---|
| 11. Neither Victim 1 nor Anderson's ex-girlfriend were fully questioned about her role, relationship, or assistance in identifying Anderson or any possible ulterior motive she would have in suggesting Anderson as the perpetrator of the robbery. The potential for bias in her identification of Anderson was never documented (and potentially never evaluated) by DPD.<br><br>12. The investigation took place at a time when it was not policy to record witness interviews or suspect interrogations, and no such recordings were made. | DPD has since adopted a policy for the video recording of witness interviews and suspect interrogations. SEE [POLICY] |
| 13. A community and Department focus on successfully closing non-fatal shooting cases may have contributed to the speed with which Mr. Anderson was arrested.<br><br>14. DPD policy states that when an officer signs an arrest warrant, the case is marked "closed" for statistical purposes, even if the case is not accepted by WCPO for prosecution. | Recommendation 9: DPD should require documentation of all investigative steps taken to identify any suspect described in victim or witness accounts. Case files should include notation of follow-up actions—even if no new leads are developed—to reduce premature narrowing of investigative focus and to allow for appropriate supervisory review prior to the issuance of an arrest warrant. Supervisory check-ins should be encouraged when only one of multiple suspects described has been identified or investigated, especially prior to submitting an arrest warrant.<br><br>Recommendation 10: When a witness's identification of a suspect involves assistance from another individual, such as providing a name or directing them to a photo, DPD should ensure that any follow-up captures any potential motive the second individual might have in providing the assistance. Interviews with both the witness and the assisting party should explore the timing, content, and potential influence of those conversations. |
| 15. Technologies like ShotSpotter, Project Green Light (license plate tracking), doorbell cameras, facial recognition, and continuous GPS-based phone location data were not available in 2010. As a result, there was no independent method to test Anderson's claim that he had been shot elsewhere, to cross-reference timelines, or to capture surveillance footage. | DPD has adopted many of these technologies, which were not available at the time of Mr. Anderson's case, and continues to evaluate how evolving technologies can be accurately and efficiently applied to police investigations while respecting constitutional freedoms. |

| CONTRIBUTING FACTORS | RECOMMENDATIONS |
|---|---|
| 16. Subsequent investigation of Mr. Anderson after his arrest was limited to disproving his alibi rather than seeking out other possible perpetrators.<br><br>17. The robbery and the Coney Island shooting were investigated by separate DPD teams in different precincts, limiting investigators' ability to recognize possible links between the two incidents, including the plausibility of Anderson's alibi.<br><br>18. Gaps in supervision and information sharing limited coordination across the investigative team. The Officer in Charge (OIC) had broad discretion to lead the investigation, but rotating shift structures limited continuity in investigative leadership. At the same time, DPD lacked centralized systems for case note tracking, real-time documentation review, and automated alerts linking related cases. These structural and technological limitations contributed to silos in investigative efforts and impaired supervisory visibility. | **Recommendation 11:** DPD should continue expanding cross-precinct review procedures and case-linking prompts. When shared individuals or locations appear across incident types, supervisory review should be triggered to evaluate potential links and ensure coordinated follow-up. |
| 19. Mr. Anderson, who was under no obligation to do so, chose not to provide names of any other individuals who could have corroborated his whereabouts on the night in question.<br><br>20. Neither DPD nor WCPO nor Mr. Anderson's defense attorney investigated Mr. Anderson's alibi thoroughly. Important details about the jeans suggesting the truth of Anderson's presence at the Coney Island were not submitted into evidence or shown at trial, nor was the video of the shooting shown at trial.<br><br>21. Defense counsel did not play available video evidence that may have had probative value.<br><br>22. Defense counsel did not attempt to use an expert to evaluate the medical records of Mr. Anderson's gunshot to contest the prosecution theory of a misfire from waist level while running being the cause of the wound. | **Recommendation 12:** DPD should develop internal guidance to prompt early and complete follow-up when a suspect names an alibi witness. Where feasible, more than one point of corroboration should be sought, and the results—positive, negative, or inconclusive—should be documented prior to charging.<br><br>**Recommendation 13:** Defense attorneys should actively investigate any potentially exculpatory information that appears credible and can be independently verified, particularly when it may corroborate a defendant's stated alibi. Early, proactive follow-up increases the likelihood of preserving supportive evidence and identifying corroborating witnesses. |

| CONTRIBUTING FACTORS | RECOMMENDATIONS |
|---|---|
| 23. Only one video expert was available within DPD at the time, limiting the department's ability to timely review, enhance, or assess the relevance of surveillance footage from the Coney Island incident. | |
| 24. The courtroom environment was perceived as unfavorable to the defense, with judicial comments and interventions that may have affected how the jury viewed defense counsel and the defense's case. The tone and conduct of courtroom proceedings may have signaled skepticism toward the defense, undermining jury perceptions of fairness even absent formal error. | **Recommendation 14:** Trial judges should be encouraged to reflect on how tone, timing, and frequency of interventions may influence jury perception, especially when overseeing criminal trials with credibility-based defenses. |
| 25. A breakdown in communication occurred between prosecutors and between the WCPO and DPD, who was handling the service of subpoenas for witnesses in the Anderson case, regarding the subpoena status of a key witness, causing the witness not to be available at trial.<br><br>26. Anderson's ex-girlfriend, who provided the lone data point connecting Anderson to the case and also stated to police that she had no direct knowledge of his involvement in the robbery, was not subpoenaed for trial.<br><br>27. Anderson's defense attorney did not raise the ex-girlfriend's absence from the trial until the end of the second day despite knowing that she was a student at Michigan State and additional steps to secure her appearance might be needed.<br><br>28. The trial judge allowed the trial to proceed to the jury without a key witness to the case over defense objections.<br><br>29. Judicial emphasis on speed and docket efficiency may have placed procedural pressure on counsel and may have limited the court's support for or flexibility in resolving evidentiary issues or delays at trial. | **Recommendation 15:** Third Circuit Court judges should oversee and enforce structured pretrial hearings to ensure witness coordination and trial readiness. An in-person scheduling hearing no later than 30 days before trial should confirm all witness endorsements, designate which party is responsible for securing each witness, and address unresolved logistical issues. A final scheduling conference one week before trial should verify that all subpoenas have been served, witnesses are expected to appear, and exhibits are ready. Witness lists must be submitted by court-imposed deadlines, and judges should actively track attorney compliance and take corrective action if lists provided by attorneys are incomplete or untimely. Any gaps or inconsistencies identified at either stage should be documented and addressed before trial proceeds.<br><br>**Recommendation 16:** Defense counsel should take proactive steps to ensure the attendance of any witness central to the defense theory. Third Circuit Court judges should support this responsibility by clearly assigning obligations during pretrial scheduling and ensuring that procedural mechanisms—such as deadline enforcement and judicial oversight—help both parties follow through on securing their respective witnesses. |

| CONTRIBUTING FACTORS | RECOMMENDATIONS |
|---|---|
| 30. No clear procedural steps were taken by either the prosecution or defense to ensure that Anderson's ex-girlfriend would testify at trial.<br><br>31. The witness that provided the sole linkage of Mr. Anderson to the robbery, despite stating to police that she had no actual knowledge connecting Mr. Anderson to the robbery, did not testify at trial. | Recommendation 17: WPCO should reinforce existing internal case transfer protocols that include documentation of pending tasks—such as unresolved subpoenas—and assign clear responsibility for follow-up when cases are reassigned. When transfers of cases occur, witness logistics should be treated as a formal checkpoint requiring signoff from incoming and outgoing prosecutors.<br><br>Recommendation 18: Third Circuit Court judges should remain mindful of how efforts to manage efficiency, including the transfer or rescheduling of cases, may impact the ability of counsel – both prosecutors and defense attorneys – to respond to evolving logistical or evidentiary issues. Even in time-sensitive dockets, maintaining space for reasonable adjustments can promote fairness without compromising overall case flow. |
| 32. The actual perpetrator did not confess to the robbery until 2018, eight years after Anderson's conviction.<br><br>33. Other individuals with relevant information involving the robberies did not come forward at the time of trial or in the years that followed. Several witnesses, including those present on the night of the incident, did not initially disclose what they knew. Some spoke only when contacted during the CIU's later review, limiting the opportunity to test Anderson's account in real time.<br><br>34. Conflicting statements and credibility concerns—both from the actual perpetrator and other witnesses—initially undermined the confession's impact and contributed to delays in post-conviction relief. Witnesses changed their accounts over time, and some offered statements that conflicted with prior trial testimony. These discrepancies complicated the CIU's ability to evaluate the confession and required extended investigation. | Recommendation 19: Agencies should continue to develop, invest, and build partnerships with community intermediaries who can support information-sharing in a safe and trusted environment. |

| CONTRIBUTING FACTORS | RECOMMENDATIONS |
|---|---|
| 35. A general reluctance among individuals with relevant case knowledge to speak openly with police, counsel, or CIU hindered the flow of information. Although not uncommon in serious cases, the hesitancy of certain individuals to come forward—whether due to fear, mistrust, or perceived risk—limited the ability of both defense counsel and investigators to fully evaluate competing narratives. These dynamics persisted through the investigation, trial, and post-conviction phases. | |
| 36. The actual perpetrator's confession was complicated by inconsistent polygraph results. | Recommendation 20: Criminal justice professionals should approach polygraph results with great caution and should continue to pursue other indicia of guilt or innocence when determining how to proceed in the investigation or adjudication of a criminal case. |
| 37. Clearance pressures associated with non-fatal shootings may have accelerated the investigative timeline and case progression. DPD, working under pressure to resolve non-fatal shooting cases, moved cases forward quickly. While such efforts supported community safety goals, they may have limited the time available to fully develop alternative theories or follow up on emerging leads. | Recommendation 21: Agencies should be funded and structured to support both efficiency and thoroughness. Investigative teams need sufficient resources and staffing to pursue all relevant leads without being constrained by clearance targets or volume-based expectations. |
| 38. Resource limitations, staffing transitions, and experience gaps affect WCPO's prosecutorial capacity. As DPD resolves more cases and refers them for prosecution, WCPO faces constraints in absorbing and reviewing the resulting caseload. Turnover and limited staffing make it more difficult to ensure experienced attorneys are assigned to complex matters, potentially impacting the depth and continuity of case review. | Recommendation 22: Each agency within the system should be supported and funded in proportion to its role, and resource studies should be periodically conducted (e.g., every x years) to assess funding levels relative to caseloads. When DPD is equipped to pursue and clear more cases, WCPO should be resourced accordingly to maintain balance and avoid downstream bottlenecks.<br><br>Recommendation 23: WCPO should continue efforts to retain and assign experienced attorneys to review and supervise cases involving serious charges. Supporting long-term staffing and supervisory continuity will help strengthen review quality and institutional knowledge. |

| CONTRIBUTING FACTORS | RECOMMENDATIONS |
|---|---|
| 39:  An Assistant Prosecuting Attorney (APA) worked closely with the non-fatal shooting team, potentially limiting independent prosecutorial review. Having an APA working within the DPD offices facilitates efficient review and collaborative case development, but it may reduce the space for independent assessment over time. Proximity and familiarity between the supporting APA and investigative teams can gradually diminish the "second set of eyes" function that helps catch issues early.<br><br>39.  No formal supervisory structure existed for private defense counsel. Without standardized oversight, private attorneys may lack the institutional support, guidance, or accountability necessary for preparing complex cases. | Recommendation 24: WCPO should consider formalizing assignments of APAs to consult with DPD on legal standards for charging with scheduled rotations and structured role definitions. Clear expectations regarding independence and periodic reassignment can help preserve critical oversight while maintaining collaboration with investigative teams.<br><br>Recommendation 25: The Michigan Bar Association and other relevant state bodies should consider developing supervisory models for private defense counsel handling serious criminal matters. This could include mentorship, reporting mechanisms, requiring the completion of, e.g., a certain number of criminal misdemeanor cases before being allowed to represent clients in felony cases, or other structures that promote consistency while respecting attorney independence. Certification or continuing education requirements focused on trial preparation, evidence review, and case management could enhance the overall quality and consistency of defense representation. |

# Appendix C. Limitations of the SER

The participants in the SER made every effort to conduct a thorough, objective review of the events that led to the withdrawal of charges against Mr. Anderson in 2019, and to ensure that the contributing factors identified were thorough and accurate. No review is perfect, however, and the reviewers acknowledged some limitations on the ability to review the case, including: the unavailability of certain key participants in the case due to death, inability to establish contact with past participants, or unwillingness of past participants to participate; the time period between the events in question and the review, which may have impacted the recollection of individuals interviewed; and a lack of complete documentation of actions taken during the case period.

## Appendix D. Participants in the SER

The following individuals participated in the Sentinel Event Review (in alphabetical order):

Todd Bettison, Chief, DPD

Tracey Brame, Director Cooley Innocence Project

Joe Kurily, WCPO CIU

Marilena David-Martin, Director, State Appellate Defender's Office

Grant Ha, General Counsel, DPD

John Hollway, Executive Director, Quattrone Center for the Fair Administration of Justice (Coordinator)

Joe Jansen, Chief, Special Prosecution, WCPO

Chief Judge Donald Knapp

Patricia Little, WCPO CIU

Margaret Mackie, Dechert LLP (Coordinator)

Mike McGinnis, Professional Standards, DPD

Rebecca McKay, Commander, Major Crimes, DPD

Maria Miller, Director of Communications, WCPO

Beth Greenberg Morrow, Director, Oakland County Prosecutor's Office CIU

Janet Napp, WCPO CIU

Val Newman, Deputy Chief and Director, CIU

Jay Schleppenbach, Shook, Hardy & Bacon LLP (Coordinator)

Kari Sloan, Deputy Chief, DPD

Brian Surma, Chief, Homicide, WCPO

Judge Margaret Van Houten

Leon Weiss, WCPO CIU

Kym Worthy, Wayne County Prosecutor



**DODSON
FOWLER
WILLIAMS
& NESI, PLC**

*Main Office*

18050 Mack Ave.
Grosse Pointe Farms,
MI, 48230

(313) 458-8276
(313) 469-7085 (Fax)

*Village Office*

722 Notre Dame
Grosse Pointe, MI
48230

(313) 886-5769
(313) 886-5851 (Fax)

dfwnplc.com

***Attorneys***

Nathan A. Dodson, Esq.
Aimee M. Fowler, Esq.
Daniel J. Williams, Esq.
Christopher J. Nesi, Esq.

# EXHIBIT 10

                              STATE OF MICHIGAN
                        THIRD JUDICIAL CIRCUIT COURT
                            CRIMINAL DIVISION




THE PEOPLE OF THE STATE OF MICHIGAN     File No. 26-000925-01-FC


      v


CARLOS KIJUAN JENNINGS,

                    Defendant.

_____/



                            MOTION HEARING
              BEFORE THE HON. MARGARET M. VAN HOUTEN
            Detroit, Michigan - Tuesday, April 14, 2026



APPEARANCES:


FOR THE PEOPLE:        JAMES ANDREW KEHOE (P82812)
                       Assistant Prosecuting Attorney
                       Wayne County Prosecutor's Office
                       5301 Russell Street, Suite 200
                       Detroit, Michigan 48211
                       (313) 967-6600

FOR THE DEFENDANT:     DANIEL JOSEPH WILLIAMS (P72085)
                       Managing Partner
                       Dodson Fowler Williams & Nesi, PLC
                       18050 Mack Avenue
                       Grosse Pointe Farms, Michigan 48236-3223
                       (313) 458-8276


COURT REPORTER:        Kim Blackburn, CSR 7263
                       Third Judicial Circuit Court

                                1

<u>T A B L E   O F   C O N T E N T S</u>

<u>WITNESSES</u>                                                        <u>PAGE</u>

PAUL BROWN
  Direct examination by Mr. Williams                             19
  Cross-examination by Mr. Kehoe                                 70
  Redirect examination by Mr. Williams                          72
JEFFREY COOPER
  Direct examination by Mr. Williams                            80
  Cross-examination by Mr. Kehoe                               113
  Redirect examination by Mr. Williams                         118


| <u>EXHIBITS</u> | <u>DESCRIPTION</u> | <u>IDENTIFIED</u> | <u>ADMITTED</u> |
|---------|-------------|------------|----------|
| DX#1-7  | Hearing exhibits | 43 | 43 |


<u>OTHER MATERIAL IN TRANSCRIPT</u>


Motion to Quash the Identification by Mr. Williams              4

Response by Mr. Kehoe                                           9

Reply by Mr. Williams                                          11

Findings                                                       13

Ruling                                                         15

Final argument by Mr. Williams                               121

Final argument by Mr. Kehoe                                  130

Rebuttal by Mr. Williams                                     132

THE COURT:  Sir, could you please state your name and spell it for the record?

MR. BROWN:  Yes, my name is Lt. Paul Brown.  That's P-a-u-l, Brown, B-r-o-w-n.

THE COURT:  Thank you, sir.  You may proceed.

MR. WILLIAMS:  Thanks, Judge.

P A U L   B R O W N

called and sworn as a witness at 11:14 a.m., testified as follows:

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q   Good morning, Lieutenant.

A   Good morning sir.

Q   Good to see you, sir.

A   How are you doing?

Q   It's another day.  I'm going to ask you some questions.  Okay?

A   Okay.

Q   If you don't understand my question or you're not sure the way I'm asking, please let me know so I can try to ask it a different way.

A   Will do.

Q   All right.  Lt. Brown, how long have you been with the Detroit Police Department?

A   Twenty-six years.

Q   And what's your current position?

19

A    Detroit Police - Homicide.

Q    All right.  Homicide is part of a larger unit; correct?

A    Yes, Major Crimes.

Q    Major Crimes.  What other units fall within Major Crimes?

A    Special Victims Unit, which consists of Domestic Violence, Sex
Crimes, and Child Abuse.

Q    All right.

A    Also, we have Fatal Squad, which is Fatals dealing with
vehicular accidents.  And also we have Cold Case and the
Missing Persons cases Squad.

Q    All right.  Your assignment, however, was solely to Homicide
cases; correct?

A    Correct.

Q    How long have you been in Major Crimes?

A    I've been a part of Major Crimes on and off since 2013.

Q    And when did you get promoted to Lieutenant?

A    That will be September 11th, and that would be '23.

Q    All right.  And was your promotion by appointment, or was it
by testing?

A    Testing.

Q    Testing.  All right.  So you weren't under the old promotion
regime.  You were under the promotion regime; correct?

A    Correct.

Q    Already.  Now, as a lieutenant, I'm assuming that you got a
bunch of people that work for you?

20

A    Yes.

Q    How many people are you in charge of in the Homicide section?

A    On any given day, it should be -- it varies between 30 and 40.

Q    All right.  How many lieutenants are in Homicide?

A    Four.

Q    Yourself and which other three?

A    It would be myself, along with Lt. Bolden, Lt. O'Rourke, and
     Lt. Sampson.

Q    All right.  And how many detectives do you have working with
     you at any given time?

A    It's 74 detectives on the floor at any given time.

Q    All right.  And those are actual promoted rank detectives?

A    It varies between promoted rank and people that are appointed
     in a detective position.  So we do have some police officers.

Q    All right.  So you've got some guys that were under the old
     appointment regime when Chief Craig was there?

A    We do.

Q    All right.  You said there were 74 at any given time?

A    Yeah, 74.  And that would include police officers, detectives,
     and sergeants.

Q    All right.  How many detectives, sergeants, and officers were
     directly involved with the investigation concerning Mr.
     Jennings?

A    It would be our D string.  So they have a total of 10
     personnel there.

21

Q    All right.

A    It's seven detectives, an analyst, and two sergeants.

Q    All right.  So basically ten people could have touched this case --

A    Correct.

Q    -- from Major Crimes?  How many people of that ten had supervisory authority?

A    Two was in that squad.

Q    All right.  Who were those two?

A    That would be Sgt. Heid and, Sgt. Haidar.  What's my timeframe on this again?  What date?

Q    October 26th until we'll call it present.

A    Okay.  Sgt. Heid was on his own at that time.

Q    Okay.  So --

A    Sgt. Haidar wasn't there.

Q    Okay.  What about you?  You were a supervisor?

A    Yes.

Q    All right.  And there was a Officer in Charge of the case?

A    Correct.

Q    Who was that person?

A    Det. Jeffrey Cooper.

Q    All right.  And as the lieutenant, are you responsible for directly supervising Det. Cooper?

A    No, I'm not.

Q    Okay.  Who was responsible as his direct supervisor?

22

A    That would be Sgt. Heid.

THE COURT:  Can you spell that last name, please?

THE WITNESS:  That would be H-e-i-d.

MR. WILLIAMS:  All right.

THE COURT:  H-e-i-d.  Okay.

THE WITNESS:  Correct.

Q    (CONTINUED BY MR. WILLIAMS):  All right.  What is your supervisory role then?

A    So I pretty much manage the whole floor.  I head the -- I'm in charge of the east side of Detroit, which consists of two squads, precinct areas 11th and 7th, also the 9th and 5th.  So everything east of Woodward.

Also, I have Missing Persons and Cold Case.  So I usually just oversee the operation and management thereof.

Q    All right.  And you have a supervisor I'm sure?

A    Yes.

Q    Who is that?

A    Marcus Thirkill.

Q    Captain Starkey?

A    Marcus Thirkill.

Q    Oh, all right.  And then you've got a -- you've got a commander, I assume?

A    Commander Rebecca McKay.

Q    McKay.  All right.  So did you attend DPAC, or maybe what we call "lieutenant school"?

23

A    Yes.

Q    All right.  And do you recall approximately when you attended DPAC?

A    It would be before November -- September 11, '23.  It would be those first two weeks.

Q    Because your start date as a lieutenant is the date you finished the academy; correct?

A    Correct.

Q    All right.  Were you trained at lieutenant school about how to conduct a live eyewitness lineup?

A    Yes.

Q    Do you recall approximately how much time --

A    Let me rephrase that.  He wasn't trained at lieutenant school.  However, I was a detective and a sergeant in Investigations, so I've been trained on live lineups.

Q    Okay.  So you helped me because you skipped about three questions for me.  So at lieutenant school, they didn't specifically provide eyewitness training, but in detective and sergeant school they did?

A    They did.

Q    And all of that is through what we would refer to as "DPAC".  Can you just clarify what DPAC stands for?

A    That's just once you get promoted, you go through what they call an "officer candidate school," where they are preparing you for the next steps.  So they'll go through transitioning

24

you from officer to detective, or officer to sergeant, and from sergeant to lieutenant, and go through the various changes of what you will experience when you get to achieve that rank.

Q   And it stands for Detroit Promotional Assessment Center?

A   Correct.

Q   And they have a detective school there, a sergeant's school there, a lieutenant school?

A   Correct.

Q   All right.  As far as your training as a lieutenant -- as a detective and a sergeant, what did they -- what were you trained at school to do, as far as administering a live eyewitness lineup?

A   So when we do a live lineup, the first thing we want to do, we want to get an attorney present to actually be there present with the lineup.

Also, you want to go over to the holding facility where the person that is going to participate in the lineup at and you want to find other individuals that you would put into the lineup with that person.

Once you get that done, you'll go to a holding room, or what we call a "viewing room".  And then the persons will be assembled there.

The person that is -- the person that is the focus of that lineup will be placed in the lineup.  And then the

25

other individuals will be placed in the lineup with them and around them.

And then at that point, you know, if you're working in concert with a partner or somebody that's in the viewing room, you'll let them know that the lineup is ready for viewing.  And then they go ahead and show the lineup from the other side.

Q    All right.

A    And that other side would have that independent attorney present.

Q    All right.  DPD has what they refer to as "24-hour trainings" once a year; correct?

A    Yes.

Q    They're mandatory?

A    Yes.

Q    I assume because of their mandatory nature, you must have attended those?

A    Yes.

Q    Since your promotion in '23 to lieutenant, to the best of your recollection, did any of those mandatory 24-hour trainings involve how to conduct eyewitness live lineups?

A    No.

Q    All right.  Are you aware of whether or not the Detroit Police Department has a mandatory policy in place for how to conduct a live lineup?

26

A    Yes.

Q    Do you recall how that was disseminated?

A    How the policy was disseminated?

Q    Yes.

A    No, I do not know how the policy was disseminated, but it's in our Detroit Police Officers Manual.

Q    All right.  Let me ask you in a different way.  I'll be more specific.  When the Detroit Police Department issues policies, they typically go through the MAS system; correct?

A    Yeah, the MAS system.

Q    All right.  And they also will send them by e-mail; correct?

A    Yes, some policies will come out through e-mail.

Q    And then some policies will also be disseminated by written form at roll call; correct?

A    Sometimes.

Q    All right.  But all of the policies are in the MAS system; correct?

A    So our MAS system is a part of what they call the "Detroit Police Department intranet system".

Q    Correct.

A    So MAS system is Management Awareness System, which is where managers can go in and look at each individual person that's under their span of control that you supervise and help them out through there, as far as counseling, things of that nature.

27

What you're referring to is going to be in our Detroit Police Officer intranet system under what they call the Detroit Police Officers Manual.  That's where the policies and procedures are held at.  So you're in the right place, it's just two separate entities.

Q You're actually helping me, because I was actually going to get to several of those distinctions in a minute.  Because my next question is that the MAS system that you have access to as a supervisor works in tandem with the policy manual; correct?  In other words --

A In some fashion.

Q -- you can see whether or not one of your subordinates has read and acknowledged having read a specific policy or procedure that's in place in the manual; correct?

A If a person read a policy and they checked that that policy is read, then that is referred over to our compliance office, which is under the office of Compliance and Planning.

So I would not necessarily see that that person checked that box, but it is credited on their MAS profile sheet through another entity, Office of Civil Rights Planning and all that.

Q All right.  And you would agree that if there is a written policy and procedure, everybody is supposed to know about it and have read it; correct?

A I would not agree to that, no.

Q   All right.  Have you submitted any form 568s requesting additional training specifically related to live lineups or eyewitness lineups?

A   I have not personally.

Q   All right.  Do you know if they've offered any trainings on eyewitness lineups and how to conduct them that a form 568 could have been submitted for?

A   Not that I am aware.

Q   All right.  You indicated that you were aware of the policy; correct?

A   I am.

Q   If I were to show you a copy of the policy, would you recognize it?

A   Yes.

MR. WILLIAMS:  May I approach?

THE COURT:  You may.

MR. WILLIAMS:  It's Exhibit 4.

Q   (CONTINUED BY MR. WILLIAMS):  All right.  I'm going to give you a second to look that over.  Let me know when you've looked at it, reviewed, and are ready to answer some questions.

A   Yes.

Q   All right?

A   This is it.

Q   Now, I'm going to make some presumptions.  You tell me if I'm

wrong.  Okay?  I presume you have read and understand that policy?

A   Yes.

Q   All right.  And I would assume that when and if you were to conduct a lineup, you would follow the policy and procedure as it was prescribed by the department; correct?

A   Yes.

Q   All right.  And you would agree that if there is a policy and procedure disseminated by the department, they expect you to follow the policy and procedure; correct?

A   The expectation is there.  However, it's also areas that sometimes you might have to deviate from policy.  And that is also in our policy.

Q   All right.  So thank you.  That answers another question.  I'm going to assume that if the policy does not allow for deviation, you may not deviate?

A   I assume if it doesn't allow it.

Q   If the policy does not specifically state that there is a means by which you can deviate, you are not supposed to deviate from the policy?

A   No.  So that is not accurate.

Q   All right.

A   A policy's in place to give you a guideline on how you're supposed to -- you should conduct business.  "Shall" is only on things that is determined.  Okay.  However, we do have

policies that say that policies can be deviated from on certain circumstances, i.e., you can't shoot at a moving -- you should not shoot at a moving vehicle.

However, we know that that happens depending on that set of circumstances given at that particular point in time. So that deviation can be justified if it's proper.

Q   All right.  So I'll make this analogy.  It's a lot like the legislature writes statutes.  If it says "may" or "should," you have some discretion.  If it says "shall" or "must," you don't?

A   That would be fair.

Q   Now, has the department provided any in-person training, or has Major Crimes as a department provided in-person training regarding the implementation of that policy to your knowledge?

A   To my knowledge, I'm not aware.

MR. WILLIAMS:  And, Judge, just for the record so I don't have to say "policy 203.11" every time, I'm just going refer to it as "policy" for the record.  Okay?

THE COURT:  Okay.

MR. WILLIAMS:  Because extra words are going to make a difference today.

Q   (CONTINUED BY MR. WILLIAMS):  Do you recall how or by what means you received a copy of the policy?

A   It's on our Detroit Police Department intranet.

Q   All right.  So you would have received it either through a

31

directive to read the manual, or it would have been disseminated at roll call I would assume?

A   No, not necessarily.  You know, any personnel could go on it any time and read this particular policy.  I usually go through and read the particular policies that's applicable to the job function that I'm in charge of.

Q   All right.  Would you agree that personnel are supposed to use the MAS system to acknowledge having read it and reviewed newly-issued policies and procedures by the department?

A   If that policy is placed in the MAS system, yeah, they are required to go in and read it.

Q   All right.  Do you recall if this particular policy was?

A   I don't recall.

Q   All right.  Do you know if Det. Cooper was made aware of the policy that we're talking about today?

A   I'm not sure if he was.

Q   All right.  Det. Cooper, do you recall when he was promoted to detective?

A   I don't remember exactly.

Q   Do you recall if he would have attended detective school, DPAC?

A   He did go to DPAC.

Q   All right.  Do you recall what year that promotion was?

A   I would say it was in the last two years.

Q   All right.  So 2024 or later?

32

A    I would say it was in the last two years.

Q    Okay.  Do you recall if his promotion was before or after the approval of the current policy that you've got there regarding eyewitness live lineups?

A    I don't know what the revised date is on this.

Q    File date was May 30, 2024.

A    I'm not sure if it was before or after.

Q    All right.  Do you recall if the department provided Det. Cooper or any of Major Crimes a specific training regarding implementation of that policy?

A    I believe I said I'm not sure about that, sir.

Q    All right.  I just wanted as far as Det. Cooper, you're also not sure?

A    No.

Q    All right.  So he would have received eyewitness live-lineup training at detective school though?

A    He would have received some detective training in various areas.  And lineups, I believe, are still part of that training.

Q    And that's generally a two- to three-week program?

A    Correct.  Correct.

Q    Since his promotion to detective, how many live lineups has Det. Cooper conducted?

A    I'm not sure.

Q    All right.  I'm assuming this wasn't his first one?

33

A   I don't believe this was his first one.

Q   All right.  Have you personally observed Det. Cooper conduct a live lineup?

A   Yes.

Q   That was not on this case I assume; correct?

A   This was one I remember him being a part of.

Q   All right.  Were you present at the time the lineup was conducted?

A   I was in the building, yes.

Q   So you were at DDC?

A   Correct.

Q   But you were not actually in the room observing?

A   No, I was not.

Q   Okay.  All right.  Do you, yourself, provide training to your detectives on how to do lineups?

A   I personally haven't done training on this particular policy.

Q   All right.  Do you know if Det. Cooper received any specific training from individuals inside Major Crimes about how to do lineups?

A   I'm not sure.

Q   All right.  Have you ever been a field trainer?

A   No.

Q   All right.  Do you recall when Major Crimes instituted a double-blind administration process for conducting live lineups?

34

A    A double blind of live lineups?  No, I don't recall that.

Q    If I were to tell you 2016, does that sound about right?

A    That would be before my time then.

Q    All right.  You would agree that the policy that you've got in front of you, issued May of 2024, updated double-blind protocols for Major Crimes and for the entire department on how to conduct live lineups; correct?

A    Yeah, it's the policy, yeah.

Q    And so that's the current policy and would have modified the old administration's policy; correct?

A    I don't know if it modified it or not because I don't -- at the time, I was not a detective during that time.  However, this is the current policy.

Q    All right.  Did you have a chance to review the recording of the live lineup that Det. Cooper conducted in this case?

A    I have not.

Q    Okay.  Are you aware that your name was signed on the Recommendation For Warrant as the reviewing supervisor?

A    Yes.

Q    Okay.  Did you have a chance to review the live-lineup video prior to coming to court today?

A    I have not.

Q    All right.

          MR. WILLIAMS:  Judge, I guess before I ask the prosecutor if they can roll the footage, I'm going to ask a

35

few more preliminary questions, and then I will ask the Court if it would be willing to play the video.

Q    (CONTINUED BY MR. WILLIAMS):  Based on the policy, you would agree that the administrator of a live lineup is supposed to be a double-blind administrator, correct, meaning they do not know the identity of the suspect?

A    And that's the person that's presenting the lineup?

Q    Correct.

A    I would have read that in the policy.

Q    Would you take a look, please, at the policy section 4.2(11), and also policy 4.4(1)a.  Let me know when you're ready.

THE COURT:  What was the second one?

MR. WILLIAMS:  4.4(1)a.

THE WITNESS:  And you said .11?

MR. WILLIAMS:  4.2(11) --

THE WITNESS:  Okay.

MR. WILLIAMS:  -- and 4.4(1)(a).

THE WITNESS:  Okay.

Q    (CONTINUED BY MR. WILLIAMS):  All right.  You would agree that the policy requires there is a "shall" there, requires that the administrator of the lineup be double blind; correct?

A    Double-blind presentation, correct.

Q    Officer Cooper would not qualify as a double-blind administrator in this case, would he because he knew who the suspect was and he knew who the witness was; correct?

36

A    Now, we are aware of the suspect.  Was he aware of the witness?  I'm not 100 percent sure about that.

Q    You were not aware that prior to the lineup, Mr. Evans and Det. Cooper had had some communication and that Mr. Evans had forwarded him some video that purportedly came from his porch?  Were you aware of that?

A    I know that members of our team attained some video.  I'm not sure exactly which one.  We work in tandem as a team, and it could be anywhere from eight to ten people working on a particular case.  So those particular pertinent details, I'm not sure.  I would have to go to the detective for that.

Q    All right.  But you do agree he was not double blind with regard to the suspect?

A    I will agree to that.

Q    All right.  You would agree that the video -- well, let me ask this:  Are you aware that the video recording equipment at DDC in the actual lineup room, where the purported suspect was and all the fillers were located, was not functioning on October 30th of 2026 (sic)?

A    I don't remember that.

Q    All right.  Would you quarrel with me if I told you it wasn't?

A    I would have no quarrel with that.

Q    All right.  And you indicated that you did not review the body cam video from inside the witness room; correct?

A    I did not.

37

Q   All right.  You would agree that the policy requires a video recording or photographic recording of the lineup as it occurs?  If you need to look, feel free.

A   It should.

Q   All right.  Were you presented any photographs of the participants in the lineup as they were seated in the lineup?

A   I was not.

Q   The policy requires that a photograph be attached to the Lineup Identification Sheet, does it not?

A   That's in the policy.

Q   That is a "shall," is it not?  Take your time.  I believe it's 4.4(3) -- excuse me -- (5).

A   Well, in 19 it says:

         "It shall be video and audio or unless doing so is
          not possible."

Q   Try 4.4(5).

         MR. WILLIAMS:  Judge, if I'm making you dizzy up here, let me know.  I'll try to stand still.  Old habits die hard.

         THE WITNESS:  You mean 4.4(5), where it says "Photographic Identification"?

Q   4.4(5), yes, requires a live lineup to be photographed and that the live-lineup photograph is to be -- the person taking it has to put themselves down and others present, and a copy of the photos have to be attached to a lineup.  Do you see

38

that?

A   Yeah, I see it.

Q   All right.  That's a "shall," is it not?

A   It says, "shall be entered".

Q   All right.  Did you look at the Lineup Identification Sheets from Mr. Evans and Mrs. Evans in this case?

A   I don't recall if I looked at them.

Q   Do you recall at any time seeing any photographs documenting the persons that were in this lineup at all?

A   I did not see those photographs.

Q   Would you quarrel with me if I told you there were no photographs?

A   No.

Q   Would you quarrel with me if I told you that there is no video that shows all six of the participants in this particular lineup?

A   If a video was, I'm not sure.

Q   But you didn't watch it?

A   I did not.

Q   All right.  I want you to take a look at the Preamble to the policy.  I don't remember if it's 1.1 or if it's just listed as the Preamble.

A   Where it says, "The purpose"?

Q   Yes.

A   Okay.

39

Q    What's the reason they implemented this policy in 2024?

A              "The purpose of the directive is to establish the guidelines for eyewitness identification procedures involving show-up photo arrays, and live lineups.

Erroneous eyewitness identifications have been cited as a factor most frequently associated with wrongful convictions.

Therefore, in addition, the eyewitness identification, all appropriate investigative steps and methods should be employed to uncover evidence that either support or eliminate a suspect's identification."

Q    All right.  You might not be able to answer the next, but I'm going to ask it anyway.  The body camera footage inside the witness room has a tag at the bottom that says "Sgt. Sweppy".  Do you know who Sgt. Sweppy is?"

A    So, yes.

Q    But?

A    But his title is not sergeant.

Q    All right.  Maybe it's lieutenant now.  I don't know.

A    Actually, it's Police Officer Sweppy.

Q    Oh, Police Officer Sweppy.  Do you know if Officer Sweppy was in the building, or did somebody just grab a camera?

A    I don't recall if Sgt. Sweppy was there.

Q    All right.  One second.  I apologize.  All right.  I can't ask you to describe any of the individuals in the lineup because I

40

know you didn't see it.  So let me ask you this:  You had contact with Mr. Jennings; correct?

A    Yes.

Q    In fact, the first contact you had with Mr. Jennings was with me; correct?

A    Correct.

Q    I turned him in to you?

A    Correct.

Q    Mr. Jennings is not 6'1" or 6'2"; correct?

A    I don't remember his height.

Q    Would me having him stand up help you?

A    It would probably jog my memory.

        MR. WILLIAMS:  May I have him stand up, Judge?

        THE COURT:  You may.

Q    (CONTINUED BY MR. WILLIAMS):  For the record, I'm 6'1" ish.  Does Mr. Jennings look 6'1" to you?

A    Looks more like 5'8" or 5'9".

Q    His official booking photo says 5'7".

A    Okay.

Q    Definitely not 6'1" or 6'2"; correct?

A    That would be correct.

Q    You would agree, not bald, is he?

A    No.

Q    Was not bald when I turned him in to you, was he?

A    That I don't recall.

41

Q    He's not bald in his booking photo?

A    Okay.  So he's not bald.

Q    All right.  You would agree with me that nobody in the room would describe Mr. Jennings as a dark-complected African American male; correct?

A    He would be described more medium brown if I were to describe him.

Q    I take your description because it's about what I would have said, which is medium complected, definitely not dark complected; correct?

A    I would not describe him as dark complected.

Q    All right.  You would agree on the -- oh, you know what, probably would help if you saw it, wouldn't it?

              MR. WILLIAMS:  May I approach, Judge?

              THE COURT:  You may.

              MR. WILLIAMS:  It's the lineup sheets.

Q    (CONTINUED BY MR. WILLIAMS):  I'm going to hand you the first Lineup Eyewitness Identification form and Lineup Photo Array Identification prepared for Mr. Evans and for Mrs. Evans. I'll set that one down.

              THE COURT:  And those are proposed exhibits?

              MR. WILLIAMS:  They were Exhibit 7 to my motion, Judge --

              THE COURT:  Okay.

              MR. WILLIAMS:  -- I suppose for housekeeping

42

purposes.

THE COURT:  Any objection to those exhibits?

MR. KEHOE:  I have no objection.  Thank you.  Sorry.

THE COURT:  Any other exhibits?

MR. WILLIAMS:  So I ask that 1 to 7 be admitted for hearing purposes only.

THE COURT:  Well, the transcript is not necessarily an exhibit.

Any objection to that?

MR. KEHOE:  No, Judge.  Sorry.

THE COURT:  They're admitted.

MR. WILLIAMS:  I suppose you could take judicial notice of it anyway.

Q   (CONTINUED BY MR. WILLIAMS):  Let me know when you're ready Lt. Brown.

A   I'm ready.

Q   All right.  You would agree that on the Identification Sheet the six witnesses do not have anything listed with regards to race or national origin of the lineup participants?

A   No.

Q   You would agree that there is no description of whether or not the participants were bald?

A   No.

Q   You would agree that the height and weight of the participants is not listed?

43

A    Correct.

Q    You would agree that the build of the participants is not listed?

A    Correct.

Q    You would agree that facial hair is not listed?

A    Correct.

Q    You would agree that tattoos, scars, or other noticeable marks are not listed for any of those individuals?

A    Correct.

Q    You would agree that the procedure requires that that information be documented?

A    So on this Identification form, it asks for name, position of suspect, age, height, weight, and then description marks. So those items were not documented.

Q    Correct.

A    The only thing that we have here is position number, name, age, and on one of them date of birth.

Q    All right. You would agree the policy requires that that information be present on those forms; correct?

A    I agree.

Q    All right. And that's a "shall," not "should"; correct?

A    I'm not sure if it's a "shall" or "should".

Q    I'm going to let you refresh your memory by looking at the policy. Not a "should"; correct?

          THE COURT: Are you directing him to a certain one?

44

MR. WILLIAMS:  You know, Judge, as much as I hate hand holding, I suppose I should do that, shouldn't I?

THE COURT:  Well, we could be here all day if he has too many policy questions.

MR. WILLIAMS:  Give me one second, Judge.  I've got too many of them written down to find it fast.

THE WITNESS:  Are you referring to where it says:

"Fillers should be reasonable in similar age, height, weight"?

Is that --

Q   That's a different one, but you're getting close.  Here it is.  4.2(7).

A   Yeah, that's what I just read.

Q   Yeah.  And then there's one more as well.

A   That's not talking about the form, sir.

Q   No, I realize that.  I believe it's on 4.4(b) -- or (3)(b) and (a).

A   Okay.  As it relates to (a) and (b), what was the question again?

Q   The policy requires that that information be placed on the form; correct?

A   For DPD 355?

Q   Correct.

A   This item is a DPD 479, sir.

Q   So you would agree that that is not actually the correct DPD

45

form on which the --

A   No, I'm not saying that's not correct, but I'm saying that as it relates to this and what you're showing me, these are two different forms.

Q   Do you know if there was form 355 filled out?

A   Well, you asked me specifically about this one.

Q   Now, I'm asking you --

A   I can only testify to --

Q   I got you.  Now, I'm asking you --

A   -- what's in front of me --

Q   -- do you know if there was --

A   I'm not sure of that, sir.

Q   Okay.  All right.  You would agree that on that form there isn't that information?

A   As it relates to this policy and this form, these two -- these two things are different.  So are you talking about this one?

Q   On the form --

A   Okay.

Q   -- it does not list those items; correct?

A   And some of the items that you asked me about is not asked on this particular form.

Q   Well, do you agree that the policy requires the use of form 355?  You're about six questions down.  So we'll just go down that road now.

A   Okay.

46

Q   Now, when you're doing a live lineup, there's a form that DPD wants you to use; correct?

A   Yes.

Q   All right.  And that's form 355; correct?

A   355 is one of the forms.

Q   All right.  We don't have a 355 in this case; right?

A   No, not in this case.

Q   All right.  And the information that would be required to be on form 355 is not on the documents that you actually have from the eyewitness identifications?

A   Not on this one.

Q   All right.  You would agree that if the Detroit Police Department felt it important for that information to be provided on the forms, it probably ought to be on there?

A   I know what this form asks for.

Q   That wasn't my question.

A   Yeah.

Q   If DPD --

A   I won't speak to what DPD thinks.

Q   Okay.  I will ask it this way:  You would agree it would be awfully important for somebody to know what the demographic and characteristics of the participants in a live lineup are, wouldn't you?

A   That is important.

Q   All right.  And we don't have squat about that on those forms,

47

do we?

A No.

Q All right. So I want to just cover this. As far as you're aware, we don't have any photographs of the live-lineup that were taken at the time; correct?

A No.

Q We don't have any video that you've seen that shows the participants of the lineup; correct?

A No.

Q And we have no written record of the forms, features, and characteristics of any of the participants in the lineup; correct?

A No, I haven't seen it.

Q You would agree, it might be awfully difficult to challenge the makeup of a lineup when you don't know who was in it, wouldn't you?

A That's fair.

Q You would agree it would be difficult for me as an attorney to determine whether or not the policy regarding whether these witnesses had their descriptions matched the individuals in a lineup without knowing their descriptions?

A That's fair.

Q And you would agree that the policy requires that the individuals in a lineup must be as close as possible to the descriptions provided by the witness?

48

A     That's fair.

Q     You would agree that there is no separate Witness Statement from Cedric Evans in this case, other than the description provided on the Lineup Information form; correct?

A     Say that again.

Q     You would agree that there is no separate Witness Statement from Cedric Evans, other than what is put on the Lineup Identification form that you have in front of you?

A     As far as the Witness Statement from him?  I'm not aware of that.

Q     All right.  So you would agree the only witnesses upon whom Det. Cooper could have based his choice of fillers in this lineup were other witnesses besides Mr. Evans; correct?

A     That would be probably a question for Det. Cooper as the Officer in Charge.

Q     I plan to ask him.  The reason I'm asking you is because unfortunately your name is on this as having reviewed it.

A     And rephrase that question one more time.

Q     You would agree that if we don't have a Witness Statement from Cedric Evans providing a description of the assailant from a time prior to his Statement after the lineup was conducted, Det. Cooper could only pick fillers based on descriptions given by other witnesses; correct?

A     Well, that's not necessarily a fact.

Q     Well, how else would he have chosen fillers who matched the

49

witnesses' descriptions?

A    Well, if he was working -- well, on this particular day, I believe he was working in tandem with Police Officer Sweppy.

And what you'll do is, you'll walk -- you'll walk around the DDC and you'll look for people that is of similar attributes and similar attainments.  That is how you'll pick your fillers.

Q    Similar --

A    They don't necessarily have to come from an actual --

Q    Similar to who?

A    It would be similar to the person that's going to participate in the lineup.

Q    But that's the exact opposite of what the policy requires, is it not?

A    Yes.

Q    All right.  So Det. Cooper was working with Officer Sweppy to select people that looked like the defendant, but not like what the witnesses had described.  Is that what you are saying he would have done?

A    No, that's not what I'm saying.

Q    All right.  Well, tell me what you're saying.

A    So if the witnesses -- because you referred to this Witness Statement, which I can't testify to the Witness Statement. But if you're referring to that Statement as how Det. Cooper would have got it, that would be an answer that Det. Cooper

50

should answer.

However, as it relates to me, what I'm saying is, the possibility of him finding those fillers, it is other means that you can use.  So those are means that we can use, although it might not coincide with actually what we're reading right now.

Q   Well, I'm going to have you take a look at (7), 4.2(7).  And I'm not so much interested in the first part.  Before the "in accordance," I'm interested in "the accordance with the witness's or victim's description of the offender".

A   And that's what I'm referring to, sir.  I don't -- I'm not privy to what Det. Cooper was told --

Q   All right.

A   -- in a particular Witness Statement.

Q   So if -- and this is going -- I'm going to go back to the question I started with, which is why I asked it first -- there is no Witness Statement from Cedric Evans prior to the lineup; correct?

A   Okay.  I see what you're saying.  No.

Q   All right.  So the only description that he would have had -- and by "he" I mean Det. Cooper -- would have been from a different witness; correct?

A   Correct.

Q   There was another witness who provided a physical description named Shakiva (phonetic) Griffin; correct?

51

A    Correct.

Q    And Shakiva Griffin gave that description to Officer Saad at the scene; correct?

A    I believe, yes.

Q    And that description was a 6' to 6'2" dark-complected African American male; correct?

A    I believe that was the description.

Q    Who was bald?

A    I believe so.

Q    All right.  If Det. Cooper was looking for people at the jail who looked like my client, he wasn't looking for people who were 6' to 6'2", dark complected, or bald, was he?

A    Once again, that would be a question for Det. Cooper, sir.

Q    Well, I'm asking you because of the statement that you made earlier, which is you were -- potentially he was looking for people that looked like my client.

A    And that -- mind you, that was based on my articulation of what you were asking me.  I wasn't present --

Q    No, I understand that.

A    -- when they did that.

Q    I understand.

A    Plus, you rephrased it later on in the diagram.  I understand what you were going for.

Q    I --

A    But I wasn't there when he picked those particular fillers.

52

Q   No, no, I get you.  I'm not saying you were.  But my point is, assuming you were running and he was trying to do that as an alternative means, if he's looking for people that look like my client, they weren't people that matched the description of --

A   That would be fair, yes.

Q   All right.  So --

MR. WILLIAMS:  One second, Judge.

Q   (CONTINUED BY MR. WILLIAMS):  All right.  During the course of your review prior to signing your name to the Recommendation for a Warrant, did you talk to Det. Cooper about what happened in that lineup room?

A   I don't recall if I personally talked to him about it.

Q   All right.  I want you to take a look at Mr. Evans' Identification Sheet, specifically the page where there's handwriting indicating what Mr. Evans purportedly did at the lineup --

A   Okay.

Q   --where it says:

"Picked Number 4" and then gives a description of events?

A   On Ms. Evans'?

Q   Mr. Evans.

A   Oh, I'm sorry.

Q   That's okay.

A    Couldn't read your handwriting there.  Okay.  I got it.

Q    You got the same problem I do.

A    Okay.  I got you.  I'm with you.

Q    I've got bad handwriting, but that was challenging me for a bad day.

A    I got you.  I'm ready.

Q    Now, you see, based on what's written there, it looked like Mr. Evans picked Number 4.  And then there's a description of what Mr. Evans indicated that Number 4 had done; correct?

A    Correct.

Q    All right.  I'm going to ask you a couple of hypothetical questions.  Would you conduct a live lineup that had two persons in the room at the same time?

A    I normally would not.

Q    The policy says you're not supposed to do that too; right?

A    Yes.

Q    Would you conduct a live lineup where you had the two witnesses talking to each other in the room about who the perpetrator may or may not be?

A    I would not.

Q    The policy says you're not supposed to do that, doesn't it?

A    Yes.

Q    All right.  If a witness indicates -- excuse me, strike the question.

     If both witnesses were in the room at the same time,

54

and both of them were indicating for a period of approximately two minutes that none of the persons in the lineup were the person they saw, would you have marked that as a no pick?

A   If that would have happened to me and I was in the room?

Q   Yes, sir.

A   Well, that would never happen, because I wouldn't allow two people in there.

Q   All right.

A   But if we're speaking hypothetically, right --

Q   Hypothetically.

A   -- yeah, I would probably -- I would have probably made a no pick.

Q   Probably wouldn't make any comments to them yourself either, would you?

A   To the actual people that's looking at the lineup --

Q   Correct.  Correct.

A   -- would I make comments to them?

Q   In a hypothetical scenario, would you be making any comments to them about their selection?

A   Well, it depends.  It is -- oftentimes we do talk to the person that's viewing the lineup.  It's reasons why you will talk to the person that's viewing the lineup.

Q   In the witness room?

A   Yes.

Q   All right.  Hold on.  I'm going to stop you.  Could you take a

55

look at 4.2, Number 16, and 4.2 Number 17?  That one's long, so let me know when you're ready.

A    I read it.

Q    You would agree that making statements to the witness is prohibited by the procedure; correct?

A    No.

Q    No?

A    No.

Q    Well, let me read it.

"Members shall not use statements, cues, casual comments, or provide unnecessary or irrelevant information that in any manner may influence the witness's and/or the victim's decision-making process or perception."

Then we go to 17.

"The proceeding must be conducted in a fair manner so as not to be unduly suggestive of the suspect.  This is important because any remarks could later be interpreted as an attempt to influence the identification."

Your interpretation of the policy is that that does not forbid you from making comments to the witness while you're in the actual identification room?

A    That's not -- that's not a fair assessment of what I was saying.

Q    That -- hold on, I'm going to get back to what you were saying.

56

A    Okay.

Q    I want you to clarify.  But you would agree that that's what the policy says?

A    Yes.

Q    All right.  So I'm going to give you a chance to go back and tell me what it is that you were explaining so that I can get a clear picture of what you meant versus what I was asking. So, please --

A    So remember we were speaking in hypotheticals.

Q    Of course we are.

A    And then also at the beginning, I told you that it is certain places and times in policy that we may deviate from policy. And so you asked me where I speak inside of the witness room, and I said, yes, sometimes I have spoken inside of the viewing room.

And then that's when you went back to the policy. You never asked me why would I or what reasons would I speak inside it.

Q    All right.

A    So inside a room, you give instructions.  You let them know what we're about to partake in.  It is reasons why you will speak.  Sometimes you'll ask the attorney or attorneys, is there any other guidelines you need me to do while I'm in here.  So --

Q    So let me --

57

A    And it's reasons why you would speak in that particular room.

Q    Let me -- I guess, okay, and you know what, actually, I really appreciate you making that clarification because it helps me on a couple of things I need to clarify.

So I'm not talking about the sort of introductory mandated language, which, as you're indicating, the policy also requires, or questions of the show-up attorney, which we'll get to that topic in a minute.

I'm talking about the frame of time where the witnesses are viewing suspects, they're in the room, and they're now going about trying to pick somebody or not.

A    Okay.

Q    During that frame of time, you would agree, probably shouldn't be saying anything to them; correct?

A    I don't normally speak to them, no.

Q    Okay.  You would agree that -- and again, we're still in our hypothetical scenario with you conducting this lineup in this crazy world where there are two witnesses and they're talking to each other, and we don't have a video, and we don't have photographs, and we don't have anything -- you would agree that after they said, both of them, it's not any of these people, you would have stopped the lineup; correct?

A    The lineup could have been stopped.

Q    All right.  Would you have told them to "take their time" and then allowed them to continue chitchatting in the room about

58

who they wanted to pick?

A   I have said plenty of times for the witnesses or the viewers
to take their time.

Q   All right.

A   We're not in a rush.

Q   Okay.

A   I have said that plenty of times.  Now, in this particular
incident, I'm not sure of what occurred behind that black
glass.

Q   Hold on.

A   Yeah.

Q   I want to stick to our hypothetical universe --

A   Yeah.

Q   -- where both of the witnesses have said multiple times it's
not any of the people in this lineup.  Would you have, after
that, told them to take their time?

A   Hypothetically, I probably would have had them take a little
bit more time, and then I probably would have ended the
lineup.

Q   All right.  Now, if both of the witnesses were still in the
room, and they both simultaneously changed from, It's none of
them, to It's 6, would you have stopped the lineup at that
point?

A   Well, this is one of the reasons where I would have eventually
said, you can talk now in the witness room, because I would

59

have asked some follow-up questions at that juncture before stopping the interview.

Q   All right.  Tell me what you would have asked.

A   Hypothetically speaking, because since this has never happened to me --

Q   Of course.

A   -- okay, so --

Q   All of this questioning right now --

A   -- I would say --

Q   I will let you know when the hypothetical portion of questions --

A   I would have asked them, like, you know, what was the, you know, what changed, or what determining factors?  Or how do you know this person?  I would have asked some follow-up questions to make sure that they were sure about the pick.

Q   All right.  Assuming that the witnesses, in their making the decision to change to Number 6 stated reasons why, for example, well, his beard looks more like the guy I saw, or he looks like he's closest to the build of the person that I saw, would that satisfy you to stop at that point?

A   I probably wouldn't ask that particular question in my experience, but if -- you know, that would be fair.  I would have probably stopped after that.

Q   All right.  Probably not the right point to then throw one of the witnesses out and tell the remaining witness to take their

60

time and keep looking?

A    Why are you asking me a hypothetical that rarely occurs?  So but you're also going to use my hypothetical answer to support your theory; right?

Q    You're a smart man, Lieutenant.

A    So, you know, hypothetically, I probably, if we're talking about a situation that never happens, I'm sure -- and when you cross Det. Cooper, he probably would have his reasons on why he did what he did.  But hypothetically, I probably would have -- if -- I'm going to conclude I would have concluded it with both people in the room at the same time if I allowed them in.

Q    Now, I'm going to keep going because it doesn't get better. If the lone ranger that was left in the room then again selected Number 6 by themselves, assuming all of the other hypothetical past incidents, would you have stopped at that?

A    Yes.

Q    Probably would not have told him to take his time and keep looking?

A    I probably would have stopped it.

Q    All right.  You didn't get to see the video you said; right?

A    No.

Q    If I told you that all of that, in some very close form or fashion, actually happened on that video before Mr. Evans, who was the lone ranger that we were talking about changed his mind a third time and picked my client, do you think what's

61

written down on that form was an accurate representation of what happened in that room?

A   The accurate representation would have been the steps that they took to get to that final pick.  And I would have actually categorized each one of those descriptions that you just went over on this Statement.

Q   Obviously, as you can see, that did not happen?

A   Correct.

Q   Were you aware that Mr. Evans had gone through the stages of no selection, his wife in the room with him saying no selection; selecting Number 6; and then his wife being in the room and selecting Number 6; his wife being escorted out of the room; Mr. Evans again picking Number 6 all before he finally came around to Number 4?

A   Not in the -- not in the layout like we just did.  I was aware that it was -- it was told to me that his wife was there for support and then that he did pick out who we listed as the suspect in the Investigator's Report.

Q   But all that other no pick, no pick, pick 6, pick 6 --

A   That wasn't part of it, no.

Q   Do you see anything written down on there about Mr. Evans' level of confidence in his selection of Number 4?

A   I don't see his level of confidence here.

Q   All right.  You would agree that the current policy requires that a recording of the participants -- or excuse me -- the

62

witness's selection and level of confidence in that selection is supposed to be -- or strike that -- must be included on the form?

A   Yes.

Q   Given what you now know about this procedure, would you agree that Mr. Evans' level of confidence might have had an impact on whether or not to recommend this case for charging?

A   I would -- that's fair.

Q   You would agree with me that Mr. Evans' identification of Mr. Jennings was the only identification of Mr. Jennings as the alleged perpetrator that you have in the case?

A   Correct.

Q   And so serious questions about his identification by Mr. Evans would have been something frankly you probably would have wanted to know; right?

A   Correct.

Q   If you knew all of that when this warrant was presented to you for review to submit to Wayne County for signing and charging, would you have recommended it go over?

A   I still would have had a recommendation sent over to VCRI for prosecutor review.

Q   Would you have included a copy of the lineup video for the prosecutor to watch?

A   I believe that was sent over also.  So --

Q   You don't know for sure though?

63

A    Yeah, well, we have -- in our warrant package, we have a check list.  That check list will add in things that is presented to VCRI.  And so everything that will be presented or that you have, it should have been presented over to VCRI.

Q    Do you know if that warrant was signed the same day?

A    That I'm not sure.  I can't recall.

Q    Do you know who took the warrant over there?

A    It was uploaded to a system called *evidence.com* and also PBK.  So it's electronically.

Q    Okay.  Do you know who would have done that?  Would that have been Det. Cooper himself, or was that something that you would have done?  Who would that done that?

A    Anybody on our team can upload evidence, but the final submission would be through the Officer in Charge, which is Det. Cooper.

Q    Okay.  So Det. Cooper would have been the one ultimately who submitted everything out?

A    That's correct, sir.

         MR. WILLIAMS:  All right.  One moment, Judge.

Q    (CONTINUED BY MR. WILLIAMS):  If I were to tell you that the lineup video was not listed, would that be surprising to you?

A    Yeah, that would be surprising.

Q    You would agree if what happened in that witness room, as I described it in the hypothetical, happened in the witness room here, you would have serious concerns about the veracity of

64

that identification?

A   I would have some concerns.

Q   All right.  You would agree that it did not abide by the current policy and procedure that's in place?

A   That's fair.

Q   And you would agree that the stated purpose of that policy is to avoid misidentifications?

A   Correct.

Q   Because misidentifications are the single most common reason for wrongful convictions in the United States; correct?

A   Correct.

Q   And the department as a whole strives to put policies and procedures in place so that we can avoid that?

A   Correct.

Q   You would agree that if you had known about what happened in that lineup procedure, you would have had some questions about Mr. Jennings being the perpetrator in this case, wouldn't you?

A   Yes.

Q   You would agree with me that without information sufficient to challenge the makeup of the lineup, it makes my job very difficult in terms of finding out whether it was proper or not?

A   I could see the difficulty.

Q   And you would agree that live lineups have to be conducted in a specific way to ensure that they don't violate someone's due

65

process rights; correct?

A  I will agree.

Q  And you would agree that if the procedures in this case were not followed, and there isn't anything documenting the makeup of the persons who were in that lineup, I have no way of actually challenging the makeup of the lineup; right?

A  That's fair.

Q  All right.  Now, I'm going to ask you the last set of questions I have.  I walked Mr. Jennings in to the precinct on the 29th of October; correct?

A  Correct.

Q  I turned him over to you and a sergeant; correct?

A  Correct.

Q  I gave you my contact information; correct?

A  I remember so, yeah.

Q  You would agree that when he was turned over, he was taken in to custody?

A  Yes.

Q  He was not free to leave?

A  Yes.

Q  He was the primary focus of your investigation?

A  Correct.

Q  And you knew I was retained to represent him on this case?

A  Correct.

Q  Det. Cooper knew I was retained to represent him on this case?

66

A    I believe so, yes.

Q    Why then did no one think it was important enough to call me to let me know that my client was being forced to stand in a corporeal live in-person lineup?  If you don't have an answer, that's okay.

A    I don't have an answer.

Q    Because somebody probably should have; right?

A    Det. Cooper should have made a phone call.

Q    Right.

A    But, yeah, you did leave your phone number.

Q    In fact, you and I texted?

A    Correct.

Q    And I asked you on the 31st about the condition of my client at that time, did I not?

A    I believe so, yeah.

Q    Nobody told me about a live lineup, you would agree, that you know of?

A    That I know of, I don't know if anyone told you.

Q    In fact, they used the stationhouse lawyer.  I think it was Mr. That day; correct?

A    Yes.

Q    You would agree that had I been present at that lineup to observe it, I would have personal knowledge about the makeup and deposition, characteristics of the people who sat in the lineup?

67

A    Yes.

Q    I would have an ability to challenge the lineup because I would have seen it?

A    Correct.

Q    But now because we don't have video, and we don't have a photograph, and I don't have a physical description written down, I can't; right?

A    Correct.

Q    Doesn't sound like due process to me.  Does it sound like due process to you?

MR. KEHOE:  Objection, that's a legal conclusion, Judge.

MR. WILLIAMS:  I can get his lay opinion.

THE COURT:  Sustained.

MR. WILLIAMS:  I won't take it as an expert conclusion.  I'll take it from a lay --

THE COURT:  Calls for a legal conclusion.

Q    (CONTINUED BY MR. WILLIAMS):  Well, they teach you about due process, don't they, in the academy?

A    Correct.

Q    And they tell you when you do live lineups, you got to do certain things to make sure that people's due process rights aren't violated; right?

A    Correct.

Q    And I guess I'll ask it this way:  This ain't how you would

have conducted this lineup, is it?

A    No.

Q    This isn't how you would recommend anyone conduct a lineup, is it?

A    No.

Q    And you would agree with me that from your standpoint you wouldn't conduct a lineup this way because it would create serious questions about the constitutionality of how it was performed; correct?

A    It could create some difficulties.

MR. WILLIAMS:  I'll leave it at that, Judge.  Thank you.

THE COURT:  Were you going to play the video for him, or no?

MR. WILLIAMS:  I don't think we need to.

THE COURT:  Okay.  Cross?  And then I think we break for lunch because I think that Det. Cooper's going to take a bit longer.

MR. WILLIAMS:  Oh, I would say so, Judge.  I got a lot of questions for him.

THE COURT:  So cross?

MR. KEHOE:  I just have, I think, really one question to make sure I didn't mishear something.

CROSS-EXAMINATION

BY MR. KEHOE:

69

Q    Hi, Lt. Brown.

A    Hey, how you doing?

Q    Good.  So much earlier on in your testimony, you were asked --
I believe it was about whether everyone should be aware or
have read the written policy.  Does that sound right?

A    Yes.

            MR. KEHOE:  Mr. Williams, am I butchering the
question?

            MR. WILLIAMS:  Oh, yes, I did ask that question.

Q    (CONTINUED BY MR. KEHOE):  And you said not necessarily; is
that correct, or, no, not necessarily?

A    Yes.

Q    Why is that?

A    The Detroit Police Officer Manual is there for everybody in
the department.  However, certain things are not applicable to
everybody in the particular department.

            So usually people will be more proficient in areas
that they work in and proficient, as far as their scope of
their job descriptions.

Q    Okay.  So is it fair to say that DPD has a requirement that
you have to read or understand the policies that are
applicable to your position within the department?

A    You should, yes.

Q    Okay.  When --

A    For example --

70

Q   Go ahead.

A   -- I'm a detective.  I'm not reading, and understanding, and acknowledging policies about shipping and storage in the department.  It's not applicable to my job description.

Q   And then you also indicated that the check box is done when somebody verifies they've read and acknowledged that they've read the policy, and that's sent off to Personnel Management; is that correct?

A   That will be, yeah.

Q   Okay.  Apart from that being sent to Personnel Management, is that sent anywhere else within the --

A   They're under a umbrella of Civil Rights Planning, that particular entity.

Q   Okay.  So for you, or Sgt. Heid, or someone in the chain of command to verify that information, you would have to talk to that division, the Civil Rights or Personal Management?

A   It would actually -- if that policy was on there, it would fall off of what the attorney was articulating as a MAS record.

Q   Okay.

A   It would fall off.  So once it falls off, we know that policy was read.

Q   Okay.  So that would actually be something you would verify in the MAS system?

A   Correct.

71

Q   Okay.  I was very confused.  So took me a while to wrap my head around it too.

MR. KEHOE:  Thank you, Lt. Brown.

Judge, I don't have any further questions about this.

MR. WILLIAMS:  Well, Judge, he opened up a little box for me.  I'm going to need a minute.

All right.  This is for my Exhibit 5, Jim.

MR. KEHOE:  Thank you.

MR. WILLIAMS:  And I'm going to approach.

May I approach the witness, Judge?

THE COURT:  You may.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q   I'm going to hand you a couple of documents.  Now, I know you haven't seen these, but I want you to read them.  I know you haven't seen that.  You may have seen this, but I want you to read those over.  I'm going to give you a minute because they're -- it's lengthy.

MR. WILLIAMS:  Judge, for the record, what I have handed the lieutenant is a copy of the Settlement document from the *Williams versus City of Detroit* case, which is what required this policy to be implemented, along with a copy of the Training Directives that were included as part of all of this implementation.

72

This is a public record.  It's verifiable.  This isn't any sort of confidential issue.  And I think the Court already reviewed it.  It's my Exhibit 5.

THE COURT:  Yes.

MR. WILLIAMS:  I'm glad you read the important one first, which was the Training Directive.

THE WITNESS:  It's six pages, you'll have to give me some time --

MR. WILLIAMS:  Okay.

THE WITNESS:  -- because I don't know what your line of questioning would be.  So I just want to make sure --

Q    (CONTINUED BY MR. WILLIAMS):  It's really going to be to the Training Directives.

A    Okay.

Q    But I wanted to give you the Settlement Agreement so you could see in case you had questions about what I'm asking, you could refer to it.

A    Okay.

Q    Those Training Directives, I want you to look at the first three paragraphs in particular, particularly paragraphs 2 and 3.  You'll probably see where I'm going with it when you get done reading it.

A    Okay.  I'm ready.

Q    As part of that Settlement Agreement, the City of Detroit Police Department was required to provide all officers -- I

73

believe the term is "all sworn officers," which does, I think, include detectives, sergeants, lieutenants, captains, commanders, deputy chiefs, and chiefs with an in-service training on the eyewitness identification procedures, does it not?

A   It does say that here.

Q   And it also says that all sergeants and lieutenants are supposed to receive training on the new procedure at DPAC; correct?

A   Correct.

Q   That was after your time, I'll note that for the record.  You testified that you've never received any policy training at the annual in-service 24 hour trainings.  Is that still your recollection?

A   I said I didn't recall.

Q   That's what I asked you.

A   But I did say that I remembered going through this particular training as a detective and as a sergeant working in the field.

Q   All right.

A   But I don't remember if it was covered in my annual last year. I'm not sure.

Q   But your time as a detective and a sergeant would have been before May of 2024?

A   Oh, yeah, I -- but remember, I said I remembered the policy,

sir.

Q   Oh, no, I got you.

A   Okay.

Q   But my point is, they were supposed to provide this to everybody once it was implemented.  That's what it says there in the Training Directive; right?

A   I believe it has been.

Q   Okay.

A   So and I know for a fact it's on our training intranet page.

Q   All right.  Now, you can't tell me whether Det. Cooper has attended that training; correct?

A   I can not.

Q   All right.  And you would agree with me that court settlements and court orders are not options; correct?

A   Correct.

Q   They have to be followed?

A   They have to be followed.

Q   And there's an expectation that the people that are the subject of the court settlement and the court orders are going to follow them; correct?

A   Correct.

Q   You would agree that the procedure came about as a result of that Settlement and is being implemented as a result of that Settlement; correct?

A   Correct.

Q    Therefore, violations of the procedures in handling an eyewitness identification would be violations of the court order, would they not?

A    Yes.

MR. WILLIAMS:  I have nothing else.

THE COURT:  Okay.  I just wanted to get some clarification about whether video and/or the lineup information was supplied with the warrant.

I'm looking at the warrant check list, which is part of Exhibit 1, and it does say, "Witness Statements, written: Yes; Witness Statements, video:  Yes; Lineups:  Yes."

MR. KEHOE:  Judge --

THE COURT:  And so, I'm not sure.

MR. KEHOE:  -- it's not listed on the document.  Mr. Williams and I agreed to that.  However, going through *evidence.com*, Judge, as an officer of the court, I believe it was uploaded on October 31st, 2025.

THE COURT:  So it was available for the prosecutor to look at?

MR. KEHOE:  That's correct, Judge.

THE COURT:  Whether it was reviewed, you don't know?

MR. KEHOE:  That part I couldn't tell you, but I can tell you that we received it on our end on October 31st.

THE COURT:  Okay.  I just wanted clarification of what was sent to the prosecutor's office.

MR. WILLIAMS:  And, Judge, I appreciate that.  I would say, one, I take his representation as accurate.  As an officer of the court, I have no reason to question Mr. Kehoe.

I do think, however, Lt. Brown's answer still stands, which is he doesn't know for sure, and that would be a question for Det. Cooper.  And so it's on my list.

THE COURT:  Got you.

MR. WILLIAMS:  Thanks, Judge.

THE COURT:  And one last question for you, Lieutenant.  You said not necessarily every policy has to be read by everyone, that if it's shipping and something it wouldn't really apply to this detective.  That was your testimony, right, if it was some policy that doesn't really apply.

But lineup identifications for detectives in Homicide or Major Crimes, that would be something they should be familiar with?

THE WITNESS:  Yes, you should be familiar with, yes.

THE COURT:  Okay.  Anything further based on those questions?

MR. KEHOE:  No, Judge.

THE COURT:  Okay.  We're going to break for lunch.  I have a meeting with the fellow judges right now.  So we'll break until 1:45 and then come back and take Det. Cooper's testimony at 1:45.

77



**DODSON
FOWLER
WILLIAMS
& NESI, PLC**

*Main Office*

18050 Mack Ave.
Grosse Pointe Farms,
MI, 48230

(313) 458-8276
(313) 469-7085 (Fax)

*Village Office*

722 Notre Dame
Grosse Pointe, MI
48230

(313) 886-5769
(313) 886-5851 (Fax)

dfwnplc.com

***Attorneys***

Nathan A. Dodson, Esq.
Aimee M. Fowler, Esq.
Daniel J. Williams, Esq.
Christopher J. Nesi, Esq.

# EXHIBIT 11

STATE OF MICHIGAN
THIRD JUDICIAL CIRCUIT COURT
CRIMINAL DIVISION

THE PEOPLE OF THE STATE OF MICHIGAN        File No. 26-000925-01-FC

        v

CARLOS KIJUAN JENNINGS,

                    Defendant.

_____/

MOTION HEARING
BEFORE THE HON. MARGARET M. VAN HOUTEN
Detroit, Michigan - Tuesday, April 14, 2026

APPEARANCES:

FOR THE PEOPLE:        JAMES ANDREW KEHOE (P82812)
                      Assistant Prosecuting Attorney
                      Wayne County Prosecutor's Office
                      5301 Russell Street, Suite 200
                      Detroit, Michigan 48211
                      (313) 967-6600

FOR THE DEFENDANT:    DANIEL JOSEPH WILLIAMS (P72085)
                      Managing Partner
                      Dodson Fowler Williams & Nesi, PLC
                      18050 Mack Avenue
                      Grosse Pointe Farms, Michigan 48236-3223
                      (313) 458-8276

COURT REPORTER:       Kim Blackburn, CSR 7263
                      Third Judicial Circuit Court

1

T A B L E   O F   C O N T E N T S

WITNESSES                                                    PAGE

PAUL BROWN
 Direct examination by Mr. Williams                           19
 Cross-examination by Mr. Kehoe                               70
 Redirect examination by Mr. Williams                         72
JEFFREY COOPER
 Direct examination by Mr. Williams                           80
 Cross-examination by Mr. Kehoe                              113
 Redirect examination by Mr. Williams                        118


EXHIBITS        DESCRIPTION              IDENTIFIED      ADMITTED

DX#1-7      Hearing exhibits                43               43


OTHER MATERIAL IN TRANSCRIPT

Motion to Quash the Identification by Mr. Williams            4

Response by Mr. Kehoe                                         9

Reply by Mr. Williams                                        11

Findings                                                     13

Ruling                                                       15

Final argument by Mr. Williams                              121

Final argument by Mr. Kehoe                                 130

Rebuttal by Mr. Williams                                    132

name and spell it for the record.

THE WITNESS:  My name is Jeffrey Cooper, J-e-f-f-r-e-y, C-o-o-p-e-r.

THE COURT:  r-e-y?

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.  You may proceed.

MR. WILLIAMS:  Thanks, Judge.

J E F F R E Y   C O O P E R

called and sworn as a witness at 1:49 p.m., testified as follows:

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q   Good afternoon, Detective.

A   Good afternoon, sir.

THE COURT:  Hang on just a second.

What do you need?

THE OFFICER OF THE COURT:  Go ahead.

THE COURT:  Okay.  Go ahead.

MR. WILLIAMS:  Thanks, Judge.

Q   (CONTINUED BY MR. WILLIAMS):  I'm going to be asking you some questions.  All right?

A   Yes, sir.

Q   If you don't understand my question or you're not sure what I'm asking, stop me so that I can try to rephrase it or ask it again.  Okay?

A    Yes, sir.

Q    Det. Cooper, your current position with DPD I'm assuming is a detective?

A    Correct.

Q    What's your education?

A    I have a bachelor's degree, working on my master's.

Q    All right.  What is your bachelor's in?

A    Business with a focus on leadership.

Q    All right.  And your master's you're working on, what are you working on?

A    Same thing, business.

Q    Same thing?

A    Yes.

Q    All right.  When did you start with DPD?

A    2016.

Q    And where were you first assigned?

A    The 7th Precinct.

Q    Did you find that there were skills that you learned while acquiring your MBA that were relevant and helpful to you as a patrol officer?

A    Yes, sir.

Q    Tell me more about that.

A    Communication skills, being able to talk to people, being able to, you know, understand.

Q    Would you agree that statistics in closure rates were

81

important as well?

A   Yes, sir.

Q   And, in fact, you received some awards when you were with 7th Precinct for closing cases and citations; correct?

A   Officer awarded for most felony arrests, yes, sir.

Q   Those generated from high closure rates; correct?

A   I'm not certain how that goes.  I was just the recipient of it.

Q   Got you.  When do they consider, for DPD's statistical purposes, a case being closed?

A   So I don't do the statistics.  A case is closed once it's signed on our end, but we have to see it all the way until it's adjudicated.

Q   So when you say signed on your end, you mean once the recommendation for a warrant is signed and submitted to the prosecutor's office?

A   Yes, sir, that's considered a closure on our end.  Then we have to see it through the court process as well.

Q   All right.  And not the only thing, but one of the things DPD looks at is rate and speed with which cases get closed; correct?

A   That I'm not certain of.

Q   All right.  That's not something that they've sort of talked to you about?

A   No, never.

82

Q   All right.  All right.  What's your current assignment as a
    detective?

A   Homicide.

Q   How long have you been there?

A   Six years.

Q   How long have you been there as a detective?

A   I got promoted two years ago.

Q   Do you know approximately when?

A   April of '24.

Q   April of '24?

A   Yes, sir.

Q   Okay.  And were you part -- I assume then that you were part
    of the promotional class?  There was not an appointment;
    correct?

A   That was a promotional class, yes.

Q   All right.  So you had to take the test and all that to
    qualify?

A   Yes.

Q   And then did you go to DPAC for detective school?

A   I did.

Q   All right.  I'm going to come back to that in a second.  On
    the examination for detective, did they have any questions
    about policies and procedures for DPD?

A   Yes, sir.

Q   Specifically, did they test policies and procedures relative

to eyewitness identifications and lineups?

A   Somewhat.  Some of it was there.

Q   All right.  Did they talk about DPD's current either special orders that were in place at that time with regards to lineup policies or procedure or the pending changes that were coming into effect regarding lineups and procedures?

A   No, sir.  Only thing that was on the test was what was in the policy at that time.

Q   Okay.  All right.  And they tested you on the general DPD policy, correct, not on any thing that would have related to something that was going on in Major Crimes?

A   Correct, sir.

Q   Okay.  And you said you were assigned to Major Crimes as a detective then technically in '24; correct?

A   Yes, sir.

Q   And who are the supervisors in your chain of command as we speak today?

A   Right now, we have Sgt. Stephen Heid, Sgt. Lidia Hassig, and Lt. Paul Brown.

Q   All right.  And back in October --

THE COURT:  I'm sorry, that second sergeant was who?

THE WITNESS:  Lidia Hassig, H-a-s-s-i-g.

THE COURT:  s-s-i-g.  And Heid is H-e-i-d?

THE WITNESS:  Yes, ma'am.

MR. WILLIAMS:  I heard i-c-k as well, Judge.  Thank

84

you for clarifying that.

Q    (CONTINUED BY MR. WILLIAMS):  Back in October of 2025, were those the same supervisors that you had, or were they different?

A    They were the same.

Q    They were the same.  Okay.  Has Lt. Brown been your lieutenant since you achieved the rank of detective?

A    Correct.

Q    Okay.  Ultimately, he is the person who authorizes your warrants to go to Wayne County as the reviewing supervisor; is that right?

A    Yes, sir.

Q    Okay.  While you've been a detective at Major Crimes, how many live lineups have you actually conducted, if you can recall?

A    We don't do a lot of live lineups.  Most of them are photo lineups.  I would say about six to ten.

Q    Okay.  Including this one?

A    Yes, sir.

Q    All right.  When we talked about detective school earlier, that's the Detroit Promotional Assessment Center training; correct?

A    Correct.

Q    Was yours a two week or a three week, do you remember?

A    I believe it was a two week.

Q    All right.  And you attended that training, I would guess, the

85

two weeks immediately prior to your promotion?

A    Correct.

Q    In that training, did you receive any information or education about what constitutes arrest probable cause?

A    Yes.

Q    And did you receive training on lineups?

A    Not in that training.

Q    Okay.  And so I assume, then, they didn't really talk about the difference between live lineups and photo lineups in that manner?

A    Yes, they talked about that, but it wasn't like any direct training as far as like --

Q    Sort of general information, not sort of how to do it practical skills?

Okay.  Since you've been promoted to Detective, have you had any specific training on how to conduct live in-person eyewitness lineups?

A    When you go to -- so I've been to the detective school three times.  And there were some --

THE COURT:  I'm sorry?

THE WITNESS:  I've been to the detective school three times since I've been at DPD --

THE COURT:  Okay.

THE WITNESS:  -- Yes, ma'am.

Q    (CONTINUED BY MR. WILLIAMS):  So the first time you had to go

86

for promotion; correct?

A   The first time was when I got down to Homicide.  It was just a general, you know, go to detective school.  They teach you how to do the things at Homicide.

Q   Okay.  When did that occur?

A   That happened in '21 or '22, I believe.

Q   All right.  And then you had detective school or your promotion, which would have been '24?

A   I had detective school again midway through.  It was like '23.

Q   Okay.

A   Then '24.

Q   All right.  Since your promotion, have you gone to any trainings that were specifically about live lineups?

A   No, sir.

Q   All right.  Have you attended the mandatory three-day in-service training for all DPD officers?

A   Yes, sir.

Q   And you attended that in '24 and '26 I assume?

A   I'm currently in there now.  I just came to court today.  So it --

Q   Oh, you're in there today?

A   Yes, sir.

Q   Okay.  I apologize for taking you away from mandatory training.  In '24 or '25 at that training -- and it's normally in July; correct?

A    It just depends on when your name falls.  It's in alphabetical order for the year.

Q    Got you.  In '24 or '25, did the in-service training cover anything to do with Detroit Police Department policy regarding live eyewitness lineups?

A    I don't recall.

Q    All right.  Have you submitted any form 568s to request special training for eyewitness identifications and live lineups?

A    No, sir.

Q    All right.  Are you aware of the current Detroit Police Department policy that instructs on how to conduct live lineups?

A    Yes, sir.

Q    Rather than calling it policy 203.11, I'm just going to refer to it as "the policy" for purposes of questioning you, Det. Cooper.  Okay?

A    Yes, sir.

          THE COURT:  That's fine.

          MR. WILLIAMS:  I'm going to approach, Judge, if it's okay with you, and hand him a copy of the policy, which is Exhibit Number 4.  It would be easier to communicate with that.

Q    (CONTINUED BY MR. WILLIAMS):  I want you to take a look and read that policy over, and then let me know when you're ready

88

for questions.

(From 1:58 p.m. to 1:59 p.m., off the record.)

THE WITNESS:  I think I'm ready.

MR. WILLIAMS:  All right.  Judge, if it's all right with you, I'm going to have Mr. Kehoe play the video of the lineup at this point so that we can ask him --

THE COURT:  That's fine.

MR. WILLIAMS:  -- questions about the policy in the video.  All right?

THE COURT:  Okay.

MR. WILLIAMS:  If you don't mind, I'm going to sit down while he does that.

THE COURT:  Well, he has to plug into the podium --

MR. WILLIAMS:  Yep.

THE COURT:  -- with the HDMI cord.

MR. KEHOE:  Whenever the Court is ready, Judge, I'm plugged in.

THE COURT:  And I think to get rid of that little green arrow, you just hit the X.

MR. KEHOE:  Oh, thank you.

THE COURT:  Down -- no --

MR. KEHOE:  It's off of mine, Judge.

THE COURT:  Okay.

MR. KEHOE:  For the record, Judge, I've queued what was People's Exhibit 4 that was played at the time of the

89

preliminary examination, and I will play from the beginning.

THE COURT:  Okay.

(From 2:01 p.m. to 2:09 p.m., PX#4 video played for the record.)

MR. KEHOE:  For the record, your Honor, that played through its entirety, and I'm disconnecting.

THE COURT:  I have to take it off presentation mode.

MR. WILLIAMS:  That's the joy of technology right there, Judge.

MR. KEHOE:  I'm sorry, Judge.  Every courtroom has me do it differently.  I apologize, your Honor.

THE COURT:  That's okay.  I just have to be quicker in taking it out of presentation mode.

MR. KEHOE:  And, Judge, I wasn't blaming you, by the way.  I apologize.

MR. WILLIAMS:  I was just telling him that I don't have a medical condition with flashing red because otherwise I would have just had a problem.

Q    (CONTINUED BY MR. WILLIAMS):  Detective, you would agree that was the video from the Officer Sweppy's body cam inside the witness room of the live lineup in this case?

A    Yes, sir.

Q    All right.  So can you describe the process that you go through when you're putting a live lineup together?

A    So when we do a live lineup, I, as the Officer in Charge, I

90

work with several of my colleagues.  We go over to the Detroit
Detention Center.

I wait in the front until the show-up attorney comes
while my colleagues go to the back in building 500, get
individuals that resemble the suspect, or the person, the
focus of the investigation, and they put them in the box.

I wait outside until they say that they're ready.  I
don't know what position or what seating area they're in until
I go in with the witness.

Q   All right.  Now, you indicated your team gathers individuals
who look like the suspect?

A   Correct.

Q   Would you agree that that process is not department policy?

A   I can't say that it's not policy to get individuals that
resemble --

Q   The suspect?

A   Yes, sir that resembles the person that's the focus of the
investigation.

Q   I want you to grab your policy manual that I handed you.

A   Okay.

Q   I want you to go and flip to 4.2(7).

A   Okay.

Q   Take a look at No. 7.

A   I see it.

Q   So No. 7 indicates:

91

"Fillers should reasonably resemble age, height, weight, general appearance, same sex, and race in accordance with the witness's and/or victim's description of the offender."

Correct?

A Yes, sir.

Q At the time you conducted this lineup, you only had a physical description of the offender from one witness; correct?

A Physical description? Yes.

Q And that would have been Ms. Shakiva (phonetic) Griffin; correct?

A Yes.

Q And Ms. Griffin described the offender as being 6'1" to 6'2", dark complected, African American male, bald; correct?

A Correct.

Q Mr. Jennings is not bald; correct?

A No, but at the time he had a bald fade.

MR. WILLIAMS: Do you happen to have a copy of his booking photo in that box, Mr. Smerek? I think we do.

Q (CONTINUED BY MR. WILLIAMS): You would agree that he is not dark complected; correct?

A Yes, sir.

Q And you would agree he is not 6'1" or 6'2"?

A Yes, sir.

Q All right. You would agree that department policy requires

92

video or photographic recordation of the actual lineup; correct?

A   Yes, sir.

Q   We don't have that, do we?

A   We have the body-worn camera video.

Q   Ah.  Let me ask you this question:  Does that body-worn camera video at any time show all of the six persons that are in that lineup?

A   Unfortunately, it didn't.

Q   In fact, you can see the heads and maybe the neckline of those six persons; correct?

A   Yes, sir.

MR. WILLIAMS:  Judge, I'll note the video speaks for itself, but --

THE COURT:  Well, I think you misspoke.  We only saw three to four people.

MR. WILLIAMS:  There is a point where you can see four heads and then --

THE COURT:  Right, but you said six.  So --

MR. WILLIAMS:  No, no, you can only see four of the six.

THE COURT:  Okay.

Q   (CONTINUED BY MR. WILLIAMS):  And then at best you can see the heads and maybe a little bit of their neckline.  You would agree?

93

A    Yes, sir.

Q    All right.  So we can't see how tall they are.  You would agree?

A    Yes, sir.

Q    We can't really make out their facial features particularly well.  You would agree?

A    Correct.

Q    None of them were bald?

A    No, sir.

Q    All right.  You would agree that the department policy requires that a separate police officer must photograph the live lineup presented to each witness and that that photograph must be attached to the Lineup Identification Sheet; correct?

A    That is the policy.

Q    Okay.  And, in fact, the policy states "shall," does it not?

A    Yes, sir.

Q    All right.  And you understand that "shall" means it's not optional; correct?

A    You can -- there's -- under some circumstances, you can deviate away from it, but, yes, sir.

Q    Okay.  In this case, you knew the video recording equipment in the room was not working; correct?

A    Not until after the fact.

Q    Okay.  But there was no photograph taken; correct?

A    No, sir.

94

Q   And there was never a photograph of the lineup attached to the Lineup Identification Sheets; correct?

A   No, sir.  I obtained the photos of the mugshots of the individuals after the fact.

Q   You agree that the department policy doesn't ask you to get mugshots.  It asks you to take a photograph of the lineup at the time; correct?

A   Yes, sir.

Q   All right.  You also had two individuals in the witness room; correct?

A   Two police officers --

Q   No.

A   -- or an officer?

Q   You had Mr. Evans and Mrs. Evans in the room initially; correct?

A   Yes, sir, initially, yes.

Q   You would agree that Detroit Police Department policy requires that you only show one lineup to one witness; correct?

A   Yes, sir.

Q   That did not happen here, did it?

A   No.  At this time, the main witness refused to cooperate unless his wife came with him.  So that's why I asked the attorney and my supervisor was it okay for the young lady to go with him.

Q   Does the procedure allow for you to deviate in that manner?

95

A    Yes, sir, if it's a situation like that.

Q    Can you point in the policy where it says -- even though it says "shall" -- you're allowed to deviate when it's convenient or the witness doesn't want to cooperate?

A    No, sir.

Q    All right.  You would agree that both Ms. Evans and Mr. Evans initially indicated it wasn't any of the people in that lineup; correct?

A    Correct.

Q    I counted six different times where they said it wasn't anybody in there.  Would you agree?

A    Yes, sir.

Q    And in fact, I think Mr. Evans even asked you at one point, "Are you going to bring any other people"; right?

A    Yes, sir.

Q    Wouldn't that have been a no identification at that point?

A    Well, I can't end it unless he says he's done.  So I just let him continue to look over the suspects or the individuals inside of the box.

Q    So you didn't interpret, "Bro, it ain't none of these" to be a statement of finality?

A    No, sir.  He was still looking.

Q    Right.  If he would have stood there all day looking, you wouldn't have ended it?

A    It depends.

96

Q    Eventually, they both moved on to Number 6; right?

A    Yes, sir.

Q    Both of them indicated together that it was Number 6 --

A    Correct.

Q    -- correct?

A    Yes.

Q    Not my client?

A    Right.

Q    Then Ms. Evans is sent out of the room; right?

A    Yes, sir.

Q    And then again Mr. Evans picked Number 6; correct?

A    That's correct.

Q    And then after he stood there for a while because the session didn't end, he migrated his way over to Number 4?

A    Correct.

Q    All right.  At that point, once he selected Number 4, he didn't tell you it was over, did he?

A    No.  He selected Number 4 and turned around and began to walk towards me.  So it was over at that time.

Q    After they said it was nobody, you told both of them to take their time; right?

A    Correct.

Q    You would agree that the policy indicates no commentary to the witnesses in the witness room; correct?

A    Yes, sir, but it depends though.

97

Q   No, the procedure says you shouldn't make comments to the witness because any comment could be considered influencing the witness in their decision; right?

A   Correct.

Q   After they picked Number 6, you again told them to take their time; correct?

A   That's correct.

Q   Then when Ms. Evans went out of the room, you told him to "take your time"; right?

A   That's right.

Q   After he, Mr. Evans, picked Number 6 again, you told him to take his time?

A   Correct.

Q   But after he picked Number 4, you didn't?

A   Correct.

Q   You would agree that a person in Mr. Evans' position could have looked at your telling him to take his time to suggest that he wasn't picking the right person?

A   I can't say what he was thinking.

Q   If you were in his shoes, could you have seen how someone would take it that way?

A   I wouldn't have took it that way.  I would just have tooken it as him telling me to take my time.

Q   Okay.  All right.  Now, I want you to take a look at the policy.  You agree that the proper procedure requires a

98

double-blind administrator; correct?

A   Correct.

Q   You know what a "double-blind administrator" means?

A   It means an individual that has nothing to do with the case that doesn't know what's going on with the case.

Q   Correct.  And in the background of the video, I saw a person that I have a faint recollection of being someone I know as Police Officer Sweppy.  Am I right about that?

A   Yes, sir.

Q   All right.  Was Officer Sweppy involved in this investigation?

A   Sweppy?  I believe he was after the fact.  But I'm not sure if he was on maternity leave at the time when this happened.

Q   Well, on that day, he was walking around in the participant room, wasn't he?

A   Yes, sir.

Q   Was he aware that prior to being there that day that Mr. Jennings was a suspect in this particular case?

A   I'm not certain if he was or not.

Q   And that was his body cam that you had in there; right?

A   Yes.

Q   You were not a double-blind administrator?

A   No, sir.

Q   Why didn't you ask Officer Sweppy to administer the lineup?

A   So the double blind administrators, we just have somebody else go.  Like, say, for instance, if I was doing a photo lineup,

we would go to a separate crew on our floor to ask them to do the lineup for us.  They have no recollection about the case and don't know who the suspect is.  So it doesn't say that I can't be the one that's giving the live lineup.

Q   I'm going to have you take a look at the policy.

A   Yes, sir.

Q   Please take a look at 4.4(1)(a).

A   I see it.

Q   You would agree with me that it was required for that person administering the lineup to be double blind?

A   Yes, sir.

Q   That was not you?

A   Correct.

Q   You would agree with me that not having a live lineup administrator who was double blind is a direct violation of that policy; correct?

A   Yes, sir.

Q   The policy requires that you receive a recitation of the events that led to the witness being there that day; correct?

A   Can you rephrase your question?  I'm sorry.

Q   The policy requires that you obtain a statement of the events that the witness observed prior to conducting the lineup; correct?

A   Yes, sir.

Q   That did not happen here, did it?

A    It didn't happen on the record.  But I did speak with the witness prior to him coming down, and he gave me a synopsis of what happened.

Q    When did that happen?

A    The day before the live lineup.

Q    Right.  You would agree that in your report it fails to note your prior conversation with Mr. Evans?

A    Yes, sir.

Q    In that conversation, did he describe to you the physical description of the perpetrator?

A    Vaguely described the description of the individual, but he described the events of what happened on that day.

Q    Was his vague description consistent with what Ms. Griffin told you?

A    Yes, 6', yes, sir.

Q    Okay.  Had he gave you a description of the events on the phone?

A    Correct.

Q    Okay.  Now, the policy, however, requires that you get that at the lineup prior to administering it; correct?

A    Yes, sir.

Q    That did not happen?

A    No.

Q    In fact, you didn't get that recitation until afterwards; correct?

101

A    Correct.

Q    And the conversation you indicate you had with Mr. Evans prior to the lineup is not recorded anywhere, is it?

A    No, sir.

Q    Did you place information about that call in your Case Management Note file?

A    It's a possibility I put it in my case notes, but I didn't do a report on it.

Q    All right.  And case notes are not included in the Report Management System; correct?

A    Yes.

Q    They're a separate file?

A    Yes, sir.

Q    Okay.  Have you turned the case notes over to the prosecutor?

A    No, sir.

Q    Okay.

          MR. WILLIAMS:  Judge I'm going to want to --

Q    (CONTINUED BY MR. WILLIAMS):  You would agree with me -- and I think I may have asked it, but I'm going to clarify it because I'm rolling here, that having two witnesses in a room is a violation of the policy?

A    Yes, sir.

Q    For the very reason that we saw, they're not supposed to talk to each other; correct?

A    Correct.

102

Q   Because the witnesses may influence each other in how they make a selection; correct?

A   Correct.

Q   That separation didn't happen in this case; correct?

A   No, sir.

Q   And I appreciate the explanation you had, but it didn't happen?

A   Correct.

Q   You're not supposed to show the two witnesses the same lineup; correct?

A   Correct.

Q   It may be the same participants, but not the same lineup; correct?

A   Correct.

Q   That didn't happen here either, did it?

A   No, sir.

Q   Same participants, same positions, two separate witnesses?

A   Yes, sir.

Q   All right.  You would agree that the policy indicates you are not supposed to make commentary to the witnesses in the witness room?

A   Yes, sir.

Q   In this particular case, you did; correct?

A   Yes, sir.

Q   All right.

103

MR. WILLIAMS: One moment, Judge. I'm going to approach with the Lineup Identification forms, which have been admitted as Exhibit 7 for purposes of today's hearing. May I approach, Judge?

THE COURT: You may.

Q   (CONTINUED BY MR. WILLIAMS): Det. Cooper, I'm going to hand you first two sheets, which are for Cedric Evans; and second, two sheets which are for Wanda Evans.

A   Okay.

Q   You agree with me the policy of the Detroit Police Department requires that demographic information for the participants in the lineup is supposed to be recorded?

A   Yes.

Q   It's supposed to have their name, their height, their weight, their race, and their age; correct?

A   Correct.

Q   That is not on the form?

A   So it doesn't have the -- it has the age, the height, and weight, no, sir, it doesn't have that on there.

Q   Correct, so it's not on the form; right?

A   Correct.

Q   Okay. And you've already indicated that there is not a photograph of the lineup attached to the form as the policy requires; correct?

A   Yes, sir.

104

Q    All right.  On those two forms, did either Mr. Evans or Mrs. Evans write down their level of confidence as it relates to their identification?

A    No.

Q    You would agree that the Detroit policy requires that they note the level of confidence in their selection?

A    So we do have a form for that.  And that's not one of the forms that we fill out all the time unless it's a live -- I mean, a photo lineup.

Q    I'm going have you take a look at 4.2(18).

MR. WILLIAMS:  Judge, I suppose I should state for the record, 4.2 of the policy of 203.11 is titled "Basic Procedures For Conducting a Live Lineup Or Photo Array".  And subsection 4.4 is entitled "Live Lineups".

Q    (CONTINUED BY MR. WILLIAMS):  4.2(18), do you see that there?

A    I do.

Q    Does it not indicate that:

"The administrator shall ask the witness or victim
   to complete and sign a Live Lineup Or Photo Array form,
   and as part of the form, the witness and/or victim shall
   record their degree of confidence in the identification"?

A    Yes, sir, it says that.

Q    That did not happen here; correct?

A    No, sir.

Q    All right.  I want you to take a look at the first page of the

105

policy after the documentary letter with the approval stamp from the board.  And I want you to look at the section that says "Purpose".

A   Okay.

Q   I want you to read for the Court what the purpose of this policy is?

A          "The purpose of this directive is to establish guidelines for eyewitnesses procedures involving show-ups, photo arrays, and live lineups.

Erroneous eyewitness identifications have been cited as the factor most frequently associated with wrongful convictions.

Therefore, in addition to eyewitness identification, all appropriate investigative steps and methods should be employed to uncover evidence that either supports or eliminates a suspect identification."

Q   All right.  You would agree that that is a high and just purpose for having the policy, wouldn't you?

A   Absolutely.

Q   The policy also requires -- I want you to look at 4.4(5)(a) and B.

"The policy requires that an independent" -- meaning outside of the investigation -- "officer must photograph the lineup."

Correct?

A    Yes, sir, the policy states that.

Q    And that's not there; correct?

A    Correct.

Q    The policy also requires the use of DPD 355.  I assume that is referencing a specific form in the department; correct?

A    Correct.

Q    That form was not used --

A    No.

Q    -- correct?

A    No, sir.

Q    Because there was no person taking the photograph, they could not be listed in the "Others Present" section as directed by the policy; correct?

A    Correct.

Q    We have no video inside the lineup room that shows the participants; right?

A    No, it doesn't show all the participants, no.

Q    I don't have a photograph of the lineup; correct?

A    Yes, sir.

Q    I don't have a demographic description of any of the lineup participants; correct?

A    There should be a demographic description in the photographs that I sent to APA Hitz.

Q    That wasn't my question.  My question was, I don't have demographics listed on the lineup form from which I can make

107

an assessment, do I?

A   Correct.

Q   And you would agree that the photographs that you forwarded were not of the lineup itself; correct?

A   Yes, sir.

Q   They were a prophylactic array that you put together of booking photos; correct?

A   I didn't put them together.  The people at the Detroit Detention Center put them together and sent them, yes.

Q   All right.  You would agree it would be awfully hard for somebody to challenge a live lineup on whether or not it was impermissibly suggestive if we have no video, no photograph, and no description of the participants; correct?

A   Well, that's why we have the attorney there to make sure that the whole thing is non-biased.

Q   And now we're going to get to that, so I appreciate you mentioning it.

A   Yes, sir.

Q   I turned Mr. Jennings in to the police department on October 29th, didn't I?

A   Correct.

Q   My information was provided to the police department; correct?

A   That's correct.

Q   At that time, Mr. Jennings was in custody; correct?

A   Yes.

108

Q    Unquestionably could not leave if he wanted to; correct?

A    Correct.

Q    Was the primary focus of your investigation; correct?

A    Yes, sir.

Q    And I specifically indicated I was retained to represent him on this matter, did I not?

A    You did.

Q    And yet despite looking back on my call log, and my text messages, and searching my e-mails, I received zero communications from the Detroit Police Department letting me know that my client was going to be forced to stand in a corporeal live lineup.  You would agree?

A    Correct.

Q    You didn't think that maybe it was important to let his actual attorney know the lineup was going to occur?

A    Well, I did follow policy this time, and I did call the show-up attorney.  And they came to make sure the lineup was good.

Q    But you knew I was retained?

A    I did.

Q    And you knew he had an attorney?

A    Yes, sir.

Q    And the policy actually requires you to attempt to schedule the lineup with counsel and the witnesses, does it not?

A    Yes, I did call in the attorney that we have on standby for

109

that.

Q   So you thought it was just fine to intentionally bypass his counsel of choice to use the stationhouse attorney?

A   It wasn't intentional.  It's just I was following what I was trained to do.

Q   Who trained you to do that?

A   One of the supervisors when I first got to Homicide.

Q   Okay.  And when you first got to Homicide, that policy wasn't in place, was it?

A   I'm not sure.

Q   All right.  And again, even assuming the show-up attorney were there, how many show-ups do you think Mr. Dimaggio has participated in in his career?

A   Probably a lot.

Q   Huh.  Without a video, without a photograph, and without documentation, how do you expect Mr. Dimaggio to even remember this lineup?

A   I can't say what he remembers or not.

Q   Are you aware of how that policy came to be put into place?

A   No, I'm not.

        MR. WILLIAMS:  Judge, I'm going to approach the witness with these two documents.

        THE COURT:  Exhibits what and what?

        MR. WILLIAMS:  It's -- this is Paul -- these are parts of Exhibit 4 and 5.

110

THE COURT:  Okay.

Q   (CONTINUED BY MR. WILLIAMS):  The first document I handed you is a Settlement Agreement in the case called *Williams versus City of Detroit* from the Eastern District of Michigan.

The second document I handed you is a training protocol with regards to mandatory implementation of the very policy that we're talking about.

The important document is really the second one, so I would like you to focus your time and attention on the Training Procedures.  Let me know when you're ready.

A   I think I'm ready.

Q   All right.  If you hadn't seen the video and I just handed you that form with those six names on it, with the exclusion of Mr. Jennings, who has the unfortunate pleasure of sitting here today --

A   Mm-hmm.

Q   -- from independent recollection, could you have told me what any of those other people looked like?

A   No, sir.

Q   That training procedure required that every sworn officer in the City of Detroit receive training on the eyewitness lineup policy that we're discussing today, didn't it?

A   Yes.

Q   I know you indicated before, but I want to clarify -- you cannot recall if you received that training; correct?

111

A   It wasn't extensive training if we did receive training.  It was just a brief overview of the policy.

Q   All right.  You understand that that policy being implemented as a result of the Settlement Agreement in federal court is the equivalent of an order?

A   Yes, sir.

Q   And all of the people that are part of Detroit were trained on that because they are obligated to follow the order.  You understand that?

A   Yes.

Q   You would agree with me that there were at least ten points of the procedure and policy that happened in this lineup that were violated?

A   Now that I see, yes.

Q   All right.  So you would agree that that constituted a violation of the court's order?

A   Yes.

Q   Going back, if you had to do this lineup all over again, you wouldn't do it that way, would you?

A   No, I wouldn't.

Q   Looking at it in hindsight, would you agree with me that there might be some constitutional issues with this lineup?

            MR. KEHOE:  Objection, that's a legal conclusion.

            THE COURT:  Sustained.

            MR. WILLIAMS:  Thanks, Judge.

112

Q   (CONTINUED BY MR. WILLIAMS):   Would you agree that you probably wouldn't engage in the procedure that you engaged in?

A   I would have did it a little different, yes, sir.

Q   And you would agree that trying to argue about whether a lineup is constitutional or unconstitutional, or suggestive, or impermissible is impossible when we don't have evidence to look at?  You would agree with me?

A   Yes.

Q   And you would agree that with no photos, and no video, and no written documentation, I've really got no means by which to actually engage in an in-depth conversation with you about that; right?

A   Correct.

MR. WILLIAMS:  I'll leave it at that, Judge.  Thank you.

THE COURT:  Cross?

MR. KEHOE:  Briefly, Judge, if I may?

CROSS-EXAMINATION

BY MR. KEHOE:

Q   Hi, Det. Cooper.

A   Hello, sir.

Q   So a couple things:  First, in terms of the live lineup, why were the participants seated?  Is that normal?

A   That is normal.

Q   Okay.  And when did you come to learn that the cameras in the

113

room were not functional?

A   After the fact, when I asked one of the officers can I get a recording of it, and they said that it wasn't working.

Q   Is it -- well, in that case, why did you guys carry -- not you -- I should say specifically why did you guys carry in a body cam at that point?

A   So we always carry a body cam just to have backup just in case the cameras aren't working.

Q   And I think there's some confusion about DPD 355.  That was the form Mr. Williams was asking about --

A   Correct.

Q   -- Det. Cooper?

A   Yes.

Q   Can you go to the second page of Exhibit 7 for the two witnesses.  Isn't that DPD form 355?

A   That's correct.

Q   Okay.  I just wanted to make sure that -- so that's the right form, but we're still missing the information.  Is that fair?

A   Correct.

Q   Okay.  And then in terms of the conversation you had with Mr. Evans, I believe you indicated that was the day before; is that correct?

A   That's correct.

Q   Was that over the phone or in person?

A   It was over the phone.

114

Q   Is there any particular reason why you did not document that conversation in any way besides case notes?

A   No, sir.

Q   Okay.  And then lastly, you've been asked a few questions about the physical description of the suspect at the time.  Do you recall that?

A   Yes.

Q   Wasn't there also a witness by the name of Deserae Neal that provided a physical description?

A   Yes.

Q   Did you know this at the time of the preparation of the live lineup?

A   I don't recall.

Q   Okay.

THE COURT:  You don't recall?

THE WITNESS:  No, I don't recall.

Q   (CONTINUED BY MR. KEHOE):  In terms of -- I will ask it this way just to make sure though -- in terms of the individuals that you spoke -- well, first did you go to the scene on the day this happened?

A   I did, yes, sir.

Q   Okay.  Did you talk to all the witnesses at the scene that day, sir?

A   I did.

Q   Okay.  So you don't recall if you talked to Ms. Neal though?

115

A    No, I do remember a Neal staying next door to where the incident occurred.

Q    And did you talk to her?

A    I did.

Q    Okay.  Do you recall what her -- well, first, did she describe the person in any way?

A    She did describe the person.

Q    Do you recall what she said about them?

A    I don't recall exactly what she stated.

Q    Okay.  If I showed you a Witness Statement form, would that potentially help refresh your memory?

A    Yes, sir.

MR. KEHOE:  Sorry, your Honor.  I have to move something around so I can disconnect.

MR. WILLIAMS:  For the record, I had a chance to review the Statement he's proposing to show the witness.

THE COURT:  All right.

MR. KEHOE:  For the record, your Honor, I'm approaching with that same Witness Statement.  It's a two-page document.

THE COURT:  And the name of the witness again?

MR. KEHOE:  Desarae Neal, your Honor.  That's D-e-s-a-r-a-e, last name N-e-a-l.

Q    (CONTINUED BY MR. KEHOE):  Det. Cooper, I just want you first to look just both at those two pages of the document.

116

A    Yes, sir.

Q    And do you know who -- well, had you seen this document before?

A    I have.

Q    Okay.  Do you know who filled out this document?

A    I did.

Q    Okay.  In terms of now what we were talking about, I'm going to draw your attention to the second page.  And please read that silently to yourself.

A    Okay.

Q    Does that refresh your memory as to the description given by Ms. Neal in this case?

A    Yes, sir.

Q    Okay.  And what was that description by Ms. Neal?

A    Black male, low haircut, brown skin, light shorts or pants.

Q    Okay.  Apart from Ms. Neal and Ms. Griffin, did you have any other descriptions that you knew about at the time of the live lineup?

A    There was -- I'm trying to think.

        MR. KEHOE:  And I will actually collect the laptop.  That would be improper.

        THE COURT:  I'm sorry, could you repeat that description again?

        THE WITNESS:  Yes.  I'm not sure -- oh, I'm sorry, it was a black male, short haircut, light complected, light

117

shorts or pants.

Q    (CONTINUED BY MR. KEHOE):  And then just to make sure, we're back to the question I asked you, Det. Cooper, just so there's no confusion, apart from the description given by Ms. Neal and the description given by Ms. Griffin, did you have any other descriptions that you knew about at the time of the live lineup?

A    I don't think so.

Q    Okay.  And I should say also as the conversation with Mr. Evans?

A    Right, yes.

MR. KEHOE:  Thank you, Det. Cooper.

Judge, I have no further questions at this time.

THE COURT:  Redirect?

MR. WILLIAMS:  Yes, very briefly.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q    Det. Cooper, you would agree that Ms. Neal's description lacked height and weight; correct?

A    Yes, sir.

Q    And her description is inconsistent with Ms. Griffin's description; correct?

A    Yes, sir.

Q    And inconsistent with Mr. Evans' description; correct?

A    Yes, sir.

118

Q   All right.  Did you document any of this lineup and the issues as far as identification in your Investigator's Report that was submitted?

A   No, I didn't.

Q   Did you have a conversation with Lt. Brown about the happenings of this lineup?

A   No.

Q   Do you know if Lt. Brown ever watched the video?

A   I do not.

Q   He signed the Warrant Request; correct?

A   Correct.

Q   Did you submit the Warrant Request to the prosecutor?

A   I did.

Q   Did they call you?

A   I'm sure I talked to them over the phone.

Q   Did anybody ask you questions about the lineup video?

A   No, sir.

Q   Very good.

        MR. WILLIAMS:  Nothing else right now, Judge.  Thank you.

        THE COURT:  Anything further, Mr. Kehoe?

        MR. KEHOE:  I don't believe so, Judge.  Thank you.

        THE COURT:  You may step down, Officer.

        MR. KEHOE:  May he be excused, Judge?

        THE COURT:  Yes.

119



**DODSON
FOWLER
WILLIAMS
& NESI, PLC**

*Main Office*

18050 Mack Ave.
Grosse Pointe Farms,
MI, 48230

(313) 458-8276
(313) 469-7085 (Fax)

*Village Office*

722 Notre Dame
Grosse Pointe, MI
48230

(313) 886-5769
(313) 886-5851 (Fax)

dfwnplc.com

**Attorneys**

Nathan A. Dodson, Esq.
Aimee M. Fowler, Esq.
Daniel J. Williams, Esq.
Christopher J. Nesi, Esq.

# EXHIBIT 12



| | | Case Number:<br>26-000925-01-FC |
|---|---|---|
| | **Order Denying/Granting Motion** | |

ORI MI - 821095J    Court Address    5301 Russell Street, Suite 700 Detroit, MI 48211    Courtroom 704    Court Telephone No. 313-224-8220

## THE PEOPLE OF THE STATE OF MICHIGAN

**vs.**

**Carlos Kijuan Jennings**
**Defendant**

At a session of said court held
at   Third Circuit Court (CJC)
Michigan, on the   22nd   day of
April         ,   20   26         .

**PRESENT:**   Honorable Margaret M.
Van Houten

A Motion for:   Defense Suppression of Cedric Evans' Identification of Defendant in the live line up.

                                                                                having been filed; and

the People having filed and answer in opposition; and the Court having reviewed the briefs and

records in the cause and being fully advised in the premises;

IT IS ORDERED THAT the Motion for   Same as above for the reasons stated on the record

                                                                                be and

is hereby   ☐   denied   ☒   granted.

Honorable Margaret M. Van Houten

3CC-CR-1014CM (8/26/2024)                                                       Page **1** of **1**

Yahmi Nundley    4/22/2026 2:52 PM    WAYNE COUNTY CLERK    Cathy M. Garrett    FILED IN MY OFFICE    26-000925-01-FC





**DODSON
FOWLER
WILLIAMS
& NESI, PLC**

*Main Office*

18050 Mack Ave.
Grosse Pointe Farms,
MI, 48230

(313) 458-8276
(313) 469-7085 (Fax)

*Village Office*

722 Notre Dame
Grosse Pointe, MI
48230

(313) 886-5769
(313) 886-5851 (Fax)

dfwnplc.com

***Attorneys***

Nathan A. Dodson, Esq.
Aimee M. Fowler, Esq.
Daniel J. Williams, Esq.
Christopher J. Nesi, Esq.

# EXHIBIT 13

| STATE OF MICHIGAN THIRD JUDICIAL CIRCUIT WAYNE COUNTY | ORDER OF ACQUITTAL/DISMISSAL OR REMAND | CASE NO. 26-000925-01-FC |
|---|---|---|

ORI MI-

Court Address    5301 Russell Street, Suite 700 Detroit, MI 48211 Courtroom  704      Court telephone no.    313-224-8220

Police Report No.

☒ The State of Michigan

THE PEOPLE OF    ☐ _____

v

**Defendant/Juvenile name, address, and telephone no.**
Carlos Kijuan Jennings
14240 Brandywine Road  Sterling Heights, MI  48312

| CTN/TCN 25726660-01 | SID | DOB 11/02/88 |
|---|---|---|

☐  Juvenile    In the matter of  _____

| Count | CRIME | CHARGE CODE(S) MCL citation/PACC Code |
|---|---|---|
| 1 | Homicide- Murder First Degree - Premeditated | 750.316-A |
| 2 | Weapons- Firearms - Possession by Prohibited Person | 750.224F-A |
| 3 | Weapons Felony Firearm | 750.227B-A |
| 4 | Weapons Felony Firearm | 750.227B-A |

**IT IS ORDERED:**

☐ 1. The case is dismissed on the motion of the court    ☐ with    ☐ without    prejudice.

☒ 2. Defendant's/Juvenile/s motion for dismissal is granted    ☐ with  ☒ without    prejudice and the case is dismissed.

☐ 3. Defendant/Juvenile's motion for dismissal is granted in part    ☐ with  ☐ without    prejudice and the following charge(s)

Is/are dismissed:  _____

_____

☐ 4. Defendant/Juvenile is acquitted on all charge(s) in this case after trial by    ☐ judge.    ☐ jury

☐ 5. Defendant/Juvenile is acquitted after trial by    ☐ judge    ☐ jury    only on the following charge(s):

_____

☒ 6. Defendant/Juvenile shall be immediately discharged from confinement in this case.

☒ 7. Bond is canceled and shall be returned after costs are deducted.

☐ 8. Bond/Bail is continued on the remaining charge(s)

☐ 9. The case is remanded  _____  District court for further proceedings for the following reasons:

☒ 10. The Michigan State Police and arresting agency shall destroy the arrest record, biometric data, and , as applicable Profile for the dismissed charge(s).  The Michigan State Police shall also remove any LEIN entry concerning any Dismissed charge(s).

05/26/2026
Date

Judge Honorable Margaret M. Van Houten     51899  Bar no.

If item 10 is checked, the clerk of the court shall provide a copy of this order to the Michigan State Police upon entry.

MC 262    (6/19)    **ORDER OF ACQUITTAL/DISMISSAL OR REMAND**    MCL 28.243, MCL 769.16a, MCL 764.26a, MCR 6.110(F), (H), MCR 6.419, MCR 7.109(H)(2)

26-000925-01-FC FILED IN MY OFFICE    Cathy M. Garrett    WAYNE COUNTY CLERK    5/26/2026 1:43 PM    Yahmi Nundley